| | AUSA: Sara D. Woodward | Telephone: (313) 226-9180 |
|---|---|---|
| AO 106 (Rev. 04/10) Application for a Search Warrant | Special Agent: Robert K. Galbreath | Telephone: (313) 348-0828 |

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

Case: 2:18-mc-50884
Assigned To : Murphy, Stephen J., III
Assign. Date : 6/7/2018
Description: Search/Seizure Warrant (SO)

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 43348 Donley Dr., Sterling Heights, Michigan | ) ) ) |

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized):*
See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2423(c), 1589, 2261A | sex tourism, forced labor, stalking |
| 18 U.S.C. 2251, 2252A(a)(2), (a)(5)(B) | Receipt, possession of child pornography |

The application is based on these facts:
See attached AFFIDAVIT.

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Robert K. Galbreath, HSI
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: _____ June 7, 2018 _____

*Judge's signature*

City and state: Detroit, Michigan

Anthony P. Patti,      U. S. Magistrate Judge
*Printed name and title*

00000019

**AFFIDAVIT**

I, Robert K. Galbreath, being first duly sworn, state as follows:

1.     I am an Agent with the United States Department of Homeland Security (DHS), Customs and Border Protection (CBP), Office of Border Patrol (USBP), assigned to the Homeland Security Investigations (HSI), Michigan Human Trafficking and Transnational Crimes Task Force (MT3) in Detroit, Michigan.  I have been employed with the USBP since November, 2009.  I have successfully completed the Border Patrol Agent Training Program at the Federal Law Enforcement Training Center in Artesia, New Mexico.  In addition, I have received a Bachelor's Degree in Criminal Justice from Grand Valley State University in Allendale, Michigan. During the course of my career, I have received training in the methods used by alien smugglers, drug traffickers, and human traffickers. I have participated in numerous arrests for various violations of law; as well as seizures of narcotics and other contraband; and seizures of computer equipment, and business and financial records. Along with other agents, I am responsible for enforcing federal criminal statues involving the trafficking of individuals.

2.     This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits and evidence of violations of 18 U.S.C. § 2252A(a)(2), (a)(5)(B) (receipt and possession of child pornography); 18 U.S.C. § 2423(c) (sex tourism, including production of child pornography); 18 U.S.C. §

00000020

1589(a) and (b) (forced labor); 18 U.S.C. § 2261A (stalking) ("Target Offenses").
The items to be seized are more specifically described in Attachment B.

3.      I make this affidavit in support of an application for a search warrant to search a residence, along with the computers and electronic media located therein, associated with Craig David EVANS at **43348 Donley Dr., Sterling Heights, Michigan** (hereafter referred to as the Subject Premises). The Subject Premises is more particularly described in Attachment A.

4.      Your affiant requests that the search warrant authorize the search of the Subject Premise, along with any adjacent structures (such as tool sheds, unattached garages, storage areas, etc.) located at or near the residence which fall under the dominion and control of the person or persons associated with said residence.

5.      Your affiant requests that the search warrant authorize the search of vehicles located at or near the Subject Premises which fall under the dominion and control of the person(s) associated with locations to be searched. The search of these vehicles is to include all internal and external compartments and all containers that may be associated with the storage of child pornographic materials or their instrumentalities contained within the aforementioned vehicles and adjacent structures.

6.      This affidavit is based on my personal knowledge, experience, and training, as well as on information obtained by me through investigative observations and conversations with other HSI agents and agents from other law enforcement

00000021

agencies. This affidavit does not set forth every fact resulting from this investigation; rather, it contains a summary of the investigation to date for the limited purpose of establishing probable cause to obtain a search warrant.

## PROBABLE CAUSE

7.    On January 13, 2018, Sterling Heights Police responded to a domestic violence call at 43348 Donley Drive, Sterling Heights, Michigan (Subject Premises). Officers encountered a 19 year-old woman (Victim One, or V1) who reported that her husband, CRAIG DAVID EVANS (DOB: 10/17/1962), had physically assaulted her. V1 told officers that she had been laying in her bedroom because she was sick, and EVANS walked into the bedroom masturbating. V1 said that EVANS asked her: "you wanna be willing, or do you wanna be raped?" V1 further stated that EVANS "always" says this to her. V1 told officers that she took video of the incident on her cell phone, and that during the altercation, EVANS was wrestling with her on the bed to get the phone away from her. V1 reported that EVANS grabbed both of her wrists to restrain her on the bed. V1 said that she kicked EVANS to get him away from her, and that she called 911. V1 also provided a written statement:

> He standing in my front and he always saying that "You wanna be willing or
> do you wanna be raped" and I told him to stop and he didn't stop and I told
> him that I video him and after that he grab me because he wants to take my
> cell phone and he grab me down.

00000022

8.     As a result of the incident described above, EVANS was charged with domestic violence. The charge is pending in Macomb County.

9.     On May 2, 2018, EVANS contacted the United States Citizen and Immigration Services (USCIS). EVANS spoke with Immigration Officer (IO) Adam Bailey. EVANS provided IO BAILEY with his address, and said that he resided at 43348 Donley Drive, Sterling Heights, Michigan (Subject Premises). EVANS told IO Bailey that he wanted to have V1 deported. EVANS said that he was recently in rehab and when he returned, V1 told him that V1 did not want to live with him any longer. EVANS stated that he was arrested for domestic violence against V1, but that he did not do anything wrong. EVANS told IO Bailey that V1 could not have a video of the assault and beating because V1 does not have a phone. When IO Bailey told EVANS if no assault took place, then why would it matter if V1 does not have a phone, EVANS began to stutter and said he had misspoke.

10.     IO Bailey said that EVANS told him that he was not a "predator" and that V1 decided to dress up with Hello Kitty products on her own. Also, EVANS said that V1 can say what she wants, but V1's room being decorated with only Hello Kitty items was due to his daughter previously occupying the room. IO Bailey tried to get more information, but it seemed difficult for EVANS to keep a straight train of thought. EVANS told IO Bailey that he had plenty of pictures and videos to provide that V1 was willing and that he was not a predator. IO Bailey said that EVANS told

4

him that V1 was eighteen years old at the time they married so "nobody can say anything."

11.     IO Bailey said that EVANS told him that he and V1 met online. EVANS said that he found out later that he was speaking to V1's mother who was pretending to be V1. EVANS told IO Bailey that he flew to the Philippines when V1 was 17 years old and threw V1 a "welcome to adulthood party" to signify that V1 would be an adult soon. EVANS said that he then had a "biblical" marriage with V1.

12.     On May 30, 2018, HSI MT3 Special Agent (SA) Jeremy Forys, Task Force Officer (TFO) Saturnino Dioso, and your affiant spoke with V1. V1 stated that when she was 17 and living at home in the Philippines, her mother created a profile online for V1 without V1's knowledge. One day, V1 said that V1's mother told her that V1 was going to marry EVANS. When V1 told her mother that she did not want to be married, V1's mother said that V1 didn't have a choice and wouldn't let V1 see V1's siblings or finish school if V1 didn't comply. Even though V1 complied with her mother's demands, V1 was pulled out of school and V1's friends did not know what happened to V1. Also, V1 said that EVANS knew that V1's mother had arraigned their meeting.

13.     V1 said that she first met EVANS at an airport in the Philippines. V1, who was 17 years old at the time, was accompanied by her mother. V1 said that her mother dressed V1 up as a nun (describing a traditional wedding outfit in the

00000024

Philippines). V1 said V1 was confused why she was being dressed like this, as V1 said that she had never had a boyfriend. V1 said that as soon as she met EVANS, EVANS forcefully kissed her on the lips against her will. After meeting at the airport, V1, V1's mother, and EVANS went to a hotel. While at the hotel, V1 said that EVANS began to forcefully kiss V1 again and touched V1's private parts (breasts). V1 said that she began crying to her mother saying that she did not want it and that she felt gross, but V1's mother said that V1 didn't have a choice. V1 said that EVANS set up a video camera and recorded/took pictures of V1 naked. V1 said that EVANS continued to touch V1's private parts while V1 and EVANS stayed in one bed, and V1's mother stayed in an adjacent bed in the same room.

14.    Then next day, V1 said that while EVANS was at the airport waiting to depart, EVANS began acting erratically because he was drunk. V1 said that EVANS again forcefully kissed V1. V1 said that V1 became very shy because everyone was looking at them, so V1 ran into the restroom to get away from EVANS.

15.    V1 said that the next time EVANS came to the Philippines, V1 had recently turned 18 years of age. V1 said that EVANS and V1's mother planned to get V1 drunk in Manila, Philippines, without V1's knowledge. V1 said that she had never drank alcohol before and that she didn't like it. V1 said that once she was drunk, V1's mother told V1 that she was going to give V1 and EVANS two hours alone, and that V1 would not be able to leave until V1 had sex with EVANS. Once V1's

mother left, V1 said that EVANS wanted to have sex with V1. Even though V1 said V1 did not want to have sex, V1 said that EVANS said it was okay because they were married. V1 said that though EVANS didn't have sex with V1, EVANS had V1 "jerk" his privates. V1 said that she complied because she felt she didn't have a choice, so she closed her eyes and let it happen.

16.    V1 further reported that she came to the United States on February 25, 2017 and lived with EVANS at 43348 Donley Drive, Sterling Heights, Michigan (Subject Premises) along with his adult daughter and minor son, age 12. While staying at the house, V1 said that she was expected to dress EVANS, by laying out his clothes and putting his socks on him. V1 said when V1 didn't comply, EVANS would yell saying you have to do it and would call V1 lazy.

17.    V1 said while EVANS' adult daughter was staying at the house, EVANS was not abusive. V1 said that EVANS became abusive and began drinking when his daughter left in about June or July 2017. Also, V1 said that EVANS began watching videos of young girls, about five to eight years old, dancing, wearing bikinis, and sometimes naked, on a silver laptop which V1 believe to be a Hewlett Packard. V1 said that she saw EVANS multiple times masturbating to the videos. V1 said that once, V1 saw EVANS watching a video of a naked girl (which V1 believed to be about seven years old). V1 said EVANS told V1 that he found the video on YouTube. When V1 asked EVANS if she could search for the video on YouTube

7

00000026

now, EVANS said V1 could not do it. Also, V1 said that V1's mother had sent a video to EVANS of V1's younger sister (who was a minor) in nothing but a long shirt dancing. V1 said that she saw EVANS masturbating to the video. Additionally, V1 said that EVANS wanted to have V1 and his 12 year-old son have sex while he recorded it. Furthermore, V1 said that she recorded the conversation on her phone.

18.   V1 stated that EVANS would constantly try to record and photograph V1 naked. V1 said that even though V1 would lock the door while showering, EVANS would get into the bathroom and photograph and record V1. V1 said that EVANS had told V1 to find a friend so that V1 could have sex with her while EVANS would record. V1 said that EVANS told her he wanted to tie V1 down to the bed, and that he got angry when V1 refused. Also, V1 said that EVANS wanted V1 to dress up in a bikini and dance, but V1 said that she refused.

19.   V1 further stated that at some time while she was in the Philippines before she came to the United States (when she was seventeen or eighteen years old), EVANS took pictures/videos of the front of V1 naked. While V1 knows that the pictures/videos show the top half of V1 naked, V1 was unsure if it showed V1's lower private area. V1 said that she agreed to the pictures/videos because she was scared. V1 said that EVANS threatened to post the pictures/videos online if V1 didn't comply with his demands when she was in the United States.

00000027

20.    On or about September or October 2017, V1 said that EVANS got angry that V1 was going to work for one of EVANS' friends. V1 said that EVANS put V1 in his car and started to drive. V1 said she began to get worried when she noticed that her cellular phone did not work. When V1 asked where they were going, EVANS said that he was taking V1 to Chicago to sell V1. V1 said that EVANS told V1 that when they arrived, V1 would be gang raped by multiple individuals. V1 said that V1 tried to get EVANS to stop the car, but he would not. V1 said that she told EVANS that she was hungry so he would stop. When they stopped, V1 was able to get a Wi-Fi signal that she used to contact her mother and EVANS' friend. V1 said that V1's mother called EVANS and told him she was going to call the police. V1 said that EVANS then took V1 back home.

21.    During the interview of V1, HSI Special Agent Jeremy Forys extracted data from two cellular telephones that belong to V1.  A later examination of the data identified a video that depicted EVANS walking into a bedroom masturbating.  V1 was holding the phone and positioned on a bed screaming over and over for EVANS to stop. V1 appeared to be terrified, and EVANS made statements such as "I'm gonna cum on you," "Take care of me" and "You'll get used to it." Another short video appeared to be taken from V1's perspective while V1 was locked in a small room.  In the video, EVANS appears to be screaming at V1 to unlock the door. EVANS finally is able to gain entry into the room and the video ended. The date

both videos were created appears to be January 13, 2018 based on the file naming convention (20180113_190630 and 20180113_191012, respectively).

22.    V1 also explained that she is not currently living with EVANS at the Subject Premises, and that she is staying with a friend until she finds a more permanent solution. V1 said she has not had contact with EVANS since January 2018, although EVANS has tried several methods of contacting her, but she has not responded.

23.    Your affiant has reviewed V1's status in the United States. Currently, she has permanent resident status CF1. CF1 is a conditional status of an alien that arrived as a fiancé of a United States citizen. V1's immigration documents also confirm that she arrived into the United States via Detroit Metropolitan Airport at 3:19 pm. on February 25, 2017. EVANS is listed as the petitioner on her fiancé petition. The address on her petition is 43348 Donley Drive, Sterling Heights, Michigan (Subject Premises). When V1 initially arrived in the United States, she entered the country with a non-immigration K-1 status, which is commonly known as the fiancé visa. After V1 married EVANS, she adjusted her status to the current CF1. On the application to adjust her status, the residence listed is the Subject Premises.

24.    On June 3 and June 5, 2018, HSI agents/officers conducted surveillance at the Subject Premises, and observed a blue Ford Focus registered to EVANS at the target address. In addition, EVANS lists the Subject Premises as his residence with the Michigan Secretary of State.

00000029

25.     Your affiant has checked a CBP database and identified the following international travel for EVANS: On 9/2/2016, EVANS departed Detroit Metropolitan Airport with an ultimate destination of Manila, Philippines. On September 12, 2016, EVANS returned to DTW. During this trip, V1 would have been 17 and 18 years old.

26.     Based on the facts of the investigation detailed above in this Affidavit, coupled with my training and experience as a Border Patrol Agent and as a HSI Task Force Agent, I assert there is probable cause to believe that evidence, fruits, and instrumentalities of 18 U.S.C. § 2252A(a)(2), (a)(5)(B) (receipt and possession of child pornography); 18 U.S.C. § 2423(c) (sex tourism, including production of child pornography); 18 U.S.C. § 1589(a) and (b) (forced labor); 18 U.S.C. § 2261A (stalking) ("Target Offenses") will be found at the Subject Premises.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

27.     A computer's ability to store images in digital form makes a computer an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.

00000030

28.    The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

29.    Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, iCloud, and Hotmail, and social media applications such as Kik and Snapchat among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

30.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic

00000031

communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

31.   Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

> a.  Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of

data stored, and it would be generally difficult to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

32. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software

00000033

(operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

33.     In addition, there is probable cause to believe that the computer and its storage devices are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

34.     The Affiant knows from the training and experience of other law enforcement officers with whom I have had discussions, that even if the files were deleted by a user, they still may be recoverable by a trained computer forensic examiner. Specifically, when a user deletes a file, it goes into a "trash" folder. When the user directs the computer to "empty" the trash folder the contents of the folder, including the deleted file, disappear. However, the file has not left the computer and under normal circumstances, is recoverable by computer experts until it's overwritten because there is no longer unused space in the computer's hard drive. How soon a file will be overwritten depends on a number of factors: whether the user is computer savvy and has installed a program that accelerates the normal overwriting of deleted data, how often new files are saved to his hard drive, the capacity of the hard drive, and how the computer's file system allocates new files. Trained certified computer

forensic examiners routinely extract incriminating deleted files from hard drives, usually without difficulty.[1]

35.     Since a deleted file is not overwritten all at once, it may be possible to reconstruct it from the bits of data composing it (called "slack data"), which are still retrievable because they have not yet been overwritten even if overwriting has begun.   Before a file is deleted, the file system marks it as unavailable to be overwritten.   Once it is deleted, its data are no longer protected against being overwritten, but the file system won't necessarily overwrite it all at once, and if it's only partially overwritten computer experts can recover the portion of the data that has not been overwritten, or at least can match it to images they obtained from, for example, a website, to verify that the images were once in the computer's hard drive and thus had been possessed.[2]   Although a savvy computer user can direct his computer to ensure quick (even instantaneous) overwriting, the default settings on standard operating systems do not do this.[3]

36.     It is difficult to know, prior to the search, which exact method of extracting the evidence will be needed and used and which specific expert possesses sufficient specialized skills to best obtain the evidence and subsequently analyze it. No matter

[1]*United States v. Seiver*, 692 F.3d 774, 776-77 (7th Cir. 2012).

[2]See Michele C.S. Lange & Kristin M. Nimsger, *Electronic Evidence and Discovery: What Every Lawyer Should Know Now* 235 (2d ed. 2009).

[3]*Seiver*, 692 F.3d 776-77.

00000035

which method is used, the data analysis protocols that will be utilized are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Upon approval and execution of the search warrant, in appropriate circumstances, a forensic image (also known as a bit-stream image), which is an exact physical copy of the seized electronic evidence, will be created so that their contents could be examined at a field office or computer laboratory and/or other locations following completion of the on-site search.

37.     The search of computers, hard drives, and other seized electronic media will include a complete search of the entire piece of seized electronic evidence. A computer forensic examiner cannot rely on the name of a file to exclude or confirm the existence of child pornography within that file. Individuals will intentionally mislabel directory structures, folder names, and filenames to hide the presence of child pornography. In other cases, an individual may not attempt to hide the child pornography but utilize a unique naming convention or organizational methodology which may inadvertently hide the presence of child pornography. In order to perform a comprehensive forensic examination, a computer forensic examiner must conduct an all-inclusive examination of every bit (or binary digit) on the particular electronic storage device.

00000036

38.     Moreover, hard drives and other pieces of electronic media have unallocated space which might contain deleted files, records, relevant e-mails, other communications, and search terms related to the possession, receipt, and distribution of child pornography. Thus, without looking at the entirety of the electronic media for evidence related to child pornography, the investigator may not find evidence relevant to the criminal investigation.

## SEARCH METHODOLOGY TO BE EMPLOYED

39.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.  on-site triage of computer system(s) to determine what, if any, peripheral devices and/or digital storage units have been connected to such computer system(s), as well as a preliminary scan of image files contained on such system(s) and digital storage device(s) to help identify any other relevant evidence and/or potential victim(s);

b.  examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

18

00000037

c.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d.  surveying various file directories and the individual files they contain;

e.  opening files in order to determine their contents;

f.  scanning storage areas;

g.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

h.  performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

00000038

## CONCLUSION

40.    Wherefore, by this affidavit and application, I request that the court issue a search warrant allowing agents, with appropriate assistance from other law enforcement agencies, to search the residence located at **43348 Donley Dr, Sterling Heights, Michigan** (Subject Premises); and, more particularly described in Attachment A, along with any associated outbuildings, curtilage and vehicles, and seize and search the items set forth in Attachment B.


_____
Robert K. Galbreath
Border Patrol Agent


Subscribed and Sworn
before me or by reliable electronic means
this 7th day of June 2018

_____
ANTHONY P. PATTI
UNITED STATES MAGISTRATE JUDGE

20

00000039

## ATTACHMENT A

## 43348 Donley Dr, Sterling Heights, Michigan

## (Subject Premises)

This property is described as a one story home with light tan siding above tan brick. The home is located on the East side of Donley Drive in Sterling Heights, Michigan, between Delvin Drive and Farthing Drive; and is the second house on the East side of Donley Drive, South of Farthing Drive.  The home has a driveway on the North side of the house leading to a detached two-car garage; it has a tan storm door and a brown front door.  The Subject Premises is depicted below:



00000040

The Subject Premises also includes any storage rooms, storage lockers, trash

containers, outbuildings, garages, and vehicles located at or near the residence

which fall under the dominion and control of the person(s) associated with the

residence (43348 Donley Drive, Sterling Heights, Michigan).

00000041

## ATTACHMENT B
## LIST OF ITEMS TO BE SEIZED AND
## SEARCHED FROM SUBJECT PREMISES

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offenses, namely violations of 18 U.S.C. § 2252A(a)(2), (a)(5)(B) (receipt and possession of child pornography); 18 U.S.C. § 2423(c) (sex tourism, including production of child pornography); 18 U.S.C. § 1589(a) and (b) (forced labor); 18 U.S.C. § 2261A (stalking) ("Target Offenses"):

1.  Any and all photographs, videos, or other depictions of V-1, EVANS, EVAN's minor son, and V-1's mother;

2.  Evidence of all communications with V-1's mother or others about EVANS marriage to V-1;

3.  Travel itineraries, logs, and receipts from travel to the Philippines;

4.  Any and all cell phones, tablets, computers, and electronic devices;

5.  All visual depictions, including still images, videos, films or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the receipt or storage of the same, including but not limited to:

    a.  Any computer, computer system and related peripherals including and data processing devices and software (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, routers, PDA's, gaming consoles, cell phones, computer compact disks, CD-ROMS, DVD, and other memory storage devices);

    b.  peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, scanners, digital cameras, and related communications devices such as cables and connections); and

    c.  any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

6.    Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.

7.    Any and all documents, records, emails, and internet history (in documentary or electronic form) pertaining to the possession, receipt or distribution of child pornography or visual depictions of minors engaged in sexually explicit

00000043

conduct, as defined in 18 U.S.C. § 2256, or pertaining to an interest in child pornography whether transmitted or received.

8.  Any and all documents, records, emails, and internet history (in documentary or electronic form) pertaining the enticement of a minor to engage in illegal sex acts.

9.  Any and all GPS data, maps, searches, or coordinates pertaining to travel to meet a minor to engage in an illegal sex act.

10. Any and all records, documents, invoices, notes and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of computer equipment found in the residence.

11. Documents and records regarding the ownership and/or possession of the subject premises.

12. During the course of the search, photographs of the subject premises and any vehicles may also be taken to record the condition thereof and/or the location of items therein.

00000044

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case: 2:18–mc–50884 |
| *(Briefly describe the property to be searched* | ) | Assigned To : Murphy, Stephen J., III |
| *or identify the person by name and address)* | )   Case No. | Assign. Date : 6/7/2018 |
| 43348 Donley Drive, Sterling Heights, Michigan | ) | Description: Search/Seizure Warrant (SO) |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   June 21, 2018   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   the presiding United States Magistrate Judge on duty   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   June 7, 2018   10:08 pm       _____
                                                                                  *Judge's signature*

City and state:   Detroit, MI       Anthony P. Patti,   U. S. Magistrate Judge
                                                                *Printed name and title*

00000045

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*