## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

        Plaintiff,

                            Criminal No:  18-20421

v.

                            Hon. George Caram Steeh

CRAIG DAVID EVANS,

        Defendant.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS (Docket No. 21)

Federal agents interviewed Defendant Craig Evans in his home about his wife, Victim One (V1). Defendant's interview was consensual and not custodial in any way. Defendant now seeks to suppress his statement, claiming that he was in custody in his own home. Defendant completely ignores that he invited agents into his house, and that he believed they were there to follow up on his fervent request that HSI deport his 19 year-old wife back to the Philippines.

Defendant's motion must be denied. Because his interview was not custodial, he was not entitled to the protections of *Miranda*. And when the agents later informed Defendant that they were there to execute a

1

search warrant, they also advised him of his *Miranda* rights. Defendant voluntarily waived his rights.

## I.   <u>STATEMENT OF FACTS</u>

On May 20, 2018, Defendant went to the U.S. Citizenship and Immigration Services (USCIS) field office at 11411 East Jefferson in Detroit to request that USCIS deport his wife, V1. Exhibit A, USCIS report, *submitted under seal*. Defendant spoke with Immigration Officer Adam Bailey, and told him that his wife, who came to the United States on a fiancé visa from the Philippines, was no longer to willing to live with him. During the interview, IO Bailey noticed that Defendant did not keep a straight train of the thought. Defendant further told IO Bailey:

- That he had been recently arrested for domestic violence against V1;

- That he had a court date in two weeks on the domestic violence charges;

- That he did nothing wrong, and that V1 could not have a video to prove the assault took place because she does not have the phone she recorded it on;

- That he was not a predator;

2

- That V1 decided to dress up in Hello Kitty products on her own;

- That V1 can say what she wants but her room being decorated only with Hello Kitty products was due to his daughter previously occupying the room;

- That he had plenty of videos and pictures to prove that V1 was willing and that he was not a predator;

- That V1 was 18 when "everything happened" so "nobody can say anything";

- That he did not know where V1 was currently living, but that Defendant suspected she was living with someone on probation;

- That he initially met V1 online, but later learned he was actually speaking with V1's mother;

- That he flew to the Philippines when V1 was 17 to throw her a "welcome to adulthood party";

- That he had a "biblical marriage" with V1.

On May 16, 2018, Defendant returned to the USCIS field office on Jefferson in Detroit. This time, Defendant spoke with IO Bailey and a supervisory immigration officer. Defendant told the officers:

- That he was upset and wanted to know how V1 was able to be present at his court date for domestic violence, and why she had not been deported or taken into immigration custody;

- That he was looking at many years in jail if V1 was not deported;

- That V1 had claimed in court that she was a victim of human trafficking.

USCIS officers found Defendant's interviews alarming, and had concerns that Defendant had purchased V1 from her mother for a large amount of money. Accordingly, USCIS passed this information onto HSI criminal investigators.

Agents assigned to the Michigan Human Trafficking and Transnational Crimes Task Force (MT3) in Detroit investigated Defendant's claims and interviewed V1. On June 7, 2018, Agent Kyle Galbreath obtained a search warrant for Defendant's residence in Sterling Heights.

4

On June 11, 2018,  Agents Galbreath and Jeremy Forys went to Defendant's home. The two agents arrived at approximately 7:20 a.m. They knocked on the door and Defendant answered. The agents introduced themselves as federal agents, and asked Defendant if they could talk to him about his request to have V1 deported. Defendant was happy to see the agents and excited that HSI was following up on his request to deport V1. Defendant invited the agents into his home, and offered them a seat at his kitchen table. Agent Forys led the interview, and asked Defendant to tell him, in chronological order, about his relationship and marriage to V1. Defendant explained to Agent Forys that he met V1 on the website Filipino Cupid when she was 17 years old. Defendant said that he went to the Philippines in September 2016 to marry V1, and that he stayed there for 10 to 11 days. Defendant said that V1's family was very poor, and that he bought them many items and gave them money. In total, Defendant estimated that he had paid or given V1's family approximately $50,000. Defendant also said that prior to his wedding, V1's twelve year-old sister spent the night in his hotel room. After his wedding to V1 in the Philippines, he "consummated" the marriage with V1 in the hotel. Defendant said that the hotel sheet got

5

blood on it, and that he was charged by the hotel to replace the sheet. Defendant offered to show the agents the receipt for the sheet and photographs from his wedding; Defendant went to a bedroom to retrieve these items, which he showed to the agents. Defendant portrayed himself as the "savior" of V1 and her family.

Throughout the interview, agents asked Defendant if this was a good time for him to talk, and offered to come back at another time that was more convenient for him. But Defendant was adamant that the agents stay and continue speaking with him. At approximately 8 a.m., Defendant's twelve year-old son came to the home to pick up some items that he needed for school. Again, agents offered to leave and come back later so that Defendant could help his son. Instead, Defendant told the agents to stay, and rushed his son out of the house. During the interview, Defendant repeatedly went outside to smoke cigarettes. Agents also observed that throughout the interview, it was difficult to keep Defendant on a straight train of thought. However, Defendant did not appear intoxicated, did not smell of alcohol, and there were no signs that he had been drinking that morning.

At approximately 9:30 a.m., agents asked Defendant for consent to search the electronic devices in his home. At this point, Defendant began acting nervously, and started smoking cigarettes in the house at the kitchen table. Defendant told the agents that his devices contained pornography depicting bondage, but was reassured that if the pornography did not depict minors, then it was legal. Agent Forys explained the consent form to Defendant, and Defendant signed it.

After Defendant signed the consent form, the agents told him that they had a search warrant to search his residence, and gave him a copy of the warrant. The agents then advised Defendant of his *Miranda* rights. Agent Forys presented Defendant with a waiver of *Miranda* rights form, which Defendant signed and initialed at approximately 9:50 a.m. Exhibit B, Miranda waiver form. Agents asked Defendant if had child pornography on his computers, and he admitted that he did. Defendant admitted that he downloaded child pornography from the internet from the 1990s to 2015. Defendant admitted that he had viewed child pornography as recently as the day before. Defendant estimated that he had "hundreds of thousands" of files of child pornography; Defendant later said that he had over two thousand files. Defendant told agents that

he kept his main stash of child pornography in a safe in his son's bedroom. Defendant provided agents with the combination; agents found external and internal hard drives in the safe.

## II.   ARGUMENT

When a criminal suspect is taken into custody, certain rights attach to that individual. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), police officers must inform a custodial suspect that he has a right to remain silent and to "have counsel present . . . if [he] so desires." *Id.* at 468-70. Additionally, police are required to respect the accused's decision to exercise those rights. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Id.* at 473-74.

### A.   Defendant was not in custody during his interview with agents.

*Miranda* protections are limited to custodial interrogations, which the Supreme Court has defined as "questioning initiated by law enforcement officers after a person has been taken into custody or other otherwise deprived of his freedom of action in a significant way." *Oregon*

*v. Mathiason*, 429, 494 (1977). "[F]or *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest." *United States v. Salvo*, 133 F. 3d 943, 948 (6th Cir. 1998), citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983). Here, Defendant was clearly not in custody during his interview with Agents Forys and Galbreath. He was not entitled to the protection of *Miranda*.

A defendant seeking suppression of his statements based upon a failure to receive *Miranda* warnings must demonstrate by a preponderance of the evidence that he was subjected to a custodial interrogation. *United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161 at *5 (6th Cir.1989) (unpublished Table decision) (quoting *United States v. Charles*, 738 F.2d 686, 692 (5th Cir.1984); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir.1986) (holding defendant "had the burden of proving that he was under arrest or in custody" when seeking suppression of statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir.1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation").

Courts measure *Miranda's* "in custody" requirement objectively; the proper inquiry being how "a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Id.* To determine whether a defendant was in "custody" during an interrogation, courts look to the "totality of the circumstances." *Salvo*, 133 F.3d at 950.

Under the "totality of the circumstances" approach, courts consider several factors, including: (1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he did not have to answer questions. *United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009). This analysis is considered from the point of view of a reasonable person; the unique, subjective characteristics of the individual, such as age or experience with law enforcement, are not considered. *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004); *Stansbury v. California*, 511 U.S. 318, 323 (1994) ("the initial determination of custody depends on the objective circumstances of the

interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned").

### 1.   Location of the interview

In the context of *Miranda*, the Supreme Court has recognized a fundamental difference between questioning that occurs in the home and questioning that occurs at a police station. "[W]hen police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates *Miranda* warnings." *Panak*, 552 F.3d at 466 (internal quotations omitted). In *Panak*, the Sixth Circuit noted that one's home:

> presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors. No doubt, some individuals may find it more difficult to do these things during a visit by the police. But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

*Panak*, 552 F.3d at 466.

Here, as in *Panak*, Defendant was interviewed at his home. He was not handcuffed during his interview, and he was not placed under arrest.

11

Defendant was excited to see Agents Forys and Galbreath, and eagerly invited them into his home. The agents were dressed in plain clothes. Defendant offered the agents a seat at his kitchen table. During the interview, the agents repeatedly offered to leave and come back later, especially when Defendant's minor son came to the house in need of items to take to school. But Defendant was adamant that the agents stay, and refused their invitation to leave. During the interview, Defendant repeatedly went outside to smoke cigarettes. The agents did not display or brandish firearms at any point.

### 2.   Length and manner of questioning

Agents Forys and Galbreath arrived at Defendant's house at approximately 7:20 a.m. At 9:50 a.m., Defendant signed a *Miranda* waiver. This length of time is consistent with other interviews that have been deemed non-custodial. *See Panak*, 552 F. 3d at 467 (interview between 45 minutes and an hour not custodial); *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2002) (interview of less than an hour not custodial); *United States v. Mahan*, 190 F. 3d 416, 420, 422 (6th Cir. 1999) (interview lasting one hour and thirty-five minutes not custodial); *United*

*States v. White*, 270 F. 3d 356, 366 (6th Cir. 2001) (an in-home, 30 minute interview, was not custodial).

Defendant's interview was not confrontational. The agents did not raise their voices and they did not threaten Defendant. Throughout Defendant's interview, the agents offered to leave and come back later. Defendant was excited to see the agents, and adamant that they not leave before he was done speaking with them.

### 3. Restraint on the individual's freedom of movement

Defendant's motion was not restrained in any way. Defendant was permitted to move around his home and go outside to smoke cigarettes. Defendant went into a bedroom to retrieve his wedding album and hotel receipt. During the portion of Defendant's interview prior to receiving *Miranda* warnings, the agents were not executing a search warrant, and did not restrict his movement at all. And even when agents are executing search warrants and have to restrict the movement of individuals in the home for safety reasons, the Sixth Circuit has consistently found *Miranda* warnings not required for in-home interviews during the execution of search warrants. *United States v. Tummins,* 2013 WL

13

827705 (6th Cir. 2013) (officers executing search warrant for child pornography interviewed defendant in home; interview was not custodial); *United States v. Gillman,* 432 F. App'x 513 (6th Cir. 2011) (where officer produced search warrant related to child pornography and told defendant he was free to leave, yet defendant remained and continued talking to officer, *Miranda* warnings not required); *United States v. Jewell*, 16 F. App'x 295, 298 (6th Cir. 2001) (*Miranda* warnings not required where FBI agents informed defendant that he was not under arrest).

### 4.    Whether the individual was told that he did not have to answer questions

In *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003), the Sixth Circuit stated that "[m]ost important to our analysis, though, is that Swanson was explicitly told by [law enforcement] that he was not under arrest and that he did not have to speak with him if he did not choose to." In *Swanson*, the Court emphasized its prior holding in *Salvo*, noting that "a statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was 'in custody.'" *Id.*, citing *Salvo*, 133 F.3d at 951. See also

14

*United States v. Sivils*, 960 F.2d 587, 598 (6th Cir. 1992) (defendant not in custody where he was informed before questioning that he was not under arrest); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (record would not support finding that defendants were in custody where told that they were not under arrest and were free to terminate questioning at any time). Here, as in *Swanson* and *Salvo*, it was absolutely clear to Defendant that he was not under arrest. Defendant believed that HSI had come to his home to follow-up on his request that V1 be deported. Nothing would have suggested to Defendant, or any reasonable person, that he was under arrest.

A defendant who is not in custody is not entitled to counsel under *Miranda. United States v. Malcolm*, 435 Fed. App'x 417, 422 (6th Cir. 2011), citing *United States v. Mathiason*, 429 U.S. 492, 494-95 (1977). Here, Defendant invited agents into his home to talk about V1. Agents repeatedly offered to leave and stop the interview. Because Defendant's interview was not custodial, he was not entitled to *Miranda* protections.

**B.    Defendant knowingly and intelligently waived his *Miranda* rights.**

Once agents advised Defendant that they were actually at his home to execute a federal search warrant, the tone and tenor of their interaction with changed. And the search warrant would have alerted Defendant to the fact that law enforcement was investigating whether he had committed any crimes. At this point, the agents advised Defendant of his *Miranda* rights, and Defendant knowingly and intelligently waived those rights. *Miranda* waivers must "not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Evaluating the voluntariness of a defendant's waiver depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* It is the government's burden to establish a waiver of *Miranda* rights by a preponderance of the evidence. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009).

A waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S.

16

412, 410 (1986). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler,* 441 U.S. 369, 373 (1979). Although a written waiver is "strong proof" that a defendant waived his *Miranda* rights, the question is "not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* A waiver of *Miranda* rights does not need to be express; an implicit waiver is sufficient to admit a suspect's statement into evidence. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Finally, the behavior of the individual is also relevant when determining whether he waived his rights. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 285.

Defendant was advised, in detail, of his *Miranda* rights. Agent Forys read Defendant each of the rights enumerated on the waiver form. Defendant did not hesitate, and instead signed and initialed the form, and verbally told agents that he was waiving his rights.

After signing the form, Defendant continued to answer the agent's questions. Defendant's waiver was voluntarily, knowing, and intelligent.

## III. CONCLUSION

The Court should deny Defendant's motion to suppress his statement.

Respectfully Submitted,

MATTHEW SCHNEIDER
United States Attorney

/s/ Sara D. Woodward
SARA WOODWARD
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9810
sara.woodward@usdoj.gov

Date: October 26, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2018, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system

which will send notification of such filing to the following:

Brandy Robinson and Colleen Fitzharris

/s/ Sara D. Woodward
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9810
P73784
sara.woodward@usdoj.gov

Date: October 26, 2018