UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

               Government,

                            **HONORABLE GEORGE CARAM STEEH**

     v.

                            **No. 18-20421**

**CRAIG DAVID EVANS,**

               Defendant.

_____/

**EVIDENTIARY HEARING**

**Tuesday, November 27, 2018**

-   -   -

APPEARANCES:

For the Government:            SARAH WOODWARD, ESQ.
                            Assistant U.S. Attorney


For the Defendant:             COLLEEN FITZHARRIS, ESQ.
                            BRANDY ROBINSON, ESQ.

-   -   -

*To Obtain Certified Transcript, Contact:*
*Ronald A. DiBartolomeo, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 238*
*Detroit, Michigan  48226*
*(313) 962-1234*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

1                           I  N  D  E  X

2    _____ Page

3    **JEREMY FORYS**
     Direct examination by Ms. Woodward                        6
4    Cross examination by Ms. Fitzharris                       39
     Redirect examination by Ms. Woodward                      64
5

6    **CRAIG EVANS**
     Direct examination by Ms. Robinson                        73
7    Cross examination by Ms. Woodward                        105
     Redirect examination by Ms. Robinson                     132

8

9

10

11

12

13

14

15                        E   X   H   B   I   T   S

16   Identification_____Offered   Received

17

18                     N        O        N        E

19

20

21

22

23

24

25

                    *18-20421; USA v. CRAIG DAVID EVANS*

```
 1                           Detroit, Michigan
 2                           Tuesday, November 27, 2018
 3
 4                    -   -   -
 5           THE CLERK:  Calling Case Number 18-20421,
 6   United States versus Craig David Evans.
 7           THE COURT:  Good morning.
 8           MS. WOODWARD:  Good morning.
 9           THE COURT:  Would you like to state your
10   appearances?
11           MS. WOODWARD:  Good morning, your Honor.
12   Sarah Woodward on behalf of the United States.  With me at
13   counsel table is the case agent, Special Agent Kyle
14   Galbreath.
15           THE COURT:  Good morning.
16           MS. ROBINSON:  Good morning, your Honor.
17   Brandy Robinson and Colleen Fitzharris of the Federal
18   Defender Office on behalf of Craig Evans.
19           THE COURT:  Welcome.  Two days in a row.
20           MS. FITZHARRIS:  Before we proceed, is it
21   possible to unhandcuff Mr. Evans?
22           THE COURT:  Yes.
23           MS. FITZHARRIS:  Thank you.
24           THE COURT:  Okay.  You can take a seat, and
25   we'll note that this is before the Court on a supression
```

*18-20421; USA v. CRAIG DAVID EVANS*

1    motion.

2              Ms. Woodward, would you like to proceed?

3                   **MS. WOODWARD:**  I'm sorry?

4                   **THE COURT:**  Would you like to proceed?

5                   **MS. WOODWARD:**  On which motion?

6                   **THE COURT:**  The supression motion.

7                   **MS. WOODWARD:**  Well, there are two supression

8    motions.  There's a motion to suppress the search warrant

9    for lack of probable cause, and we're prepared to argue on

10   that today, and then there's a motion to suppress the

11   defendant's statement.  Is that the one that you want us

12   to turn to first?

13                  **THE COURT:**  Whichever you would like to start

14   with.

15                  **MS. WOODWARD:**  Well, it's the defense motion.

16   So I would defer to them.

17                  **MS. FITZHARRIS:**  I think it would be best to

18   start with the evidentiary hearing.  There are two issues,

19   and the warrant interplays with both.  At issue is the

20   consent of whether Mr. Evans voluntarily consented the

21   search of the computer in the house, and that is tied up

22   with the validity of the warrant, and the end result is a

23   factual question.

24             So I recommend that we proceed with the

25   evidentiary hearing first, and finish with the legal

*18-20421; USA v. CRAIG DAVID EVANS*

1    argument on both motions.

2            **THE COURT:**  That sounds sensible.

3            **MS. WOODWARD:**  We're just going to call one

4    witness this morning, and that witness will be Special

5    Agent Jeremy Forys.

6          Also let just me clarify, I introduced Mr.

7    Galbreath as a special agent.  He is actually a task force

8    officer, but he is a border patrol agent.

9            **THE COURT:**  Okay.

10           **MS. FITZHARRIS:**  One other matter of

11    clarification, it is my understanding that Agent Galbreath

12    was present during the search and questioning of Mr.

13    Evans.  Ms. Woodward suggested that he may be called as a

14    rebuttal witness, and so at this point until we know

15    whether Mr. Galbreath -- or Agent Galbreath is going to

16    testify, we ask that he be sequestered.

17            **THE COURT:**  Ms. Woodward?

18            **MS. WOODWARD:**  He is the case agent, and like

19    the defendant --

20            **THE COURT:**  Agent in charge of the

21    investigation?

22            **MS. WOODWARD:**  Correct.

23            **THE COURT:**  I don't think there's a need to

24    sequester under those circumstances.  We'll permit him to

25    remain in the courtroom.

*18-20421; USA v. CRAIG DAVID EVANS*

1          **MS. WOODWARD:**  We would like to call Agent

2     Forys at this time.

3          **THE COURT:**  Yes.

4          **MS. WOODWARD:**  Thank you.

5

6                    **J E R E M Y   F O R Y S**

7

8     being first duly sworn by the Court to tell the truth, was

9     examined and testified upon his oath as follows:

10

11          **THE COURT:**  We will have you begin by having

12     you state your name, and spelling your last name.

13          **THE WITNESS:**  Jeremy Forys, F-o-r-y-s.

14          **THE COURT:**  Thank you.  You may proceed.

15

16                    **DIRECT EXAMINATION**

17     BY MS. WOODWARD:

18

19     **Q.**  Where do you work?

20     **A.**  I am a special agent with Homeland Security

21     Investigation here in Detroit.

22     **Q.**  How long have you worked for Homeland Security

23     Investigation?

24     **A.**  Approximately 10 years.

25     **Q.**  And is that frequently referred to as HSI?

                    *18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  It is.

2      **Q.**  Is HSI part of the Department of Homeland Security

3  or DHS?

4      **A.**  That's correct.

5      **Q.**  And so when did you become a special agent, in

6  approximately 2008?

7      **A.**  In December of 2008.

8      **Q.**  Before you became a special agent with HSI, what did

9  you do?

10      **A.**  I was a federal air marshal.

11      **Q.**  When was that?

12      **A.**  April of 2002.

13      **Q.**  Until --

14      **A.**  December of 2008.

15      **Q.**  Thank you.  And did you work with the government

16  before you became an air marshal?

17      **A.**  I did.

18      **Q.**  What did you do before you became an air marshal?

19      **A.**  I was an immigration inspector with the Department

20  of Justice, the immigration and naturalization service,

21  commonly known as the INS.

22      **Q.**  And what was the time period that you worked for

23  INS?

24      **A.**  August of 2000 until I became an air marshal in

25  April of 2002.

*18-20421; USA v. CRAIG DAVID EVANS*

1      **Q.**  And was INS also a part of the Department of

2    Homeland Security or was it something different?

3      **A.**  No.  The Department of Homeland Security was created

4    after 911 in 2003.  So that was prior to that.  It was

5    part of the Department of Justice.

6      **Q.**  Thank you.  So back to your as a special agent with

7    HSI, do you have a current assignment?

8      **A.**  Yes.  Currently for the last three years, I've been

9    working with our human trafficking task force.

10     **Q.**  And what is the human security task force?

11     **A.**  It's located in Taylor, Michigan.  It's the Michigan

12   human trafficking, human smuggling task force.  We follow

13   up leads that we gather from the border and other places

14   that involve possibly human smuggling and human

15   trafficking.

16     **Q.**  And you said that is located in Taylor.  Is that at

17   the Taylor Police Department?

18     **A.**  Right at the police department.

19     **Q.**  Do you work with other agencies besides HSI agents?

20     **A.**  Yes, we do.  We work with the border patrol, customs

21   and border protection, marine unit, and USCIS.

22     **Q.**  What does USCIS stand for?

23     **A.**  United States Citizenship and Immigration Services.

24     **Q.**  Is that also a component of the Department of

25   Homeland Security?

*18-20421; USA v. CRAIG DAVID EVANS*

1        **A.**  Yes, it is.

2        **Q.**  And you said that you investigate human trafficking

3    and human smuggling?

4        **A.**  Mostly human trafficking.

5        **Q.**  Does that include both sex trafficking and labor

6    trafficking?

7        **A.**  It does.

8        **Q.**  And how long have you been doing this work?

9        **A.**  Approximately three years.

10        **Q.**  Before you began working with the trafficking task

11    force, what did you do with HSI?

12        **A.**  I was detailed to our airport office, which was more

13    of a general crimes.  So I investigated everything that

14    HSI investigates, and prior to that, I worked in a group

15    that investigates work site enforcement, which is

16    employers hiring undocumented workers from other

17    countries.

18        **Q.**  When you did work site enforcement, you were

19    investigating labor of undocumented workers, is that fair?

20        **A.**  That's correct.

21        **Q.**  Did you ever encounter labor trafficking?

22        **A.**  We did.  It's kind of a fuzzy line between the work

23    site enforcement and labor trafficking.  So sometimes

24    cases that on their face looks like it would fit the work

25    site mold blend more into the labor trafficking.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**   How would you define labor trafficking?

2    **A.**   Egregiously abusing foreign nationals, mainly

3    putting them in unfair or inhumane circumstances, low pay,

4    no benefits.  Basically taking advantage of people.

5    **Q.**   Are you familiar with the investigation into the

6    defendant Craig Evans?

7    **A.**   I am.

8    **Q.**   When did you begin investigating the defendant?

9    **A.**   In May of 2018.

10   **Q.**   What started the investigation?

11   **A.**   We received information from USCIS.  We have an

12   individual that sits at our task force a couple days a

13   week, and actually is a conduit between USCIS and HSI.

14   **Q.**   And again, USCIS, is the U.S. Citizenship and

15   Immigration services?

16   **A.**   Yes, it is.

17   **Q.**   So do you share information occasionally?

18   **A.**   Yes, we do.

19   **Q.**   Is it common or uncommon for you to get leads or

20   information from USCIS?

21   **A.**   It is common.

22   **Q.**   And why is there someone on your task force from

23   USCIS?

24   **A.**   Because there is information that they gather

25   through their regular day-to-day activities which can lead

*18-20421; USA v. CRAIG DAVID EVANS*

1      to a human trafficking investigation or labor trafficking

2      investigation.  There are crimes that are committed that

3      they're not so much geared to investigate, and they turn

4      them over to us.

5      Q.  And so what does USCIS do?

6      A.  They work on benefits for non-Americans that come

7      into the country.  So whether it's a visa or -- they also

8      do benefit investigations.  So if someone is trying to

9      defraud the United States, they may look into that sort of

10     thing too.  They have different functions.

11     Q.  What did you learn about the defendant from USCIS?

12     What information did you receive?

13     A.  We received information that Mr. Evans came into

14     USCIS.  He was upset that his wife was not acting in a

15     function that he thought his wife should be, and wanted

16     her removed from the United States.

17     Q.  And you said he came into USCIS.  Is there a

18     physical location where this agency is located in the

19     metro Detroit area?

20     A.  Yes, it's in Detroit on Jefferson Avenue.

21     Q.  Is that at 11411 East Jefferson in Detroit?

22     A.  Yes.

23     Q.  This is a building open to the public?

24     A.  It is.

25     Q.  And normally who goes to this location?

*18-20421; USA v. CRAIG DAVID EVANS*

1     **A.**  Again, people seeking benefits in the United States.

2     They have to have their benefits adjudicated to see if

3     they are going to receive a benefit from the U.S., and

4     also people can come in like Mr. Evans to complain about

5     possibly being defrauded in this case.

6     **Q.**  So the defendant physically went to the location on

7     Jefferson in Detroit, and reported essentially that he

8     wanted to have his wife deported, is that fair?

9     **A.**  Yes.

10    **Q.**  Do you know when this was?

11    **A.**  Yes, it was May 2nd of 2018.

12    **Q.**  And do you know who the defendant spoke with when he

13    went to USCIS?

14    **A.**  Immigration Officer Adam Bailey.

15    **Q.**  What else did the defendant tell Immigration Officer

16    Bailey?

17              **MS. FITZHARRIS:**  Objection.  It is not

18    relevant to what happened on the day of the search.  It's

19    not relevant to whether Mr. Evans' statement is voluntary.

20    We are kind of pretty far afield at this point from the

21    date of the search on June 11th.

22              **THE COURT:**  Ms. Woodward?

23              **MS. WOODWARD:**  Yes, your Honor.  The

24    defendant went to USCIS giving them information,

25    requesting that his wife be deported, and when the agents

*18-20421; USA v. CRAIG DAVID EVANS*

1   went to his home with a search warrant, they were also

2   there to follow up on the report that he made to USCIS.

3           The question for the Court on whether Mr. Evans

4   was in custody is taken from the perspective of a

5   reasonable person.  So having gone to USCIS himself and

6   make statements, he understood the agents when they came

7   to his home to be following up on his request.  So it is

8   incredibly relevant to understanding whether his interview

9   at his home custodial or not.

10          **THE COURT:**  Ms. Fitzharris?

11          **MS. FITZHARRIS:**  Again, we don't have to go

12  through all the background in early May in order to

13  establish that they were following up.  They also had a

14  warrant in hand, and that's something that's going to be

15  developed further, but I think we need to start talking

16  about June 11th because that's the date --

17          **THE COURT:**  The Court will overrule the

18  objection and receive the testimony.

19          **MS. WOODWARD:**  Thank you.

20          What else did you learn from Officer Bailey about

21  what the defendant said?

22  **A.**  He made statements to Officer Bailey in reference to

23  that he was arrested recently on domestic violence

24  charges.  He was concerned about what the victim may say

25  in that case.  He was providing information that if anyone

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    asks, she wanted to dress up in this Hello Kitty type

2    clothing, and that there is a pink Hello Kitty room in his

3    house, but that's -- you know, don't worry about that.

4    That's from his daughter that lives with him, and he made

5    statements, by the way, I'm not a predator, which are

6    unusual statements that a law enforcement officer might

7    hear.

8

9    BY MS. WOODWARD:

10       Q.   Did he also explain how old his wife was and where

11   her country of origin was?

12       A.   He stated that met her online, and she was from the

13   Philippines, and he petitioned for her to come here, and

14   now he is trying to remove that and have her deported from

15   the United States.

16       Q.   And how old was she?

17       A.   He mentioned that she was 17 when they first

18   encountered each other online, and now she's a couple of

19   years older, but at the time she was 17.

20       Q.   When they first met?

21       A.   Online, yes.

22       Q.   And what did Officer Bailey do with this

23   information?

24       A.   He reached out to his supervisors, who in-turn

25   turned the information over to the task force officer that

1      sits in our group and my direct supervisor, and we started

2      to look into that.

3          Q.  Is it fair to say that there were some red flags

4      that Officer Bailey noticed?

5          A.  Oh, absolutely.  What I previously mentioned about,

6      the predator comments, the Hello Kitty comments, and

7      there's a perceived motive that hey, this is the direct

8      witness in a domestic violence charge.  So it seemed

9      pretty apparent to us that he didn't want her in the

10     country for a specific reason.

11         Q.  With this information essentially given to your task

12     force to follow up on?

13         A.  Yes, it was.

14         Q.  Did Officer Bailey write a report about his

15     encounter with the defendant?

16         A.  He did.

17             MS. WOODWARD:  Your Honor, I've provided this

18     report to the Court under seal as Government Exhibit A to

19     this response.  The Court has a copy, but I have more

20     copies here as well.

21             MS. FITZHARRIS:  Ms. Woodward, are you going

22     to admit this as an exhibit?

23             MS. WOODWARD:  Yes, it's attached to my

24     motion.

25             MS. FITZHARRIS:  I understand, but I object.

                    *18-20421; USA v. CRAIG DAVID EVANS*

```
 1    It is hearsay.

 2              MS. WOODWARD:  My response is that this is an

 3    evidentiary hearing.

 4              THE COURT:  The Court will overrule the

 5    objection.

 6              MS. WOODWARD:  Thank you.

 7

 8    BY MS. WOODWARD:

 9       Q.  So Officer Forys, take a look at Government Exhibit

10    A --

11              MS. FITZHARRIS:  There's an additional issue

12    that this was prepared by someone else, not Agent Forys,

13    and whether he has the ability or not to talk about this

14    report.  There is a lack of foundation as well.

15              MS. WOODWARD:  Your Honor, the report details

16    two visits that the defendant made to USCIS.  I'm going to

17    proceed to ask Agent Forys about the defendant's second

18    visit.  I think it is important for the Court to know,

19    again from the perspective of a reasonable person in the

20    defendant's shoes, he went not once, but twice to USCIS

21    requesting that they deport his wife, and that was -- what

22    he had done at the time the agents came to interview him

23    at his home.

24              THE COURT:  All right.  Again, the Court

25    will --
```

1              **MS. FITZHARRIS:**  One additional issue, your

2      Honor, is that the document speaks for itself.  There's no

3      reason for Agent Forys to go into the details of the

4      document if it has been admitted as substantive evidence.

5              **MS. WOODWARD:**  I have very brief questions

6      about the document, your Honor.

7              **THE COURT:**  All right.  The Court will

8      overrule the objection.

9              **MS. WOODWARD:**  Agent Forys, have you reviewed

10     this report written by Officer Bailey?

11     **A.**  I have.

12

13     BY MS. WOODWARD:

14     **Q.**  The report indicates that the defendant went to

15     USCIS not once but twice?

16     **A.**  It does.

17     **Q.**  So I think you testified that the first time that

18     the defendant went to USCIS was May 2, 2018?

19     **A.**  That's correct.

20     **Q.**  And when was the second time?

21     **A.**  On May 16th of this year, 2018.

22     **Q.**  And what happened on the second visit?

23     **A.**  The defendant arrived at USCIS, and since his first

24     visit to USCIS, he had a hearing in his domestic violence

25     case, and was upset that the victim was there, and

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    believed that USCIS should have deported the victim from

2    the country, and she shouldn't have been there.

3        Q.   Thank you.  After you received this information from

4    USCIS, what did you do?

5        A.   We reached out to the victim, and went to talk to

6    her and interviewed her.

7        Q.   And did you interviewed her on May 30, 2018?

8        A.   We did.

9        Q.   And did she make statements about her relationship

10   with the defendant?

11       A.   She did.

12              MS. FITZHARRIS:  Objection.  Relevance.

13   Again, this is very fair afield from the search and from

14   the statements on June 11th.

15              MS. WOODWARD:  I'm moving on from the

16   statements and onto the search warrant.

17              THE COURT:  All right.

18

19   BY MS. WOODWARD:

20       Q.   And so after you spoke with the victim in this case,

21   what did you do next?

22       A.   We had a meeting with the U.S. Attorneys, yourself,

23   and we drafted an affidavit for a search warrant of

24   Mr. Evans' residence.

25       Q.   Was that another law enforcement officer that you

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    worked with on this case?

2        **A.**   That's correct.

3        **Q.**   Who was that?

4        **A.**   Task Force Agent Robert Galbreath.

5        **Q.**   Galbreath?

6        **A.**   Yes.

7        **Q.**   And was a search warrant, in fact, sworn out on

8    June 7th?

9        **A.**   It was.

10       **Q.**   Was that a federal search warrant?

11       **A.**   Yes, it was.

12       **Q.**   And after the search warrant was sworn out, what did

13   you do?

14       **A.**   We went to the door, Mr. Evans' door on June 11th,

15   and we did a what we call a knock and talk.  So we knocked

16   on the door, identified ourselves, myself as a special

17   agent, and Robert as a task force agent, and said we were

18   following up on Mr. Evans' claim at CIS.

19       **Q.**   So you said "we", and then you said Robert.  Was

20   this yourself and Task Force Officer Galbreath?

21       **A.**   Yes.

22       **Q.**   And so the two of you approached Mr. Evans' home?

23       **A.**   That's correct.

24       **Q.**   And where is his home?

25       **A.**   In Sterling Heights, Michigan on Donley Drive.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  So when you approached the door, you had a search
2    warrant?
3    **A.**  We did.
4    **Q.**  But did you approach as a search team?
5    **A.**  No.  There were many officers on standby down the
6    streets, but it was just the two of us knocking on his
7    door.
8    **Q.**  And you called that a knock and talk?
9    **A.**  Correct.
10   **Q.**  So you knocked on the door?
11   **A.**  Yes, we did.
12   **Q.**  Who answered the door?
13   **A.**  Mr. Evans.
14   **Q.**  What time of day was this on June 11th?
15   **A.**  Early morning, 7:20 in the morning approximately.
16   **Q.**  And when the defendant answered the door, what do
17   you do?
18   **A.**  Again, identified ourselves.
19   **Q.**  Would you have told the defendant that you were with
20   Homeland Security Investigations?
21   **A.**  That's correct.
22   **Q.**  And Task Force Agent Galbreath would have identified
23   himself as a border patrol agent?
24   **A.**  Most likely a task force agent.  He probably
25   wouldn't have bothered to mention the border patrol agent

*18-20421; USA v. CRAIG DAVID EVANS*

1    because his duties are in line with Homeland Security

2    Investigations as well for the years he spent time with

3    us.

4        Q.  So he had an assignment to work on this trafficking

5    task force?

6        A.  That's correct.

7        Q.  You identified yourself, and what did you do after

8    that?

9        A.  Mr. Evans was very -- seemed very excited that we

10   were there following up.  He seemed like finally someone

11   is here to listen to me.  Please come in.  He invited us

12   into his house.

13       Q.  He invited you in?

14       A.  Absolutely.

15       Q.  And what did you tell him that you wanted to talk to

16   him about?

17       A.  We wanted to follow up and hear his perspective in

18   his own words about his relationship with the victim, and

19   hear his side of the story.  We mentioned that sometimes

20   he could have -- we would have follow up questions,

21   something that Immigration Officer Bailey didn't ask.  So

22   we wanted to hear his side of the story.

23       Q.  And you said that he was very excited to see you?

24       A.  Oh, yes.

25       Q.  Why did you decide to talk to him first without

*18-20421; USA v. CRAIG DAVID EVANS*

1    telling him about the search warrant?

2       **A.**   It's a strategic decision.   Sometimes people, when

3    we display our search warrant, do not want to talk, or

4    they put a wall up or get defensive, and we wanted to hear

5    his side of the story.

6       **Q.**   And so where did you go in the defendant's house?

7       **A.**   He cleared space on his kitchen table.

8       **Q.**   And did he invite you to sit down?

9       **A.**   Yes, absolutely.

10      **Q.**   What was his demeanor like?

11      **A.**   He was very happy that we were there, and he was

12   elated.

13      **Q.**   Did the defendant at any time that morning seem

14   drunk to you?

15      **A.**   No.

16      **Q.**   Did you smell any alcohol?

17      **A.**   No, I did not.

18      **Q.**   Did the defendant tell you that he was drinking?

19      **A.**   No.

20      **Q.**   Was his speech slurred?

21      **A.**   No, it wasn't.

22      **Q.**   And Agent Forys, do you see the defendant in court

23   today?

24      **A.**   I do.

25      **Q.**   Can you identify him for the record?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  He is sitting to my left at defense table.

2    **Q.**  And so did you talk to the defendant?

3    **A.**  Yes.

4    **Q.**  Who led the interview?

5    **A.**  I did.

6    **Q.**  How did you start the interview?  What did you ask

7    the defendant?

8    **A.**  Open-ended questions, just please go ahead and start

9    from square one, if you can, and tell me how you met, and

10   progress through how we're sitting at the table today.  I

11   asked him to the best of his abilities to state

12   chronological and tell me what's going on.

13   **Q.**  And so you were talking about his relationship with

14   the victim in this case, is that fair?

15   **A.**  Yes.

16          **MS. FITZHARRIS:**  Objection, your Honor, to

17   the repeated use of the word "victim."  Mr. Evans is not

18   charged with any offense related to his wife.  She is not

19   a victim in any of the charged crimes.  I think it is

20   unduly prejudicial and unnecessary to use that word.

21          **THE COURT:**  If I were a jury, I might be

22   incline to sustain your objection, but I'm not going to be

23   influenced by the moniker.  The Court will overrule the

24   objection.

25          **MS. WOODWARD:**  And just as to following the

*18-20421; USA v. CRAIG DAVID EVANS*

1    facts here, the victim is referred to as V-1 in the search

2    warrant and other documents.  So I can call her V-1 if the

3    Court prefers.

4              **THE COURT:**  I don't really care.

5

6    **BY MS. WOODWARD:**

7      **Q.**  And so the defendant told you about how he met the

8    victim, is that right?

9      **A.**  That's correct.

10     **Q.**  What did he tell you?

11     **A.**  He mentioned that, I believe, March of 16, that they

12   met online on a website called Filipino Cupid.

13     **Q.**  How old was the victim at that time?

14     **A.**  Seventeen.

15     **Q.**  At some point did the defendant travel to the

16   Philippines to meet her and marry her?

17     **A.**  He did.

18     **Q.**  What did the defendant say about the victim's

19   family?

20     **A.**  They were very poor, and he spent a lot of his money

21   to help them out, buy them couches.  I believed he

22   mentioned a toilet, some things to make their household a

23   little more comfortable in the Philippines.

24     **Q.**  And did he talk to you about getting married to the

25   victim in the Philippines?

1      **A.**  He did, but he mentioned that as a quote, unquote,

2      biblical marriage, not a legal marriage at that time in

3      the Philippines.

4      **Q.**  And did he offer to show you things about what he

5      was telling you?

6      **A.**  He did.  He had a receipt from a hotel dated,

7      showing that he had to pay for sheets because he said that

8      the victim stained the sheets, alluding to --

9              **MS. FITZHARRIS:**  Objection.  A lot of this

10     testimony about what the substance of the conversation and

11     Mr. Evans' answers is not relevant to the issue of whether

12     his statements were voluntary, whether he was in custody,

13     whether his consent was valid.

14             We can talk about -- I think it is relevant to

15     talk about the specific general nature of the questions,

16     but getting in the substance of Mr. Evans' answers is not

17     relevant.

18                     **THE COURT:**  Ms. Woodward?

19                     **MS. WOODWARD:**  Again, your Honor, this is

20     from the perspective of a reasonable person in defendant's

21     shoes.  What we're getting to is that the defendant goes

22     to get some items to show to the agents which shows his

23     freedom of movement throughout the house.

24                     **THE COURT:**  The Court will overrule the

25     objection.

                    *18-20421; USA v. CRAIG DAVID EVANS*

BY MS. WOODWARD:

Q.   So he told you something about a receipt from a
hotel.  Did he get that receipt for you?

A.   He did.

Q.   Did he retrieve other items to show you?

A.   Yes, he did.  In the back room of his house, he had
a closet, and the top part of that closet was a scrapbook,
and it had some items in there, some photographs, and it
had the receipt that he wanted to show us.

Q.   You said at first you were at the kitchen table?

A.   Yes.

Q.   Did you and Task Force Officer Galbreath and the
defendant move about home?

A.   Yes.  We went over -- we were more than happy to see
what he wanted to show us.  So he freely walked over
there, and we just, you know, walked with him in the back
room.

Q.   And he showed you these items?

A.   He did.  He brought them back to the kitchen table
and he showed us.  He brought the book back with him.

Q.   At some point was the defendant contacted by his 12
year old son?

A.   Yes, repeatedly.  I believe that he kind of denied
either the text or the phone call because we were in the
middle of talking, and he didn't seem like he wanted to be

*18-20421; USA v. CRAIG DAVID EVANS*

1    bothered with his son at that time.

2        Q.  Okay.  This was at the kitchen table?

3        A.  That's correct.

4        Q.  And the defendant's 12 year old son was contacting

5    him on the phone, is that right?

6        A.  He was trying to, yes.

7        Q.  And at first was the defendant not responding to

8    that contact?

9        A.  At first he wasn't.  It was repeated calls, and then

10   his son came to the door.  So someone had driven him to

11   the house.

12       Q.  And what was your response?  Did you say anything to

13   the defendant about responding to his son?

14       A.  Yes.  I said please answer the phone.  You don't

15   know what kind of emergency it could be or whatever, and

16   he repeatedly said this is way more important than my son.

17       Q.  Did you offer to leave or to stop speaking with him

18   so he could speak to his son?

19       A.  We absolutely did.

20       Q.  And what time was this?

21       A.  I would assume sometime in mid-interview.  I would

22   say eight, 8:15, 8:30, before the execution of the search

23   warrant.

24       Q.  At some point his son did come to the home?

25       A.  Yes, he did.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  And what was your understanding of why his son was

2    there?

3    **A.**  I believe it was he didn't have his backpack with

4    some of his school books, and he needed to get to school.

5    So this goes to that 8:00 time frame.

6    **Q.**  During the time of contact with his son, were you

7    encouraging the defendant to prioritize his son over you

8    and Task Force Officer Galbreath?

9    **A.**  Yes, I absolutely did.  I even mentioned that we can

10   come back at a different time to do this.  There is no set

11   time frame or anything like that, and he again said that

12   this was more important.

13   **Q.**  So is it fair to say that he requested or he wanted

14   you to stay?

15   **A.**  That's correct.

16   **Q.**  And during your interview with the defendant, did he

17   also move to go outside and smoke cigarettes?

18   **A.**  Yes, he did.  He had like a back porch off the back

19   of his home, and he would go outside and take often breaks

20   and smoke cigarettes every 10-15 minutes, and he was out

21   there by himself, and we were just sitting at the kitchen

22   table waiting for him to get done.

23   **Q.**  The first portion of the interview where you talked

24   about defendant's relationship with the victim, about how

25   long did that last before you moved to speaking to him

*18-20421; USA v. CRAIG DAVID EVANS*

1    about his electronic devices?

2        A.   Probably almost a good two hours.

3        Q.   And so at some point did you move the conversation

4    to ask for permission to look at his electronic devices?

5        A.   Yes, we did.  We were still at that point talking

6    about his relationship with the victim, and talked about

7    maybe there were some communications on his phone that

8    would back up his story with the victim's mother and her

9    arranging this marriage, alluding to that it was a

10   fraudulent marriage, and I said, well, what would be great

11   is if we could take a forensic look into this computer,

12   and that I had an agent that could stop on his way to work

13   and come by the house and do an extraction.  So maybe we

14   could follow through with some kind of deportation.

15       Q.   So you were asking him for permission to look at his

16   devices relating to his complaint about the victim's

17   status in this country, is that fair?

18       A.   That's fair, yes.

19       Q.   And you mentioned that another agent could stop by

20   and do an extraction.  What does that mean?

21       A.   An extraction would be like a forensic copy of an

22   electronic device that could be easily scanned through and

23   look for evidence could be admitted possibly in a case or

24   trial.

25       Q.   Is that something that you do, what you call knock

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    and talk?

2    **A.**   From time to time, yes.  It happens all the time.

3    **Q.**   Is it a way to get the data off of a device, but

4    still leave the device with the owner?

5    **A.**   Absolutely.  One, it is very convenient, but two, it

6    is an exact forensic copy of it.

7    **Q.**   Is that what you were offering to do in this part of

8    the conversation, copy the device, but leave the device

9    with him?

10   **A.**   Yes.

11   **Q.**   Did the defendant's demeanor change at this time?

12   **A.**   Completely.  He was a completely different person

13   after that conversation.

14   **Q.**   How so?

15   **A.**   He kind of just stared at the consent form that I

16   had.  He began smoking, chain smoking at the table.  He

17   was no longer going outside to smoke, which is what he had

18   done the prior two hours or so that we were there, and he

19   was continuously just kind of procrastinating, like

20   staring at the paper, and then he said, okay.  I'll do it,

21   and signed off on it.

22   **Q.**   So the demeanor that you described for the first

23   part of the interview, was happy to see you, excited?

24   **A.**   Yes.

25   **Q.**   And then the demeanor when you were talking about

*18-20421; USA v. CRAIG DAVID EVANS*

1      consent to look at his devices was different?

2          A.   Yes.

3          Q.   Did you explain to him the form, that it was

4      voluntary for him to decide whether to give permission?

5          A.   Absolutely, and even to the point where he even

6      provided the password.

7                    **MS. WOODWARD:**  I will hand the witness what

8      has been marked Government Exhibit B.  This was submitted

9      to the Court.  I believe it is attached to the other

10     response, but I'll give everyone a copy here as well?

11                   **THE COURT:**  Okay.

12

13     **BY MS. WOODWARD:**

14         Q.   Looking at Government Exhibit B, what is this form?

15         A.   This is -- it states Immigration and Customs

16     Enforcement Computer Forensic Worksheet.  Immigration and

17     Customs Enforcement like our parent agency over HSI.  It

18     has two divisions.

19         Q.   And so is this the form that you discussed with the

20     defendant?

21         A.   It is.

22         Q.   And is this the form that you said that he was

23     staring at for sometime?

24         A.   Yes.

25         Q.   He ultimately signed it?

                    *18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  He did, yes.

2      **Q.**  And since you have a search warrant, why did you ask

3      the defendant for consent?

4      **A.**  Again, it was a strategic decision to see what his

5      response would be when we handed it over, and it did

6      elicit a response.

7      **Q.**  And that response was the demeanor change that we

8      have been discussing?

9      **A.**  Yes.

10     **Q.**  Is it fair to say that the defendant was nervous at

11     this time?

12     **A.**  Extraordinarily nervous.

13     **Q.**  Did he mention to you that he was concerned about

14     pornography on his phone?

15     **A.**  He did.  He mentioned, I believe, more like bondage

16     type of pornography, and we stated to him that's not an

17     issue as long as there's not pornography with minors or

18     anything like that on his phone.

19     **Q.**  And after the defendant signed this consent form,

20     what did you do next?

21     **A.**  I handed over a copy of the federally signed search

22     warrant.

23     **Q.**  So at the time you told him that you were there with

24     a search warrant?

25     **A.**  Correct, and there would be some individuals that

*18-20421; USA v. CRAIG DAVID EVANS*

1    would be coming into the house.

2        **Q.**   So you shifted the interview now to the execution of

3    a search warrant?

4        **A.**   That's correct.

5        **Q.**   And at this time did other people enter the home as

6    part of the search team?

7        **A.**   Yes, there were the computer forensic guys that we

8    had on standby.  They came in, and were ready to look at

9    digital media that was contained in the house.

10       **Q.**   And those were folks that had been waiting somewhere

11   else while you spoke to the defendant, correct?

12       **A.**   Yes.

13       **Q.**   Was the defendant placed under arrest?

14       **A.**   No, he was not.

15       **Q.**   Did you read him his Miranda Rights?

16       **A.**   We did.

17       **Q.**   Why did you read him his Miranda Rights if you

18   hadn't arrested him?

19       **A.**   Because we were letting him know that he did have

20   certain rights at this point.  He didn't have to speak to

21   us.  He was free to stay silent, get an attorney at that

22   time.  So we just, as overly safe measure, we didn't have

23   to, but decided to give him the Miranda Rights.

24       **Q.**   Who gave him his Miranda Rights?

25       **A.**   I did.

*18-20421; USA v. CRAIG DAVID EVANS*

1     **Q.**   How did you do that?

2     **A.**   We have a statement of rights form that outlines

3     each of those rights that he has a person, a U.S. citizen

4     in this country.

5     **Q.**   So did you personally go over the form with him?

6     **A.**   We did line by line, and I believe we had initial

7     him each line to say that he understood that particular

8     line.

9            **MS. WOODWARD:**   I'm going to hand the witness

10    what has been marked as Government Exhibit C.

11           **THE COURT:**   Okay.

12

13    **BY MS. WOODWARD:**

14    **Q.**   Agent Forys, now that everyone has a copy of

15    Government Exhibit C, what is this?

16    **A.**   This is our standard statement of rights form.   It

17    basically has the Miranda Warnings on it.

18    **Q.**   Did you just hand this to the defendant and asked

19    him to read it to himself, or did you do something

20    different?

21    **A.**   We placed it front of him.   We read them to him, and

22    asked him if he understood each one, and then he initialed

23    each line.

24    **Q.**   You handed him the form and read it out loud,

25    correct?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  Correct.

2    **Q.**  And after you read it out loud, you asked him to

3  initial each line?

4    **A.**  Reread it, and initial it if he understood each

5  line.

6    **Q.**  Did he express to you in any way that he didn't

7  understand?

8    **A.**  No, not at all.

9    **Q.**  Did he have any questions for you about any of these

10  rights?

11    **A.**  No.

12    **Q.**  But you told him that he had the right not to speak

13  with you?

14    **A.**  Absolutely.  That's one of the rights that we read.

15    **Q.**  And I see some writing on the second half of this

16  form.  What are we looking at here?

17    **A.**  The waiver form where the bottom half of it?

18    **Q.**  Correct.  Whose signatures do we see?

19    **A.**  We see his printed name, his signature and date, my

20  signature underneath Mr. Evans' and the date, and Task

21  Force Agent Galbreath's signature and date.

22    **Q.**  Were the three of you going over this form together?

23    **A.**  Yes, we were all sitting at the kitchen table.

24    **Q.**  I also see a notation on the left hand side that

25  looks 9:50.  What is that?

*18-20421; USA v. CRAIG DAVID EVANS*

1     **A.**   O9:50 is -- represents 9:50 a.m. in the morning,

2     military time.

3     **Q.**   Who wrote that and why?

4     **A.**   I believe -- that doesn't look like my handwriting.

5     Most likely Agent Galbreath's handwriting.

6     **Q.**   What would the significance of that time be?

7     **A.**   Just to notate what time the rights were read to

8     him.

9     **Q.**   That's when the form was either completed or begun?

10    **A.**   Yes.  So it was pretty quick.  It would have been

11    within a minute or two, if this was most likely when it

12    was completed.  So I would say two minutes before we began

13    to read the rights.

14    **Q.**   And at the time that you went over this with the

15    defendants, you were in the home for over two hours,

16    correct?

17    **A.**   Correct.

18    **Q.**   Had he consumed any alcohol while you were present?

19    **A.**   No.

20    **Q.**   Did he seem confused or slur his speech when you

21    went over the form with him?

22    **A.**   No.

23    **Q.**   And did he ultimately agree to continue to talk to

24    you?

25    **A.**   He did.

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  After he signed the waiver, what topic did you speak

2    about?  Were you still talking about the victim or

3    something different?

4    **A.**  We were speaking more about the possibility of child

5    pornography in the home.

6    **Q.**  So you moved to child pornography?

7    **A.**  Correct.

8    **Q.**  And did the defendant make statements to you about

9    child pornography ultimately?

10   **A.**  He did.  At first he mentioned there would be

11   clothes --

12                **MS. FITZHARRIS:**  Objection to the substance

13   of Mr. Evans' statement.  It is not relevant to the

14   question of voluntariness.

15                **THE COURT:**  Ms. Woodward?

16                **MS. WOODWARD:**  I can move on, your Honor.

17                **THE COURT:**  All right.

18

19   **BY MS. WOODWARD:**

20   **Q.**  What was his demeanor during this time?  Was it the

21   same as it was the first part of the morning?

22   **A.**  No, he was very nervous as he was when he initially

23   brought out the electronic media consent form.  He stayed

24   pretty nervous at that point.

25   **Q.**  And while you were interviewing the defendant, were

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    there other members of your team doing other actions in

2    the home?

3        A.  Yes, there were people in the house searching

4    different rooms in the house.  There was a large amount of

5    electronic media in his living room area that was

6    immediately adjacent to the kitchen.  So there were agents

7    in there doing forensic extractions on site.

8        Q.  And forensic extraction on site, you mean that there

9    were agents starting to look at what was on his electronic

10   devices?

11       A.  They do a quick what's called a preview of a device,

12   and during that preview, it was immediately apparent that

13   there was a large amount of child pornography on the

14   device that they were looking at.

15       Q.  Once the child pornography was found, was the

16   defendant arrested that day?

17       A.  He was arrested later that morning.

18       Q.  Was that as a result of finding the child

19   pornography on his devices?

20       A.  That's correct.

21       Q.  We talked about the Miranda Rights that you went

22   over with the defendant, and then he continued to speak to

23   you.  While you continued to interview him about child

24   pornography, without getting into what he said, did he

25   ever ask you about those rights again, or say that he

1    wanted to exercise his right to remain silent, or that he

2    wanted to have a lawyer?

3       **A.**   No, never.

4       **Q.**   Did those rights come up again at any point during

5    the rest of your interview about child pornography?

6       **A.**   Not from him.  I did not reread his rights.  There's

7    no need for that.

8       **Q.**   There's just that one discussion where he -- you

9    went over the form -- went over the rights, and he, signed

10    it, correct?

11       **A.**   Correct.

12                **MS. WOODWARD:**  I have no further questions.

13                **THE COURT:**  Thank you, Ms. Woodward.  Ms.

14    Fitzharris?

15

16                    **CROSS EXAMINATION**

17

18    **BY MS. FITZHARRIS:**

19

20       **Q.**   Good morning, Agent Forys.

21       **A.**   Good morning, ma'am.

22       **Q.**   Before you started working at HSI, you had a long

23    career in law enforcement?

24       **A.**   Yes.

25       **Q.**   An air marshal is kind of like a police officer on a

*18-20421; USA v. CRAIG DAVID EVANS*

1    plane?

2        **A.**   In some sorts, yes.

3        **Q.**   And in your various law enforcement capacities,

4    you've received training?

5        **A.**   Yes.

6        **Q.**   Training in how to identify mental health issues in

7    a person that talking to?

8        **A.**   That's not really specific things that we get into.

9    That's more of kind of the newer thing, but I'm not a

10   mental health professional in any way, shape or form.

11       **Q.**   But you have received training how to identify

12   issues regarding mental health?

13       **A.**   Yeah, if there was someone like you mentioned air

14   marshal, if someone was acting erratically, not just

15   generalized, not necessarily a terrorist trying to

16   overtake the plane, but yeah, there's some general.

17       **Q.**   And on planes people drink alcohol?

18       **A.**   Yes.

19       **Q.**   And when people drink alcohol, sometimes they get a

20   little out control?

21       **A.**   Absolutely.

22       **Q.**   And sometimes you have to interact with people that

23   are drunk?

24       **A.**   Absolutely.

25       **Q.**   Perhaps in your own personal life, you have seen

*18-20421; USA v. CRAIG DAVID EVANS*

1    people that were drunk as well?

2        A.   I have witnessed it.

3        Q.   Have you received any training in your law

4    enforcement capacity as to how to spot signs of

5    intoxication?

6        A.   Very general things that's not the concentration of

7    law enforcement training.  I'm not a road DUI cop or

8    anything like that, nor have I ever been.

9        Q.   But you did receive training and how to spot signs

10   of intoxication?

11       A.   I think anybody can spot that if it's at a point

12   yes.  It is depending on where that line is I would say.

13       Q.   You did receive training as to how to look for signs

14   of intoxication?

15       A.   If I have, I don't recall an exact class where I sat

16   down for hours like our general training block is and

17   said, this is what intoxication looks like.  I think that

18   getting to this point in life, everybody knows whether

19   someone is drunk or not.

20       Q.   And sometimes with intoxication people ramble?

21       A.   That could be.

22       Q.   Hard to keep them focused?

23       A.   I'm sure that could be as well.

24       Q.   Yes or no, in your experience as an law enforcement

25   officer or a person talking to drunk people, did you

*18-20421; USA v. CRAIG DAVID EVANS*

1      notice it is hard to keep a drunk person focused?

2          A.   Absolutely.

3          Q.   And sometimes people who were drunk repeat

4      statements?

5          A.   I'm sure that's true.

6          Q.   Yes or no?

7          A.   Yes.

8          Q.   Okay.  Sometimes they respond to questions slowly?

9          A.   Yes.

10         Q.   Sometimes they respond quickly?

11         A.   I'm sure of that, yes.

12         Q.   They get  defensive?

13         A.   Yes.

14         Q.   Have a hard time walking?

15         A.   Yes.

16         Q.   Look disheveled?

17         A.   Yes.

18         Q.   And it's hard to keep them focused on a straight

19     train of thought?

20         A.   Yes.

21         Q.   On June 11th, when went to Mr. Evans' home, you

22     noted that it was extremely hard to keep Mr. Evans on a

23     straight train of thought?

24         A.   Yes.

25         Q.   Throughout the entire time?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  Yes, he was all over the place, the same as the

2    interview at CIS by Adam Bailey.  He mentioned that he was

3    all over the place.

4    **Q.**  Wasn't focused?

5    **A.**  Uh-huh.

6    **Q.**  Yes?

7    **A.**  Yes.

8    **Q.**  He switched topics?

9    **A.**  Yes.  He would not stay on chronological pace.

10   **Q.**  Had a hard time, stumbled a little bit walking

11   around?

12   **A.**  Not more than -- it wasn't anything crazy.

13   **Q.**  You can got house about 7:20 in the morning?

14   **A.**  That's correct.

15   **Q.**  And you would agree with me that it's possible for

16   someone to be drunk after a heavy night of drinking the

17   night before the next morning?

18   **A.**  I think anybody can be drunk anytime.

19   **Q.**  But if somebody drank an excessive quantity in the

20   evening, they could still be drunk in the morning?

21   **A.**  I'm sure theoretically that's correct.

22   **Q.**  In your law enforcement training, have you ever seen

23   somebody who has been pulled over for drunk driving early

24   in the morning?

25   **A.**  Yes.  I was never the officer of that, but I'm aware

*18-20421; USA v. CRAIG DAVID EVANS*

1      that has happened.

2          Q.   By the time you arrived at the house, you had

3      applied for a search warrant?

4          A.   Yes, that's correct.

5          Q.   And you identified four different crimes that you

6      were investigating?

7          A.   That sounds close to right, but I would have to

8      revisit the search warrant to see what exactly the crimes

9      were.

10         Q.   You were investigating suspected child pornography?

11         A.   Correct.

12         Q.   Sex tourism?

13         A.   Yes.

14         Q.   Force labor or human trafficking?

15         A.   Yes, that was on cusp of that, but I don't know that

16     we were pursuing that charge.

17         Q.   On direct examination you did talk about how you

18     were investigating human trafficking?

19         A.   Yes, as the lead came in.

20         Q.   You're part of the human trafficking unit?

21         A.   Right, but I'm not tied to one particular type of

22     investigation.  I'm not in the child pornography group,

23     and clearly we're talking about child pornography.

24         Q.   You were there because you had some concerns about

25     human trafficking?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**   There were some outside concerns with relating to

2    the victim's mother.

3    **Q.**   And you were also there investigating cyber

4    stalking?

5    **A.**   Cyber stalking?  Can you clarify what that means in

6    general?

7                **MS. WOODWARD:**   I object, your Honor.  This

8    witness is not the affiant of the search warrant, and to

9    ask him exactly what was in it when it was not his

10   affidavit, I'm not sure this gets us anywhere.

11               **THE COURT:**   Ms. Fitzharris?

12               **MS. FITZHARRIS:**   If Mr. -- if Agent Forys was

13   relying on the search warrant, then presumably he read it.

14   Agents shouldn't, you know, just blindly rely on warrants.

15   There is a requirement that they read them.

16        These are the crimes specifically listed in the

17   warrant.  Agent Forys was there with Agent Galbreath who

18   was the affiant of the warrant.  It would seem to me like

19   they would have communications, and so he would be aware

20   of the nature of the crimes that they are investigating.

21               **THE COURT:**   Overrule the objection.

22

23   BY MS. FITZHARRIS:

24   **Q.**   If I showed you a copy -- did you read the warrant

25   before you executed it?

                     *18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  Yes.

2      **Q.**  If I showed you a copy of the warrant, would that

3  refresh your recollection of the crimes that you were

4  investigating?

5      **A.**  Sure, if you have a copy of it.

6      **Q.**  Agent Forys, I handed to you what was previously

7  submitted as Defense Exhibit A as part of the motion to

8  spruce.  It's a copy of the search warrant application?

9      **A.**  Yes, ma'am.

10      **Q.**  Please turn to Page 1, and look at Paragraph 2.

11      **A.**  Okay.

12      **Q.**  Does reviewing that paragraph remind you what crimes

13  you were investigating that day?

14      **A.**  Yes, 18 U.S.C. 2261(a) stalking.  I didn't see it

15  referred to as cyber stalking.  I apologizes.

16      **Q.**  That's all right.  Thank you.  But you didn't tell

17  Mr. Evans that you were there to investigate him for those

18  crimes?

19      **A.**  To -- I did not read to him line by line the search

20  warrant.

21      **Q.**  When you arrived at the door at 7:20 in the morning.

22      **A.**  Absolutely not.

23      **Q.**  You said that you were there to investigate his

24  wife?

25      **A.**  We were following up on his complaint at USCIS that

*18-20421; USA v. CRAIG DAVID EVANS*

1    he was adamant that his wife should be removed from the
2    country.
3        Q.   You were not alone when you went to the house?
4        A.   No, I was not.
5        Q.   You were there with Agent Galbreath?
6        A.   I was.
7        Q.   He is also a member of law enforcement?
8        A.   He is.
9        Q.   And you -- when he answered the door, you identified
10   yourself as a member of law enforcement?
11       A.   We did.
12       Q.   Showed a badge?
13       A.   We did.
14       Q.   Were you dressed the way you are now?
15       A.   More casually.
16       Q.   Slacks?
17       A.   Might have had on jeans.  I don't remember my
18   attire, but more casual than today.
19       Q.   Were you wearing a service belt?
20       A.   I don't have a service belt, like, per se, like a
21   street cop or anything like that.  I wear a regular tan
22   leather belt generally.
23       Q.   Do you have a service weapon?
24       A.   Yes.
25       Q.   Did you have it on that day?

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  Of course.

2    **Q.**  And it was on your waist?

3    **A.**  Of course.

4    **Q.**  Were you wearing a jacket?

5    **A.**  Or a hoodie or some kind of cover over it.  I just

6    generally don't randomly walk around with a gun exposed.

7    **Q.**  And did you have handcuffs with you?

8    **A.**  Yes, I believe I did.

9    **Q.**  Did Agent Galbreath have a service weapon?

10   **A.**  I imagine he did.  I didn't frisk him.

11   **Q.**  But he would usually carry one?

12   **A.**  He is an outstanding officer.  He would have had his

13   gun.

14   **Q.**  And you saw it that day?

15   **A.**  I didn't see it because I'm sure he had cover on as

16   well.

17   **Q.**  And he also had handcuffs?

18   **A.**  I can't speak to the handcuffs.

19   **Q.**  So there were two of you?

20   **A.**  Correct.

21   **Q.**  And Mr. Evans was alone in the house?

22   **A.**  Correct.

23   **Q.**  There was a dog?

24   **A.**  Yes.

25   **Q.**  You told him that he needed to take the dog outside?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  I don't know -- I'm not a vet, so I can't really

2    speak to the dog being healthy, rabid or whatnot.  So with

3    us trying --

4    **Q.**  Yes or no.  You told him to take the dog outside?

5    **A.**  I believe so.

6    **Q.**  You don't believe so?

7    **A.**  I believe so.  I don't recall either way about the

8    dog, but I mean, it seems possible.

9    **Q.**  The table that you were sitting at in the kitchen,

10   it's rectangular?

11   **A.**  It's a smaller table.  It's rectangular or square.

12   I'm not sure of the shape.

13   **Q.**  It was pushed up against the wall?

14   **A.**  There was some kind of a barrier, like a half wall

15   or something.  It was in the middle of the room.

16   **Q.**  But there were only three sides that you could sit

17   on?

18   **A.**  That sounds right.

19   **Q.**  And Mr. Evans sat in the middle between you and

20   Agent Galbreath?

21   **A.**  Correct.  I was immediately -- Agent Galbreath was

22   sitting across from me, and Mr. Evans was to my left to

23   Agent Galbreath's right.

24   **Q.**  So just to visualize, Mr. Evans is in the center,

25   you know, kind of like the short end of the table?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**   Okay.

2    **Q.**   And one of you is to his left?

3    **A.**   Yes.

4    **Q.**   And one to his right?

5    **A.**   Correct.

6    **Q.**   And you mentioned that Mr. Evans went outside to

7    smoke?

8    **A.**   Several times.

9    **Q.**   When he went out, you can see from the kitchen table

10   outside on the patio?

11   **A.**   Yes.

12   **Q.**   So you could see Mr. Evans while he was smoking?

13   **A.**   Yes, at times he was standing in the doorway talking

14   with us, chitchatting.

15   **Q.**   He was never out of your eyesight?

16   **A.**   Not really.

17   **Q.**   When he went to get the photo albums, there's an

18   open floor plan in the house?

19   **A.**   I'm -- not really an open floor plan.

20   **Q.**   What I mean by that from that -- from the kitchen,

21   you can see the living room?

22   **A.**   Yes.

23   **Q.**   And when Mr. Evans got the photo album, he was not

24   outside of your eyesight?

25   **A.**   He wasn't in the living room.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  But you followed him?

2    **A.**  Of course.

3    **Q.**  All right.  You saw him at all times?

4    **A.**  Yes.

5    **Q.**  When you were asked -- when you began the

6    conversation, you asked about Mr. Evans' relationship with

7    his wife, and you had concerns that he engaged sex

8    tourism?

9    **A.**  We were there to hear his side of the story in the

10   very beginning, and asked him to tell us his details on

11   what went on in his life with his victim.

12   **Q.**  You were there with a warrant to search for evidence

13   of sex tourism?

14   **A.**  At some point we were planning on executing that

15   warrant.

16   **Q.**  You had it with you at all times?

17   **A.**  Yes.

18   **Q.**  And you came armed with that warrant?

19   **A.**  We had that warrant with us, yes.

20   **Q.**  And so you asked Mr. Evans about his travels to the

21   Philippines?

22   **A.**  Correct.

23   **Q.**  You asked about whether he engaged -- whether he

24   took photos of his wife?

25   **A.**  He offered that information up that he took photos

*18-20421; USA v. CRAIG DAVID EVANS*

1    of his wife.

2        Q.   You asked him questions about those photos?

3        A.   About like if he she was underage?  Is that what you

4    are asking?

5        Q.   Yes.

6        A.   Yes.

7        Q.   And as you know, it's not illegal to take a photo of

8    a person over 18?

9        A.   I do know that law.

10       Q.   And so you asked specifically whether he took photos

11   of his wife before she turned 18?

12       A.   Correct.

13       Q.   You asked about whether she was topless?

14       A.   I don't know if we got into that much of the

15   specifics of it.

16       Q.   Did you ask whether he took photos of her genitals?

17       A.   I don't know that we got, again, into that much of

18   that.  I think we probably left it as nude or clothed.

19       Q.   You also ask him about any sexual contacts he had

20   with his then fiancee?

21       A.   I believe that's correct.

22       Q.   And you asked all of these questions before giving

23   Miranda Warnings?

24       A.   This was all along the story of -- I mean, the

25   answer to the question is yes, before Miranda Warnings.


                  *18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  When he was answering your question, he rambled?

2    **A.**  I mean, he was like a people that we've interviewed

3    before, yes.  I mean, he just talked at his own pace.

4    **Q.**  Hard to keep focus?

5    **A.**  I just assumed that's how he talked.

6    **Q.**  Hard to focus?

7    **A.**  He was all over the place.

8    **Q.**  And before you gave Mr. Evans the warrant and the

9    consent form, you had been there approximately two, two

10   and a half hours?

11   **A.**  If we got there at 7:20 and knocked on the door, the

12   consent form I would say around 9:30.  So about two hours

13   and 10 minutes roughly.

14   **Q.**  You're asking questions about taking photos?

15   **A.**  Sure.

16   **Q.**  The marriage?

17   **A.**  Yes.

18   **Q.**  And any travel?

19   **A.**  Yes.

20   **Q.**  And his relationship with his wife?

21   **A.**  Yes.

22   **Q.**  And his domestic violence charges?

23   **A.**  Yes, he offered that very freely.

24   **Q.**  And all before giving Miranda Warnings?

25   **A.**  Correct.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  When you gave Mr. Evans the consent form -- I will
2    approach and hand you a copy of what's been marked as
3    Government Exhibit B.  That's the consent form that you
4    gave Mr. Evans?
5    **A.**  Yes, it is.
6    **Q.**  There are six paragraphs on the form?
7    **A.**  Yes, that's correct.
8    **Q.**  Four of the paragraphs have blank spots?
9    **A.**  That is correct.
10   **Q.**  First is the signatory's name?
11   **A.**  Yes, that's correct.
12   **Q.**  Did you write that?
13   **A.**  That's my handwriting.
14   **Q.**  The second is for an address?
15   **A.**  Yes, that's correct.
16   **Q.**  And you wrote the address in there?
17   **A.**  Yes, that's my handwriting.
18   **Q.**  The third blank is that the person -- establishes
19   that the person has a legal right to consent to the
20   search?
21   **A.**  Yes.
22   **Q.**  And you filled in that blank spot?
23   **A.**  The third blank spot we're referring to?
24   **Q.**  Yes?
25   **A.**  Where it says any and all electronic media at the

*18-20421; USA v. CRAIG DAVID EVANS*

1   residence?

2       Q.   Yes.

3       A.   Yes, that's my handwriting.

4       Q.   But the sentence as you have written it says:   I

5   state that I have standing to consent to such a search and

6   seizure due to the fact that I am the --

7       A.   Yes --

8       Q.   -- any and all electronic media at the residence in

9   relation to the computer system media or devices?

10      A.   That's correct.

11      Q.   That doesn't make sense, does it?

12      A.   It is what it is.   This is -- we're filling it out

13  and helping him along, and then he can either sign it or

14  not sign it.

15      Q.   But it does not actually establish that he is the

16  owner of the devices?

17      A.   I'm sorry?

18      Q.   It does not -- the form does not state that he is

19  the owner of the devices?

20      A.   It states the media at his residence.

21      Q.   It does not state that he is the owner of the

22  devices?

23      A.   No.

24      Q.   And then the fourth paragraph you also wrote -- you

25  filled that in, right?

*18-20421; USA v. CRAIG DAVID EVANS*

1       **A.**   With the word "English"?

2       **Q.**   Yes.

3       **A.**   That's again my handwriting.

4       **Q.**   And that establishes that he speaks English?

5       **A.**   Yes.

6       **Q.**   At the bottom of the page there are three signature

7       forms, three signature blocks?

8       **A.**   Yes.

9       **Q.**   And on the first line is the person who is signing

10      the form, the signatory of the form, right?

11      **A.**   His printed name, yes.

12      **Q.**   Did you write that name?

13      **A.**   No, that's not my handwriting.

14      **Q.**   Mr. Evans wrote that?

15      **A.**   Correct.

16      **Q.**   And he also wrote the date?

17      **A.**   Yes, that's not my handwriting.

18      **Q.**   He wrote a 6?

19      **A.**   It looks like a 6.

20      **Q.**   He wrote an 11?

21      **A.**   Yes.

22      **Q.**   And he wrote what looks like another 1?

23      **A.**   Correct.

24      **Q.**   And then a 9?

25      **A.**   That's -- from that photocopy it's tough to

*18-20421; USA v. CRAIG DAVID EVANS*

1    determine.  I be can't read that.

2        Q.  The handwriting is really difficult?

3        A.  Mine is not much better.

4        Q.  Looks like he might have wrote a 5?

5        A.  I don't know what that is.

6        Q.  But he did not write 2018?

7        A.  It doesn't look very clear to be 2018, nor does his

8    last name Evans, but I think that's what he was getting

9    at.

10       Q.  All right.  When you handed Mr. Evans the consent

11   form, he starred at it?

12       A.  Yes.

13       Q.  For a long time?

14       A.  Yes.

15       Q.  And he started chain smoking?

16       A.  Yes.

17       Q.  He was sweating?

18       A.  I mean, the chain smoking and kind of a blank stare

19   at the form was much more noticeable than perspiration.

20       Q.  And he seemed nervous?

21       A.  He seemed extraordinary nervous at that point.

22       Q.  And at any point did you tell him for us to help

23   you, you have to help us?

24       A.  I don't recall that statement.

25       Q.  Did you talk about how he needed -- you mentioned on

*18-20421; USA v. CRAIG DAVID EVANS*

1    direct examination that you told him what that you were

2    going to search for evidence of immigration fraud on his

3    computer?

4       **A.**  We mentioned -- he prior mentioned that he had

5    conversations with Victim 1's mother in the Philippines,

6    and I told him if there was something that could be used

7    against Victim 1 for her subsequent deportation, that that

8    could possibly be found in his phone, that we would like

9    to take a look at that.

10      **Q.**  You gave the impression that you were going to look

11   for evidence of immigration fraud?

12      **A.**  I mentioned Facebook Messenger specifically because

13   that's what he said he communicated with the mom.

14      **Q.**  You gave him the impression that you were there

15   looking for evidence for the investigation of his wife?

16      **A.**  Uh-huh, but we fully said that we were going to take

17   a look at the whole phone.

18      **Q.**  Did you tell him that he had a right to limit the

19   search?

20      **A.**  Limit the search?

21      **Q.**  Uh-huh.

22      **A.**  I don't think I specifically mentioned that.  I

23   said, do you give us consent to look at your device, yes

24   or no, and he read the form, starred at it for a long

25   period of time, and then signed it.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**   Never explain that you could say, hey, you can look

2    at Facebook Messenger, but not my email?

3    **A.**   I don't think I went into the specifics of dividing

4    up app by app on the phone.  No, I don't think I did that.

5    **Q.**   But because he mentioned Facebook Messenger, you

6    kind of gave the impression that you were going to look at

7    Facebook Messenger?

8    **A.**   I mentioned that part specifically.

9    **Q.**   And the consent form and the warrant form, they were

10   handed close in time together?

11   **A.**   The consent form was the first, the warrant was

12   next, and then Miranda followed the warrant.

13   **Q.**   So when you read Mr. Evans his Miranda Warnings,

14   there were still two law enforcement agents there?

15   **A.**   Myself and Task Force Agent Galbreath was there.

16   **Q.**   You were still in the kitchen?

17   **A.**   Correct.

18   **Q.**   You were still -- one of you was on Mr. Evans' left

19   side?

20   **A.**   I believe I was still in my chair.  If we switched

21   chairs, it wasn't to the point that I noticed it.

22   **Q.**   One was on his left side?

23   **A.**   I'm assuming.

24   **Q.**   One on his right?

25   **A.**   I don't recall at that point.  That's how we

*18-20421; USA v. CRAIG DAVID EVANS*

1    definitely started the interview.

2        **Q.**   The only difference is that you had given him the

3    warrant at that point between the start of the

4    conversation and when you gave him the form?

5        **A.**   We gave him a consent form and then the warrant.

6        **Q.**   Right.  When you read the Miranda Warnings, the only

7    changes that you had shown Mr. Evans was the warrant?

8        **A.**   I'm sorry.  We gave him the consent form first.

9        **Q.**   In terms of the surroundings, what was going on?

10       **A.**   We had given him a copy of the warrant, and I

11   believe that people were possibly starting to come in the

12   front door.  So that's why it could have possibly been

13   perceived as more of a custodial situation because it

14   clearly wasn't before.  So that's why I wanted to be safe

15   and -- can I finish or no?

16       **Q.**   When you gave him the warrant, you made a phone

17   call?

18       **A.**   Possibly.  Probably to say to let the team come in.

19       **Q.**   You had to call people to come in?

20       **A.**   Right.

21       **Q.**   And between when -- how long did it take them to

22   arrive?

23       **A.**   I mean, they were on the block.  So within a minute

24   or two.

25       **Q.**   And then you -- but you -- the order according to

*18-20421; USA v. CRAIG DAVID EVANS*

1    you is that you gave him the consent form, yes?

2       **A.**   Yes.

3       **Q.**   And then the warrant?

4       **A.**   Yes.

5       **Q.**   And then read Miranda?

6       **A.**   Yes.

7       **Q.**   And that was all between the period of time of 9:30

8    to 9:50?

9       **A.**   Yeah.   9:50 is when we wrote down on the statement

10   of rights form.   So that seems consistent.

11      **Q.**   After you gave -- read Mr. Evans his Miranda

12   Warnings, you continued to ask questions about his

13   marriage again?

14      **A.**   At that point it seemed like it was pretty focused

15   on child pornography.

16      **Q.**   You did ask questions about his travel to the

17   Philippines?

18      **A.**   Earlier in the interview.

19      **Q.**   Are you sure that you didn't ask any questions

20   about -- after Miranda Warnings, you didn't ask any

21   questions about photographs or Mr. Evans' travel to the

22   Philippines?

23      **A.**   I'm not sure if we asked him a follow up question.

24   I mean, that seems like that could have possibly happened,

25   but I don't recall like directly, oh, I gotcha.   Here's

                *18-20421; USA v. CRAIG DAVID EVANS*

1    this question.  I don't remember anything specific.

2        **Q.**  Is there anything that you looked at that would

3    refresh your recollection about what kind of questions you

4    asked after Miranda Warnings were given?

5        **A.**  Sure.  I'm sure if there is a report of the

6    investigation, I could look at that.

7        **Q.**  All right.  I will hand the officer a copy of the

8    investigation report, which I marked for identification as

9    Defense Exhibit 1.

10       **A.**  Thank you.

11       **Q.**  Please review Pages 3 and 4.

12       **A.**  Any paragraph in particular that you want me to look

13   at?

14       **Q.**  On Page 3, the final two paragraphs talk about

15   Miranda.  So if you could please review those, and then

16   look at Pages -- on Page 4 at Paragraphs 5 and 6.

17       **A.**  So the paragraph that start with Evans stated that

18   he married a young girl so his sins would go away?

19       **Q.**  Please don't read it.  Just review it.

20       **A.**  Okay, but are those the paragraphs?  I just want to

21   make sure.

22       **Q.**  Correct.

23       **A.**  So that paragraph and the one below that?

24       **Q.**  Correct -- no.  The paragraph above that.

25       **A.**  Okay.  Just give me one second.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**   Sure.

2    **A.**   Okay.

3    **Q.**   Do you recall the questions that you asked Mr. Evans

4    after Miranda was given?

5    **A.**   Yes, I reviewed them.

6    **Q.**   You asked him about whether he took photos of his

7    then wife before she was 18?

8    **A.**   I don't know if there was a question there.  He made

9    statements.

10   **Q.**   But you -- did you ask him follow up questions about

11   that?  Your testimony is that he unprompted he brought

12   that up?

13   **A.**   I'm not sure.  I'm just reading the statements that

14   he made, and how we memorialized it.

15   **Q.**   There were questions about why he married his wife?

16   **A.**   It appears that he made statements that his sins

17   would go away if he --

18   **Q.**   There were questions or comments about why he

19   married his wife?

20   **A.**   There was some questions and conversation going on,

21   yes.

22   **Q.**   What time did you leave Mr. Evans' house on

23   June 11th?

24   **A.**   I'm not exactly sure.  We left, myself and another

25   agent, and escorted Mr. Evans to the U.S. Marshals for

*18-20421; USA v. CRAIG DAVID EVANS*

1    lockup.

2        Q.   But you don't remember -- was it afternoon?

3        A.   I would say it was in the vicinity of 11, 12.   I

4    don't know time that we exactly drove him to the marshals.

5    I left before the rest of the search team.

6        Q.   Agent Forys, after you arrested Mr. Evans, he made

7    statements that he thinking about committing suicide?

8        A.   When I took him in the vehicle and drove him, there

9    was a fear that he did make some claims to kill himself,

10   yes.

11            **MS. FITZHARRIS:**  Right.  No further

12   questions.

13            **THE COURT:**  All right.

14        Ms. Woodward?

15

16                    **REDIRECT EXAMINATION**

17

18   BY MS. WOODWARD:

19

20       Q.   Just to clarify Agent Forys, when you testified on

21   direct that when you spoke to the defendant about consent,

22   you were talking about bringing someone to the house to

23   review the devices, is that right?

24       A.   Yes.

25       Q.   But you ended up seizing the devices taking them off

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    site, is that right?

2        A.  Yes.

3        Q.  Because that's what the search warrant authorized?

4        A.  Yes.

5        Q.  So were you relying on the search warrant or on the

6    consent that he gave?

7        A.  The search warrant for the electronic video that our

8    forensic agent did the preview on and found the initial

9    load of child pornography.

10       Q.  Ms. Fitzharris asked you some questions about the

11   date on Government Exhibit B.  I will have you take a look

12   at B and C together, and you see the defendant's printed

13   name on Government Exhibit B?

14       A.  Yes.

15       Q.  And for the date we see a 6 and 11, correct?

16       A.  Yes.

17       Q.  And then the number next to it, is it possible

18   that's an 18 or is it hard to say?

19       A.  I mean, it is hard to make out, but again, he was

20   pretty nervous.

21       Q.  Government Exhibit C, did the defendant date --

22   write a date next to his name?

23       A.  It states 6-11-18.

24       Q.  That's easier to read?

25       A.  It is.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  Back to Government Exhibit B, underneath the date

2    there's like a scribble below it.  Do you know what that

3    is?

4    **A.**  Yes, his signature.

5    **Q.**  All right.  So you wrote his -- the portions of this

6    form that the defendant filled out were his printed name,

7    the date and his signature, is that correct?

8    **A.**  Correct.

9    **Q.**  Ms. Fitzharris asked you questions on cross about

10   drunk people.  Do you remember those questions?

11   **A.**  I do.

12   **Q.**  And I think she was asking you if drunk people

13   ramble and hard to keep them on a straight train of

14   thought.  Do you remember those questions?

15   **A.**  Yes.

16   **Q.**  Have you also encountered people that appeared to be

17   sober that ramble?

18   **A.**  Of course.

19   **Q.**  And hard to keep on a straight train of thought?

20   **A.**  Of course.

21   **Q.**  Is that yes?

22   **A.**  Correct.

23   **Q.**  And before you went to Mr. Evans' home, you had

24   received information from Officer Bailey, correct?

25   **A.**  That's correct.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.** And Officer Bailey also reported that the defendant

2    didn't keep straight train of thought?

3    **A.** Yeah, he made mention in his memo that the defendant

4    was all over the place.

5    **Q.** Take a look at Government Exhibit A in the third

6    paragraph.  Does Officer Bailey make note of the

7    defendant's demeanor?

8    **A.** Yes.

9    **Q.** And that he was jumping from topic to topic?

10    **A.** Yes.  It says the USC began jumping from topic to

11    topic.

12    **Q.** And USC would be the U.S. citizen.  That would be

13    the defendant?

14    **A.** Yes, that would be Craig Evans.

15    **Q.** And also that he had a hard time keeping a straight

16    train of thought?

17    **A.** Yes.

18    **Q.** Just to review, when the defendant spoke to Officer

19    Bailey on two occasions, May 2nd and May 18th --

20    **A.** I think it was the 16th.

21    **Q.** Thank you.  He had driven himself presumably to

22    USCIS to Detroit from Sterling Heights?

23    **A.** Yes, there was no mention of another individual.

24    **Q.** Okay.  Ms. Fitzharris asked you questions about your

25    attire the day that you spoke to the defendant.  Do you

*18-20421; USA v. CRAIG DAVID EVANS*

1    remember those questions?

2        **A.**   I do.

3        **Q.**   And you testified that you were armed that day?

4        **A.**   I was.

5        **Q.**   And is that normal for you?

6        **A.**   Of course.

7        **Q.**   Did you show the defendant your firearm?

8        **A.**   No, there's no need to do that.

9        **Q.**   Did you tell him that you were armed?

10       **A.**   No.  There's no reason to explain that.

11       **Q.**   And same for Task Force Officer Galbreath.  Did you

12   observe him tell the defendant that he had a weapon or

13   show him the weapon?

14       **A.**   No.

15       **Q.**   What about handcuffs?

16       **A.**   No.

17       **Q.**   Would they have been covered up by something that

18   you were wearing?

19       **A.**   They would have been on the back of my pants hanging

20   with my jacket or hoodie or whatever I was wearing that

21   day over it.

22       **Q.**   Ms. Fitzharris asked you questions about where you

23   sat when interviewing the defendant.  We've talked about

24   how you were at the kitchen table.

25       **A.**   Correct.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  And she -- and you told her that the defendant was
2    in the middle, and you and Agent Galbreath were on either
3    side?
4    **A.**  Yes.
5    **Q.**  When you got to the defendant's home, did you tell
6    him where to sit, or did he direct you to certain portion
7    of the house?
8    **A.**  No, he was clearing off the table, and he said,
9    please, please, sitdown.  Again, he was very excited that
10   we were there.
11   **Q.**  Did you tell him to sit in the middle, where to sit?
12   **A.**  No.
13   **Q.**  When Ms. Fitzharris was asking you questions about
14   the questions of the defendant, you said that the
15   defendant talked at his own pace.  What do you mean?
16   **A.**  We just opened the questioning to him, tell us, and
17   he would just go off and kind of talk about from his point
18   of you the facts as he knew them.
19   **Q.**  So for the first portion of the interview before the
20   consent form and the search warrant, were you asking
21   pointed questions or were they more open-ended?
22   **A.**  The first part was completely open-ended, please
23   tell us the story.
24   **Q.**  Were the questions slightly different when talking
25   about child pornography?

*18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  Yes.

2      **Q.**  When talking about child pornography, Ms. Fitzharris

3    had you look at the paragraph in your report.  Do you

4    remember those paragraphs?

5      **A.**  Yes.

6      **Q.**  Some of those were statements that the defendant

7    made about why he married his wife.  Do you remember that

8    part of your report?

9      **A.**  Yes.

10     **Q.**  Did you specifically ask him why he married his wife

11   or did he offered that up to you?

12     **A.**  I think he was trying to explain that this was --

13               **MS. FITZHARRIS:**  Objection.  Speculation.

14               **MS. WOODWARD:**  Ms. Fitzharris suggested that

15   the witness was asking specific questions, and I think --

16   I just want to understand the nature of the interview at

17   this point, and what the defendant -- whether the

18   defendant was offering up information or responding to

19   specific interrogation.

20               **THE COURT:**  I'll permit the question.

21

22   BY MS. WOODWARD:

23     **Q.**  Did you ask him why did you marry your wife or did

24   that topic come up in a different way?

25     **A.**  That topic came up organically.  He explained to us

*18-20421; USA v. CRAIG DAVID EVANS*

1       that this was a way out of looking at child pornography if

2       he could marry someone that looked like a young girl or

3       child.

4                    **MS. FITZHARRIS:**  Objection.  The substances

5       of the statements are not relevant.

6                    **MS. WOODWARD:**  Again, your Honor, it's just

7       an evidentiary hearing.

8                    **THE COURT:**  Yes.  The Court will overrule.

9

10  **BY MS. WOODWARD:**

11      **Q.**  Finish what you were saying.

12      **A.**  So he was stating -- explaining that if he married

13      someone that looked young or like a child, that that would

14      alleviate the pressure to look at child pornography.

15      **Q.**  So it came up in the context of what you were

16      talking about with child pornography?

17      **A.**  Yes.

18      **Q.**  And this after you had provided him with Miranda

19      Warnings before you asked a lot of questions about child

20      pornography?

21      **A.**  Correct.

22                   **MS. WOODWARD:**  No further questions, your

23      Honor.

24                   **THE COURT:**  All right.  Thank you.  Anything

25      else?

*18-20421; USA v. CRAIG DAVID EVANS*

```
 1                    MS. FITZHARRIS:  Nothing further.
 2                    THE COURT:  Okay.  Thank you, sir.  You may
 3        step down.
 4
 5                         (Witness excused.)
 6
 7                    THE COURT:  Ms. Woodward, any other
 8        testimony?
 9                    MS. WOODWARD:  No, your Honor.
10                    THE COURT:  Ms. Robinson?
11                    MS. ROBINSON:  Yes, your Honor.  We would
12        call Mr. Evans to the stand, but may we ask the Court for
13        a five minute break?
14                    THE COURT:  Sure.
15                    MS. ROBINSON:  Thank you.
16
17                         (Recess taken.)
18
19                         (Proceedings resumed.)
20
21                    THE COURT:  Okay.  Ms. Robinson?
22                    MS. ROBINSON:  Defense would call to the
23        stand my client, Craig Evans.
24                    THE COURT:  Okay.
25
```

*18-20421; USA v. CRAIG DAVID EVANS*

```
 1                    C R A I G   E V A N S
 2
 3   being first duly sworn by the Court to tell the truth, was
 4   examined and testified upon his oath as follows:
 5
 6             THE COURT:  We will have you begin by having
 7      you state your name, spelling your last name.
 8             THE WITNESS:  Craig David Evans, E-v-a-n-s.
 9             THE COURT:  All right.  Thank you, sir.  You
10      may proceed.
11
12                    DIRECT EXAMINATION
13
14   BY MS. ROBINSON:
15
16      Q.  Mr. Evans, I will ask you some questions today about
17      things that happened the night before the police came to
18      your house, as well as the day that they were there, okay?
19      A.  Yes.
20      Q.  So if you go back to the evening before the police
21      arrived at your house and executed this search warrant,
22      where were you?
23      A.  I had just come home after leaving my son at my
24      ex-wife's apartment.  He just had a splenectomy, and he
25      was in the hospital for over a week.
```

1    **Q.**   So your son had just come home from the hospital?

2    **A.**   Yes.

3    **Q.**   You said he had been there for a splenectomy?

4    **A.**   Yes.

5    **Q.**   And so you took him where?

6    **A.**   He as at my ex-wife's apartment.

7    **Q.**   And after you left your ex-wife's apartment, where

8    did you go.

9    **A.**   I went back home after I went to the liquor store.

10   **Q.**   You stopped at the liquor store on your way home?

11   **A.**   Right.

12   **Q.**   Did you make a purchase while you were there?

13   **A.**   Yes.

14   **Q.**   What did you purchase?

15   **A.**   Two pints of Jim Beam.

16   **Q.**   What is Jim Beam?

17   **A.**   A bourbon.

18   **Q.**   Did you go directly home after you left the liquor

19   store?

20   **A.**   Yes.

21   **Q.**   What did you do when you got there?

22   **A.**   At home I just drank the bourbon and played video

23   games the rest of the evening.

24   **Q.**   Was anyone home with you?

25   **A.**   No.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.** You said that you drank the Jim Beam and played

2    video games?

3    **A.** Yes.

4    **Q.** How much of the Jim Beam did you drink?

5    **A.** I drank about half of it, about a pint.

6    **Q.** You bought two pints when you went to the store?

7    **A.** Right.  I drank about one pint.

8    **Q.** And your testimony is that you drank one of those

9    pints?

10   **A.** Correct.

11   **Q.** Was there anything in particular that caused you to

12   drink that night?

13   **A.** No, just all the stress from my son being in the

14   hospital for the past week, week and a half, whatever it

15   was.

16   **Q.** And did you end up finishing or drinking any of the

17   second pint?

18   **A.** After I woke up, I finished the rest of -- well,

19   almost the rest of it.  There was about that much left

20   sitting in the living room.

21   **Q.** What time did you start drinking that night?

22   **A.** Seven, 8:00.

23   **Q.** You said that after you drank the first pint, you

24   went to sleep at some point?

25   **A.** Between nine and 10:00.

*18-20421; USA v. CRAIG DAVID EVANS*

1     **Q.**  And then after you wake up, you said you finished
2  part the of the second pint?
3     **A.**  Correct, around one, 2:00 in the morning.
4     **Q.**  Is it uncommon for to you drink that much?
5     **A.**  No.  Sometimes it is and sometimes not.  It depends.
6     **Q.**  What do you mean by that?
7     **A.**  Normally I would just drink a pint.
8     **Q.**  Was there anything that caused you to drink more
9  than the normal amount that night?
10    **A.**  No, just alcoholism.  There's nothing that I can do.
11    **Q.**  So you consider your an alcoholic, is that fair to
12 say?
13    **A.**  Yes.
14    **Q.**  Have you ever tried stopping or stopping your
15 drinking or getting ahold of your alcohol problems?
16    **A.**  Yes, several times in my life.
17    **Q.**  Okay.  Let's talk about the last 18 months, two
18 years.  What have you done to try to get ahold of your
19 alcohol problem?
20    **A.**  August of 2017, I went into an actual rehab called
21 Harbor Lights in Clinton Township.  It is run by the
22 Salvation Army.  I was an inpatient for 10 days.
23    **Q.**  And so that was inpatient treatment.  Was that the
24 first time you went for inpatient help?
25    **A.**  Yes, first time for inpatient.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**   Do you feel like that treatment was successful?

2    **A.**   It was at the time because I started going to a new

3    Christian based program instead of a alcohol base called

4    reform unanimous.

5    **Q.**   How long were you participating in reform unanimous?

6    **A.**   All the way up to June of 2017.

7    **Q.**   Now at some point did you start drinking again even

8    though you had done inpatient at Harbor Light and reform

9    unanimous?

10   **A.**   I had a relapse one day in January of 2017.

11   **Q.**   Okay.  I'm sorry.  I didn't mean to cut you off.

12   **A.**   That's okay.

13   **Q.**   Is relapsing something that is common as part of

14   your alcoholism?

15   **A.**   Yes.

16   **Q.**   And is it fair to say that you were relapsing the

17   night before the police came to your house?

18   **A.**   Yes.

19   **Q.**   We heard testimony from one of the officers about

20   how people behave when they are dried.  And so my question

21   for you is, what -- how does your demeanor change when

22   you're drunk?

23   **A.**   I definitely talk a lot.

24   **Q.**   Would you say that you are able to stay focus when

25   you are drinking?

*18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**   No, I don't stay focus at all.

2      **Q.**   Are you a person who slurs your speech when drunk?

3      **A.**   Not really.

4      **Q.**   Not really?  So is it always going to be -- slurred

5      speech, is that going to be something that is indicative

6      of you being drunk in particular?

7      **A.**   No, you wouldn't recognize it.  It depends on where

8      I'm at.  I could go -- I know I will feel totally sober,

9      but if I were to drive and get a breathalyzer, I would

10     definitely fail.

11     **Q.**   So going back to that particular night, how did --

12     where did you fall asleep?

13     **A.**   In the living room on the couch.

14     **Q.**   And did you normally sleep in the living room on the

15     couch?

16     **A.**   No, I normally go in the bedroom and sleep in the

17     bedroom.

18     **Q.**   What stopped you from going to the bedroom?

19     **A.**   I fell asleep.  I just passed out from drinking.

20     **Q.**   So you passed out after your drinking, and that's

21     what caused you to sleep on the couch?

22     **A.**   Right, and that's when I woke up, and that's why I

23     continued drinking, because I woke up and the bottle was

24     right there on the table.

25     **Q.**   On a scale of one to 10, estimate how drunk you were

*18-20421; USA v. CRAIG DAVID EVANS*

1    that night after the second -- after you got into the

2    second bottle.  What would you say?

3        **A.**  About a seven.

4        **Q.**  Okay.  At some point the next morning you wake up,

5    correct?

6        **A.**  I woke up when the door was being knocked on.

7        **Q.**  And so when the door was being knocked on, that woke

8    you up out of your sleep?

9        **A.**  Yes.

10       **Q.**  What did you do next?

11       **A.**  Answered the door.

12       **Q.**  What specifically did you hear when you woke up?

13       **A.**  My dog starts barking because the door was being

14   knocked on.

15       **Q.**  You heard your dog barking, and you also heard

16   someone knocking being on the door?

17       **A.**  Yes.

18       **Q.**  What did you do?

19       **A.**  Answered the door.

20       **Q.**  And what happened when you got to the door?

21       **A.**  The two agents, Kyle and Jeremy, were at the door.

22       **Q.**  Were you still drunk at that point?

23       **A.**  I imagine so, yes.  Definitely over the limit of

24   like a breathalyzer.  I would have definitely failed.

25       **Q.**  Could you still feel the affects of the liquor in

*18-20421; USA v. CRAIG DAVID EVANS*

1    your system?

2        **A.**   Yes.

3        **Q.**   Even though it was the night before?

4        **A.**   Yes.

5        **Q.**   You said that two agents were at the door.  Were you

6    expecting them to come to your house?

7        **A.**   No.

8        **Q.**   What was your reaction when they showed up?

9        **A.**   I surprised that they were there.

10       **Q.**   Why were you surprised?

11       **A.**   I thought they would call me -- or, you know, I was

12   emailing back with them, with Agent Bailey was his name.

13       **Q.**   So you had been in contact with Agent Bailey, and he

14   had your contact information as far as you know?

15       **A.**   Yes.

16       **Q.**   And your expectation was that if they were to follow

17   up with you, they would make arrangements?

18       **A.**   Yes.

19       **Q.**   Before coming to your house?

20       **A.**   Yes.

21       **Q.**   So you were not expecting them that morning?

22       **A.**   No, I was not.

23       **Q.**   It was just the two agents?

24       **A.**   Yes.

25       **Q.**   Do you remember what they were wearing?

*18-20421; USA v. CRAIG DAVID EVANS*

1          **A.**  Just like regular pants and like a T-shirt.  I

2      believe Jeremy was wearing like a Hawaiian type shirt.

3          **Q.**  They were not dressed in police uniforms?

4          **A.**  No.

5          **Q.**  Could you see if they had weapons on them?

6          **A.**  Yes, I could see that they had guns and handcuffs.

7      They looked like officers like that in that sense.

8          **Q.**  Did they present their badges?

9          **A.**  I don't recall that.

10         **Q.**  But you could see both officers with weapons?

11         **A.**  Correct.

12         **Q.**  And both officers had handcuffs as well?

13         **A.**  Yes.

14         **Q.**  What did they say to you as the reason for being at

15     the door?

16         **A.**  They were following up on a claim that I made.

17         **Q.**  Did they -- did you know what they were talking

18     about?

19         **A.**  Yes, I filed a claim of immigration marriage fraud.

20         **Q.**  What was going through your mind at the time?

21         **A.**  They said that they were there to follow up on that,

22     and so I thought that's what they were there to do, follow

23     up on that.  So they asked if they could come in, and I

24     let them in, but then, you know, because I had the dog, he

25     wanted my dog outside because -- I mean, it's a little

                   *18-20421; USA v. CRAIG DAVID EVANS*

1    50 pound dog, but he still wanted him outside.  So I put

2    the dog outside before they came in.

3       Q.  So one of the agents asked you to remove your dog

4    from the house?

5       A.  Yes.

6       Q.  Do you remember which agent it was?

7       A.  The officer that was on the stand, Jeremy.

8       Q.  You said you complied.  Did you feel like you had

9    any choice in putting your dog outside?

10      A.  I just doing it to be courteous.  The dog is super

11   friendly.  I wasn't worried about the dog, but some people

12   don't like dogs.

13      Q.  You put him outside at the agent's request?

14      A.  Correct.

15      Q.  When you said they came into the house, where did

16   you all go?

17      A.  In the kitchen.

18      Q.  And can you describe for the Court how your house is

19   set up?  Is it a two story house, a ranch?

20      A.  It's a small three bedroom ranch.  So when you come

21   through the front door, you pass by the living room where

22   I would sit and where the couch was and the table right

23   there, and then you go through a big door wall, not a

24   sliding door wall, but it was big and open so you can see

25   between the living room and the kitchen pretty easily.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  So was it a straight path from the front door to the

2    kitchen?

3    **A.**  Yes.

4    **Q.**  And you all went into the kitchen area?

5    **A.**  Yes.

6    **Q.**  Where did you -- where did everybody sit?

7    **A.**  I sat like in the center seat.  Jeremy sat here and

8    Kyle sat to my left.

9    **Q.**  You were seated in the middle of that table?

10   **A.**  Yes, because it's up against like -- I call it an

11   island, like cupboards in the middle of the kitchen.

12   **Q.**  I know we covered this a little bit earlier, but

13   what did you think they were there to investigate?

14   **A.**  They said they were following up on the claim of

15   immigration marriage fraud, and that's what they were

16   there to investigate.

17   **Q.**  What types of question did they ask you?

18   **A.**  They started off asking about my relationship, and

19   how we met.

20   **Q.**  And what would you say the tone of the conversation

21   was at the beginning?

22   **A.**  It seemed like they were there to follow up like

23   what they were telling me they were there for.

24   **Q.**  So was Trisha May the focus of the conversation?

25   **A.**  Yes.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  Did there come a point in time where the tone of the

2    conversation began to change from your perspective?

3    **A.**  When they started giving me the waiver that they

4    wanted me to sign, that when I said I became really

5    reluctant, which I did, because I didn't want to sign it.

6    **Q.**  Let's talk a little bit about what was happening as

7    the tone of the conversation changed.  What were you

8    beginning to feel at that time?

9    **A.**  Pressured.

10   **Q.**  Pressured.  What was happening that was making you

11   feel pressured?

12   **A.**  Just the line of questioning itself.

13   **Q.**  And would it be fair to say that you were beginning

14   to feel nervous?

15   **A.**  Yes.

16   **Q.**  The officers -- or one of the officers testified

17   earlier that you at some point during these conversations

18   are moving around the house, and that your son began to

19   call.  Do you remember that testimony?

20   **A.**  Yes, the only time I moved in the house is they

21   asked about photographs, and so I went to the back room

22   and grabbed the photo album.

23   **Q.**  When you got -- the officer testified that he

24   followed you into the back room to get that photo album?

25   **A.**  He got up and just watch me walk down the hallway.

*18-20421; USA v. CRAIG DAVID EVANS*

1   **Q.**  You knew that he was watching you as you went to the

2   bedroom?

3   **A.**  Yes.

4   **Q.**  So it's not like you just went completely free of

5   intrusion by them.  They were watching you walk to the

6   back?

7   **A.**  Right.

8   **Q.**  At some point your son began to call your phone?

9   **A.**  Yes.

10   **Q.**  And tell us about that.

11   **A.**  He was calling.  He needed a ride to school.

12   **Q.**  How do you know he needed a ride to school?

13   **A.**  We arranged that the night before to take him to

14   school.

15   **Q.**  And he's calling you just once or were there

16   multiple attempts?

17   **A.**  A couple of times.

18   **Q.**  And what did you do in response to those phone

19   calls?

20   **A.**  I just pushed -- I turned it off.

21   **Q.**  Is there a reason why you didn't pick up the phone

22   call?

23   **A.**  They were telling me that I needed to talk to them

24   right now, and, you know, to talk to him in a little bit.

25   **Q.**  So when the agent testified earlier that you told

*18-20421; USA v. CRAIG DAVID EVANS*

1    them it was not necessary to pick up that call and that

2    this was more important, were they correct about that?

3        A.   No.   My son is my top priority in this entire world.

4    I wanted to take the call.   They were telling me not to at

5    that time, and I told them that he just got out of the

6    hospital, and they said well, if it's an emergency, call

7    him back or something.

8        Q.   Did you take them up on that?   Did you call your son

9    back?

10       A.   My son showed up at the door within a couple of

11   minutes of the phone call.

12       Q.   What did you do when your son showed up at the door?

13   How did you know your son was at the door.

14       A.   He was knocking on the door.

15       Q.   And did you get up and walk to the door?

16       A.   Yes, I answered the door.

17       Q.   Did the agents walk with you?

18       A.   I believe Kyle walked behind me when I walked to the

19   door.   One of them was right behind me.

20       Q.   And you answered the front door.   And what happens

21   next?

22       A.   My son was there, and I seen that his grandfather

23   already had him in the car.   So I asked him if his grandpa

24   could just drive him the rest of the way to school.

25       Q.   Did you have that conversation directly with your

*18-20421; USA v. CRAIG DAVID EVANS*

```
1    son?
2        A.  Yeah, it was 10 seconds.
3        Q.  Okay.  Did you have any conversation with his
4    grandfather?
5        A.  No, he was in the car.
6        Q.  What did you tell your son the reason was why you
7    couldn't take him to school?
8        A.  I just told him that they were there for the
9    immigration.  He already knew what was going on.  So I
10   just told him that the agents had showed up -- I just told
11   him that the police showed up to talk to me, and he said
12   okay.
13       Q.  Did you feel like you had the freedom at that point
14   to say to the agents, hey listen.  I'm going to stop this
15   and take my son to school?
16       A.  No, I definitely did not at that point.
17       Q.  Why did you not feel free to do that?
18       A.  Just their demeanor towards me was we're here now.
19   That was going to take priority over anything else.
20       Q.  At some point -- you have a medical condition called
21   diverticulitis?
22       A.  Yes.
23       Q.  How does that impact you during the course of the
24   day?
25       A.  I have a colostomy bag.  They had to cut my colon
```

1    out.  So they had to divert where my feces goes.  It comes

2    out to the colostomy bag.

3        Q.  Do you have to change that bag regularly?

4        A.  Yes.

5        Q.  Did you have to change the bag that morning?

6        A.  Yes, I did.

7        Q.  Did you tell the agents that you had to change the

8    bag that morning?

9        A.  Yes, I told them that I had to change the bag before

10   they took me -- arrested me or whatever.

11       Q.  Did they allow you to you do that?

12       A.  Yes.

13       Q.  Can you tell us about you going to change the bag?

14       A.  When I went in the bathroom, there were other agents

15   in the house, and the agent that sat up here Jeremy.  I

16   don't know his last name.  So he made it on a first name

17   basis when I spoke with him.  So that's all I remember,

18   but he stood at the doorway while I was changing.  I

19   pulled out some scissors to do it, and that's when he said

20   to me, not to have him shot him -- or to have him shoot me

21   because I pulled out a sharp object.  I said that I was

22   just going to cut the bag open because it has to be 30

23   millimeters of a circle.  I have to cut it open it starts

24   out like at 5-millimeter circle.

25       Q.  Let me back up.  Where did you have to change this

*18-20421; USA v. CRAIG DAVID EVANS*

```
 1      colostomy bag?

 2          A.   In the bathroom.

 3          Q.   In the bathroom --

 4               MS. WOODWARD:   If we could clarify when in

 5      the sequence of events occurred, I think that would be

 6      helpful.

 7               MS. ROBINSON:   So the agents are at your

 8      house, and your son came by.  Did you change the colostomy

 9      bag before your son was there or after son was there?

10          A.   Way after that.

11

12  BY MS. ROBINSON:

13          Q.   In terms of when the tone of the conversation

14      changed, did you change the bag before the tone of the

15      conversation changed or after?

16          A.   After.

17          Q.   And in relationship -- I know we have not gotten

18      there yet -- but I know eventually you find -- you were

19      presented with a search warrant, and you signed a consent

20      form, do you know if you change colostomy bag before or --

21          A.   After that.

22          Q.   In any event, you went into the bathroom to change

23      the bag, and were you allowed to -- is there a door to

24      your bathroom?

25          A.   Yes.
```

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  Were you allowed to close the door?

2    **A.**  No.

3    **Q.**  Tell us what happened specifically.

4    **A.**  I went in the bathroom, and I pulled out like my kit

5    in a sense.  So I have to get a colostomy bag.  I have to

6    get disposable bags, the paste to put it on.  This is just

7    to cut the bag open.  Then the different cleaning

8    solutions, and the things that I have to put on my skin

9    prior to changing.

10   **Q.**  And it was your testimony that Agent Forys was

11   watching you go through the process?

12   **A.**  He stood right at the bathroom door.

13   **Q.**  And he made a statement to you about using the

14   scissors?

15   **A.**  Yes.   There was a "C" on my door, and I asked what

16   that was, and he said this room is cleared, and that's

17   when I was pulling everything out.

18   **Q.**  Okay.  And what did he say to you about your use of

19   the scissors?

20   **A.**  That's when he said, you know, don't come at me with

21   a sharp object because he would shoot me if I was to come

22   at him with a sharp object.  Make sure I wasn't going to

23   try to hurt him, which I acknowledged that I was not going

24   to hurt him.  I was just going to change my colostomy bag.

25   **Q.**  At some point the police begin to talk to you about

*18-20421; USA v. CRAIG DAVID EVANS*

1    the fact that they have search warrant.  Is that fair to

2    say?

3         A.   Uh-huh.

4         Q.   They show you that they have a search warrant?

5         A.   Yes.

6         Q.   And they also talk to you about a consent form, is

7    that right?

8         A.   Correct.

9         Q.   Can you tell us -- or explain to the Court how those

10   forms were presented to you?

11        A.   First, they asked me to do the consent form, and

12   like you said, I got really reluctant and became nervous

13   because I didn't want to sign a consent form, and prior to

14   signing the consent form, he gave me the warrant saying it

15   wouldn't matter if I signed it or not because they have a

16   warrant.  So I might as well just sign it and cooperate,

17   and it would be better for me if I cooperated.

18        Q.   I will show you a copy of the search warrant that

19   was prepared that day.  Do you recognize that document?

20        A.   I didn't have my reading glasses at the time.  So it

21   is about how I seen it at that point.  They were

22   explaining to me what it was.

23        Q.   You said that you wear reading glasses?

24        A.   Yes.

25        Q.   When you were presented with that search warrant,

*18-20421; USA v. CRAIG DAVID EVANS*

1    did you have your reading glasses with you?

2        **A.**   They were in the kitchen, but I didn't put them on.

3        **Q.**   How many pages is that warrant?

4        **A.**   I don't know.  I didn't look that far.  Looks like

5    20 some pages.

6        **Q.**   Were you able to read through that warrant in its

7    entirety?

8        **A.**   No.

9        **Q.**   Why not?

10       **A.**   Because they said to sign the consent form, and if I

11   cooperated with them, it wouldn't matter if I read it or

12   not.

13       **Q.**   Did they tell you what the search warrant was for?

14       **A.**   They just told me it was to search my media devices.

15   That's all I knew it was for.  They didn't say the other

16   items you mentioned.

17       **Q.**   And so you say they presented you with a consent

18   form, and then the search warrant.  How much passes before

19   they showed you the search warrant after showing you the

20   consent form?

21       **A.**   Just five, 10 minutes.

22       **Q.**   So you see the search warrant first, and then you

23   make a decision to sign the consent form?

24       **A.**   Yes.

25       **Q.**   I want to show you what's been previously marked as

1      Government Exhibit B.  Do you recognize that document?

2          A.   Yes, that's one they gave me first.

3          Q.   Explain to the Court what it is.

4          A.   He just explained it to me that they were going to

5      pull some data off the electronic devices.

6          Q.   Look at the very first paragraph where there's a

7      blank and it has your name.  Is that your handwriting?

8          A.   No.

9          Q.   You did not write that?

10         A.   No.

11         Q.   Look in the second paragraph where there's

12     additional handwriting.  What does that handwriting say?

13         A.   It's my address 43348 Donley Drive, Sterling

14     Heights, Michigan.

15         Q.   Did you write your address on that line?

16         A.   No, I did not.

17         Q.   And if you skip down a couple of paragraphs to the

18     line that says, I state that I have standing to consent.

19     Do you see a blank space there that's filled in?

20         A.   Yes, I do.

21         Q.   Is that something that you wrote on this document?

22         A.   No, I did not.

23         Q.   And skip down to the very last paragraph, there's a

24     blank space where it says, I understand, and what's

25     written in English.  Did you write the word "English" in

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    that form?

2        **A.**   No.

3        **Q.**   Was this document filled out when they presented it

4    to you already?

5        **A.**   I don't remember it being filled out.

6        **Q.**   You said that you didn't have your reading glasses

7    on.  Did you read this form before you signed it?

8        **A.**   No, not actually.

9        **Q.**   Did the agent read it to you word for word?

10       **A.**   No.

11       **Q.**   Either Jeremy Forys or Agent Galbreath?

12       **A.**   No.

13       **Q.**   Either of the agents try to explain the form to you?

14       **A.**   Yeah, I think so.

15       **Q.**   Were you able to understand this document and what

16   you were signing?

17       **A.**   Yes.

18       **Q.**   What was your understanding in terms of what you

19   were giving them permission to look for?  What crime were

20   you giving them permission to look for?

21       **A.**   That's when they gave me the warrant.  So I already

22   knew.  By the time I signed it, I already knew because

23   they gave me the warrant what they were looking for.

24       **Q.**   So is it your testimony that you signed this consent

25   form in very large part because they presented you with

*18-20421; USA v. CRAIG DAVID EVANS*

1    the search warrant?

2        **A.**  Yes.

3        **Q.**  What specifically did they say was the connection

4    between these two documents?

5        **A.**  This was to search the computers and that's what the

6    warrant was for.  So I was giving them the right to do

7    that.

8        **Q.**  Did either agent ever tell you that you could refuse

9    to let them search your electronic equipment?

10       **A.**  No, they did never said that I could refuse.

11       **Q.**  Why were you hesitate to sign this form?

12       **A.**  Because I knew what was on the computers.

13       **Q.**  What did they tell you?  Did they say anything to

14   you about what signing this form would do for you in

15   relationship to the case?

16       **A.**  They said it would help me if I helped them in.

17   That's all they said.  If I cooperated with them -- it

18   would be better for me to cooperate than to be resistant.

19       **Q.**  I want to talk a little bit about what was going

20   through your head as all of this was taking place.

21            Agent Forys wrote in his report that they found

22   it extremely hard to keep you on a straight train of

23   thought during the interview.  Would you agree with that

24   statement?

25       **A.**  Yes.

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  Why?

2    **A.**  Because I was feeling the effects of the alcohol

3    from the night before or the late morning before.

4    **Q.**  So in part, the alcohol was causing you to be

5    scattered in your thought process?

6    **A.**  Correct.

7    **Q.**  How were you feeling aside from the alcohol?  Were

8    you comfortable at that point?

9    **A.**  Not with them there, no.

10   **Q.**  Do you have problems with anxiety?

11   **A.**  Yes.

12   **Q.**  Can you talk about that?

13   **A.**  It's hard to, but --

14   **Q.**  Have you ever been treated by a doctor for anxiety?

15   **A.**  Yes.

16   **Q.**  When you are feeling anxious, how does that affect

17   the way you think?

18   **A.**  Like, I am doing right now.  I don't want to talk

19   about it.

20   **Q.**  Does it affect you physically being anxious?

21   **A.**  Just makes me nervous.

22   **Q.**  And when you say that you get nervous, how do you

23   know you're feeling nervous, and I'm sorry.  I know these

24   are very basic questions, but we just want to understand

25   how you're feeling and what's going through your head so

*18-20421; USA v. CRAIG DAVID EVANS*

1    the Court can understand.

2        **A.**   I just start feeling real fidgety.

3        **Q.**   Would you say your heart starts to beat fast?

4        **A.**   Yes.   My blood pressure goes up.

5        **Q.**   Does it affect your breathing at all?

6        **A.**   A little bit.

7        **Q.**   And so are you feeling anxious during this

8    discussion with the officers?

9        **A.**   Yes.

10       **Q.**   And in addition to feeling the affects of the

11   alcohol?

12       **A.**   Yes.

13       **Q.**   When you figured out that focus of the conversation

14   was shifting to what was on the computer, how did that

15   make you feel toward the officers?

16       **A.**   I felt anxious about -- I realized then that they

17   were not there to help me.   That's when I realized they

18   were investigating me and not following up on the

19   complaint.

20       **Q.**   Did that make you feel defeat at all?

21       **A.**   Yes.

22       **Q.**   And you already said that you began to feel nervous.

23   So you would agree with the officer's statement in his

24   report that you began to exhibit nervous behavior?

25       **A.**   Yes.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  The agent wrote in his report that at some point you

2    told them that you hurt or kill yourself.  Do you recall

3    making that statement?

4    **A.**  Not really.  I have made statements like that in the

5    past.

6    **Q.**  You made statements like that in the past?

7    **A.**  Yes.

8    **Q.**  Have you had thoughts of suicide in your past?

9    **A.**  Yes.

10   **Q.**  What is going through your mind when you are feeling

11   suicidal?

12                **MS. WOODWARD:**  Objection to the relevance,

13   your Honor.

14                **MS. ROBINSON:**  Your Honor, I believe it is

15   relevant.  If the officers objectively are receiving

16   evidence from my client indicating that he suicidal, I

17   think it has every bit of bearing on his mental state at

18   the time of this interview, and it is relevant to this

19   Court's analysis.

20                **THE COURT:**  I'll permit the question.

21                **MS. WOODWARD:**  If I could just make a record,

22   the statement about being suicidal I believe is

23   post-duress, and I think the defendant just testified that

24   he didn't remember making the statement.

25                **THE COURT:**  Thank you.

*18-20421; USA v. CRAIG DAVID EVANS*

1            **MS. ROBINSON:**  You had thoughts of suicide in

2    the past?

3        **A.**  Yes.

4

5    **BY MS. ROBINSON:**

6        **Q.**  In fact, you had been admitted to the hospital just

7    a month earlier based on a report that you were going to

8    put a bullet in your own head, and you were taken in

9    voluntarily to the hospital?

10           **MS. WOODWARD:**  Objection to the leading.

11           **THE COURT:**  Try to avoid leading questions.

12           **MS. ROBINSON:**  I'm sorry.  I'll rephrase.

13        Have you been hospitalized in the past for

14    suicidal issues?

15        **A.**  Yes.

16

17    **BY MS. ROBINSON:**

18        **Q.**  How recently before the police were at your house?

19        **A.**  I believe May 21st.

20        **Q.**  When feeling suicidal, can you explain to the Court

21    what kind of thoughts are going through your head?

22        **A.**  Hopeless and lost, and I get like panic attacks,

23    feel like I'm suffocating.

24        **Q.**  So you feel hopeless, you feel lost, and you feel

25    like you're suffocating.  Were you feeling any of those

*18-20421; USA v. CRAIG DAVID EVANS*

1   things when the police came to your house?

2       **A.**   After they issued the warrant and stuff, yes.

3       **Q.**   At some point during the conversation after the tone

4   shifted -- let me rephrase it.

5            When during their interview did you start to

6   feel suicidal?

7       **A.**   I can't recall exactly.

8       **Q.**   I think you said earlier -- and forgive me for

9   talking over you -- I think you said earlier, it was after

10   they showed you the search warrant and you began to

11   understand --

12       **A.**   I don't remember exactly what time it was.

13       **Q.**   Do you think it was -- did your frame of mind begin

14   to shift in that direction after you signed the consent

15   form?

16       **A.**   Yes.

17       **Q.**   And so eventually you come to find also a Miranda

18   waiver.  Do you remember that?

19       **A.**   Yes.

20       **Q.**   I want to show you what has previously been marked

21   as Government Exhibit C.  Do you recognize that form?

22       **A.**   Yes, I do.

23       **Q.**   What is it, Mr. Evans?

24       **A.**   I'm sorry?

25       **Q.**   What is the document?

                *18-20421; USA v. CRAIG DAVID EVANS*

1     **A.**  Statement of rights.

2     **Q.**  Do you notice that there are a series of blank

3     spaces before each sentence on that page?

4     **A.**  Yes, they had me initial them as we read through

5     them.

6     **Q.**  And when you look towards the bottom of the

7     document, you see where it says "print name"?

8     **A.**  Yes.

9     **Q.**  Is that your name?

10    **A.**  Yes.

11    **Q.**  Did you write that?

12    **A.**  Yes.

13    **Q.**  It doesn't appear to say Craig Evans.  What was

14    going on with the last name?

15    **A.**  I was being reluctant to sign it.

16    **Q.**  Why?

17    **A.**  Because I actually didn't want to waive my rights.

18    I felt pressured to do so.

19    **Q.**  What was making you feel that pressure?

20    **A.**  Because they already had me do the other form for

21    Exhibit B, and then the warrant itself.

22    **Q.**  Okay.  So you don't actually complete your last name

23    on the printed part of this waiver?

24    **A.**  Correct.

25    **Q.**  And then what about below that where there's a

*18-20421; USA v. CRAIG DAVID EVANS*

1    signature line.  Is that your signature?

2    **A.**  Yes, sort of.

3    **Q.**  Is that the normal way your signature looks?

4    **A.**  No.

5    **Q.**  Why do you think maybe there's a difference how it

6    looks normally?

7    **A.**  Because I was reluctant to sign it.

8    **Q.**  At the time that you signed this document, were you

9    still feeling anxious?

10   **A.**  Yes.

11   **Q.**  Suicidal?

12   **A.**  Yes.

13   **Q.**  And still feeling the affects of the alcohol?

14   **A.**  Yes.

15   **Q.**  How long had the agents been at the house when you

16   signed the form?

17   **A.**  About two and a half hours.

18   **Q.**  And from what you recall you when signed this form,

19   was it at beginning of the interview, middle or towards

20   the end?

21   **A.**  Toward the end.  This probably right before I

22   changed the colostomy bag.

23   **Q.**  Now they asked you a series of questions both before

24   you signed this form and after signed it, is that correct?

25   **A.**  Yes.

*18-20421; USA v. CRAIG DAVID EVANS*

1     **Q.**  Did they ask you questions about your sexual

2   relationship with Trisha in the early part of the

3   interview?

4     **A.**  Yes.

5     **Q.**  Before you signed this form?

6     **A.**  Uh-huh.

7     **Q.**  Did they also ask you about your sexual relationship

8   with Trisha after you signed this form, and after they

9   presented the search warrant?

10     **A.**  It seemed to be the same type of questions before

11   and after.

12     **Q.**  Did they ask you questions about your interactions

13   was Trisha May in the Philippines during the first part of

14   the interview?

15     **A.**  Yes.

16     **Q.**  And did they ask you questions about your

17   interactions with Trisha May in the Philippines after you

18   were presented with a search warrant and signed this form?

19     **A.**  Yes, they were asking if I had taken photos of her

20   and stuff.

21     **Q.**  This was before and after?

22     **A.**  And I told them that I had never taken any nude

23   photography of her before she was 18.

24     **Q.**  Did they ask you questions about your general

25   interest in underage girls during the first part of the

*18-20421; USA v. CRAIG DAVID EVANS*

1    interview?

2         **A.**   Not entirely, no.

3         **Q.**   Did they ask you questions that were in that

4    general -- on that general topic?

5         **A.**   Yes.

6         **Q.**   Did they also ask those kind of questions after you

7    signed this form?

8         **A.**   Yes.

9         **Q.**   And did they talk to you about the making of sexual

10   videos before you signed this form during first part of

11   the interview, whether legal or not?

12        **A.**   Yes.

13        **Q.**   Did they also question you about sexual videos and

14   pornography after you signed this form?

15        **A.**   Yes.

16        **Q.**   Did the officers who were questioning you, did those

17   people change?  Were at any point questioned by any

18   officers besides Agent Forys and agent Galbreath?

19        **A.**   There was some lady that asked me a couple

20   questions.  I don't know who she was or anything about

21   her.

22        **Q.**   Did she ask you questions on the same topics or --

23        **A.**   On those topics, yes.

24        **Q.**   Do you remember -- you don't remember her name?

25        **A.**   No.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  All right.  Do you remember what she looked like?

2    **A.**  Not at all.

3    **Q.**  Okay.

4    **A.**  I think she was just there to gather devices or

5    something.

6    **Q.**  Had you been sitting in the same room at the same

7    table for the entirety of this interaction with the two

8    officers?

9    **A.**  Except for going outside, yes.

10   **Q.**  Was there any real break in time between the two

11   interviews, and the two interviews being before you got

12   the search warrant, before you signed the consent form,

13   before you signed the Miranda waiver and after?

14   **A.**  I'm sorry?

15   **Q.**  Was there any break in time or was this one

16   continuous --

17   **A.**  It seemed continuous to me.

18        **MS. ROBINSON:**  Your Honor, if I may have a

19   moment?

20        **THE COURT:**  Sure.

21        **MS. ROBINSON:**  I have nothing further.

22        **THE COURT:**  Thank you, Ms. Robinson.

23        Ms. Woodward?

24

25                    **CROSS EXAMINATION**


                 *18-20421; USA v. CRAIG DAVID EVANS*

1    BY MS. WOODWARD:

2

3        Q.   Good morning, Mr. Evans.

4        A.   Good morning.

5        Q.   Give me just a second.  All right.  Your attorney,

6    Ms. Robinson, asked you some questions about the night

7    before the officers came to your house.  Do you remember

8    those questions?

9        A.   Some of them, yes.

10       Q.   And that's just something we typically say, but

11   you're right.  I'm sure you don't remember every single

12   question.

13            I believe it was your testimony that the evening

14   before the officers came, that you had gone to the liquor

15   store and bought two pints of Jim Beam?

16       A.   Yes.

17       Q.   And you drank one pint and played video games?

18       A.   Yes.

19       Q.   And this was on June 10th of this year?

20       A.   Yes.

21       Q.   You also looked at child pornography that night?

22            MS. ROBINSON:  Objection, your Honor.  Number

23   one, I think it's irrelevant to the questions before the

24   Court.  The focus of this is voluntariness of his

25   statements the next day, and beyond that it is also

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    incriminating.  I don't think it should be permitted.  It

2    is irrelevant before the Court right now.

3              MS. WOODWARD:  Your Honor, just so you know,

4    I have a good faith basis for asking it.  That's what the

5    defendant told the officers during his interview, and he

6    has put that evening into question by testifying about the

7    other things that he did that night.

8         By testifying today his credibility is at issue,

9    and he also testified that when the demeanor -- or when

10   the interview shifted and he got nervous talking about the

11   consent form, I believe what he said was because he knew

12   what was on the computers.  Ms. Robinson didn't follow up,

13   but what is going on here is, of course, he knew there was

14   child pornography on the computers, and that he had looked

15   at it the night before.

16        So I think it is proper to continue asking him

17   questions about the night before since he's testified

18   already about the other things that he did that meaning.

19             MS. ROBINSON:  Your Honor, there is no value

20   whatsoever to the question of his state of mind when those

21   officers showed up that morning from a voluntariness

22   standpoint, and because it is incriminating and because

23   there are pending charges that he's been accused of

24   possession of child pornography, it is incriminating, and

25   I don't think it is relevant to this line of questioning.

*18-20421; USA v. CRAIG DAVID EVANS*

1          **THE COURT:**  He has admitted that he knew what

2      was on the --

3          **MS. WOODWARD:**  I can rephrase, if you would

4      like, to avoid ask directly to make an incriminating

5      statement under oath.

6          I could say to the defendant, when you spoke with

7      Jeremy and Kyle, you told them the last time you looked at

8      child pornography was the night before, is that right?

9      **A.**  I made copies of the files the night before.

10         **MS. ROBINSON:**  Objection, your Honor.

11         **THE COURT:**  I didn't hear the answer

12     actually.

13         **MS. ROBINSON:**  I'm sorry?

14         **THE COURT:**  I didn't hear the answer.

15         **MS. ROBINSON:**  I guess my objection is first

16     of all, it's not responsive to the question that she has

17     asked.  Ultimately, your Honor, the substance of what he

18     said is not pertinent.

19         **MS. WOODWARD:**  But his credibility is what

20     we're here to talk about.  He's testified that several of

21     the things that Agent Forys said were incorrect.

22

23     **BY MS. WOODWARD:**

24     **Q.**  And so I would just ask him, isn't it true that you

25     told Jeremy and Kyle when they interviewed you, that you

*18-20421; USA v. CRAIG DAVID EVANS*

1    had looked at child pornography the night before they

2    arrived?

3              **THE COURT:**  I'll permit that question.

4        **A.**  Yes.

5

6    BY MS. WOODWARD:

7        **Q.**  You also mentioned a moment ago about having a

8    drinking problem, is that right?

9        **A.**  Yes.

10       **Q.**  Something that you have struggled with off and on?

11       **A.**  Yes.

12       **Q.**  You've had periods of sobriety and relapses,

13   correct?

14       **A.**  Yes.

15       **Q.**  During times when you are drinking, is it fair to

16   say that your tolerance for alcohol is higher then at

17   times when you are sober?

18       **A.**  I don't remember how many times being sober.  So I

19   don't know.

20       **Q.**  You're sober right now, correct?

21       **A.**  Yes.

22       **Q.**  So as a human, if you were to have drinks today,

23   those would have a stronger affect on you than perhaps

24   they would at times when you were drinking regularly?

25       **A.**  I imagine so, yes.

                    *18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  And so at the time when the officers came to your

2    house, you had been drinking for awhile or was this your

3    first relapse?

4    **A.**  My first relapse in a little while, for quite a

5    while since January.

6    **Q.**  But you were able -- you're able today to remember

7    your conversations with officers in some detail, is that

8    right?

9    **A.**  Yes.

10   **Q.**  And you also said that you had made arrangements the

11   night before with your ex-wife to take your son to school

12   the next day, correct?

13   **A.**  Correct.

14   **Q.**  And when he contacted you that morning, he was

15   looking for a ride to school?

16   **A.**  Yes.

17   **Q.**  And the agents told you not to drive him, is that

18   your testimony?

19   **A.**  They said that I needed to stay talking with them.

20   About driving him didn't come up until he came to the

21   door, and I asked him to get a ride with his grandfather.

22   **Q.**  But had the agents not arrived that morning, and you

23   weren't expecting them, you would have driven your son to

24   school, is that correct?  Is that the plan that was made

25   the night before?

*18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**   He would have ended up getting a ride from his

2      grandfather because I would not have be able to drive.

3      **Q.**   All right.   Maybe I misunderstood your testimony.   I

4      thought you had said the night before with your ex-wife,

5      you arranged to take your son to school the next day.

6      **A.**   I was going to, but I was not capable.

7      **Q.**   That's your testimony, that had the officers not

8      been there, you would have declined to drive your son

9      because you were too inebriated?

10     **A.**   Yes, at that point.

11     **Q.**   You made statements on direct that you were

12     surprised to see Jeremy and Kyle that morning because you

13     thought they would called first, is that right?

14     **A.**   Yes.

15     **Q.**   And when they ultimately introduced themselves to

16     you, you knew them by their first names, Jeremy and Kyle?

17     **A.**   That's how they introduced themselves to me.

18     **Q.**   You knew them as Jeremy and Kyle?

19     **A.**   First time I met them was at the door.

20     **Q.**   Of course.   So I will call them Jeremy and Kyle

21     since those are the names that you used with them.

22             So you weren't entirely surprised that they were

23     there.   You were surprised that they didn't call first,

24     correct?

25     **A.**   Correct.   I was surprised that I didn't get a call

*18-20421; USA v. CRAIG DAVID EVANS*

1    first.

2      **Q.**  Because you had gone to talk to Officer Bailey

3    twice, correct?

4      **A.**  Yes.

5      **Q.**  So on May 2nd, you drove yourself to the U.S.

6    Customs Immigration Center on Jefferson in Detroit?

7      **A.**  Yes.

8      **Q.**  And you walked in and asked to speak to someone?

9      **A.**  Correct.

10     **Q.**  And you talked to Officer Bailey?

11     **A.**  Yes.

12     **Q.**  And you told him that you wanted -- I will call

13   V-1 -- deported, right?

14     **A.**  I wanted an investigation of immigration marriage

15   fraud.

16     **Q.**  You wanted an investigation into marriage fraud?

17     **A.**  Yes.

18     **Q.**  To your own marriage?

19     **A.**  Yes.

20     **Q.**  And you had told Officer Bailey that you weren't a

21   predator, right?

22         **MS. ROBINSON:**  Your Honor, I'm going to

23   object to the relevancy of this line of questioning.  It

24   is similar to what was talked about earlier, the substance

25   what he said is not pertinent beyond the fact that he made

*18-20421; USA v. CRAIG DAVID EVANS*

1        a report -- made two reports.  So I'm not sure of the

2        purposes of going into the details of this statement.

3                    **MS. WOODWARD:**  I'm not going to go line by

4        line, but the defendant's credibility is at issue, and I'm

5        simply asking him about his prior contacts with law

6        enforcement and his statements.

7                    **MS. ROBINSON:**  But, your Honor, that doesn't

8        answer the question of the relevance of this legal

9        question before the Court.

10                   **THE COURT:**  I will sustain the objection.

11                   **MS. WOODWARD:**  Then you went back to the same

12       location on May 16, correct?

13       **A.**  Correct.

14

15   **BY MS. WOODWARD:**

16       **Q.**  You were upset because you had a court date on your

17       domestic violence charge and V-1 was there, correct?

18       **A.**  Not that she was there.  That was not why I was

19       upset -- I'm sorry?

20       **Q.**  I'll rephrase.  When you went back the second time,

21       you had a court date between the two dates, is that right?

22       **A.**  I had a court date on May 16th.

23       **Q.**  So you had a court date on May 16th for domestic

24       violence?

25       **A.**  Yes.

                     *18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  And then you went from there to USCIS?

2    **A.**  Yes.

3    **Q.**  To further make a complaint about marriage fraud,

4    correct?

5    **A.**  Who you're calling V-1, changed her complaint from

6    domestic violence to that she was forced here by her

7    mother to come to the United States.

8    **Q.**  So you were giving them additional information, is

9    that fair?

10   **A.**  Yes.

11   **Q.**  Did you tell Officer Bailey at some point if she was

12   not deported, you could face time in prison?

13   **A.**  No, I didn't say face time in prison.

14   **Q.**  What did you say?

15   **A.**  My attorney didn't even tell me that I was going to

16   face jail time.

17   **Q.**  What did you say?

18                **MS. ROBINSON:**  Your Honor, objection to the

19   relevance.  It's been established that he went there not

20   once but twice, and made a report, and it was a follow up

21   on the initial investigation.  I think that's the relevant

22   fact for this line of questioning.

23                **MS. WOODWARD:**  Your Honor, this goes to bias.

24   The defendant essentially was trying to have his ex-wife

25   deported, and when they showed up to investigate, he was

*18-20421; USA v. CRAIG DAVID EVANS*

1    thrilled to see them.  Now he is testifying to something

2    different, and I think it's relevant appear probative as

3    to what bias he might have.

4              **THE COURT:**  I'll overrule the objection.

5              **MS. WOODWARD:**  So at some point did you tell

6    Officer Bailey that you would get in trouble if she was

7    not deported?

8       **A.**  Yeah, I said that I didn't want to have a domestic

9    violence go against my record.

10

11   **BY MS. WOODWARD:**

12      **Q.**  If she were deported, then there would not be a case

13   against you?

14      **A.**  Correct.  That's what my attorney in the civil suit

15   said.

16      **Q.**  Okay.  So when the agents came to your house, Jeremy

17   and Kyle, and knocked on your door, you answered the door?

18      **A.**  Yes.

19      **Q.**  It was about 7:20 in the morning?

20      **A.**  I think so.

21      **Q.**  And they identified themselves for you?

22      **A.**  Correct.

23      **Q.**  And they told you that they were there to follow up

24   on your request to have your wife deported?

25      **A.**  They were following up on the immigration marriage

                    *18-20421; USA v. CRAIG DAVID EVANS*

1      fraud.

2          **Q.**   Immigration marriage fraud, and you were excited?

3          **A.**   I was surprised to see them.

4          **Q.**   You were surprised, but you were happy to see them?

5          **A.**   I was surprised.

6          **Q.**   Were you happy to see them?

7          **A.**   Not really.  I was kind of out of it.  So there was

8      no happiness or sadness or anything like that.

9          **Q.**   You didn't say, you're finally here?  That was not

10     your response?

11         **A.**   No.

12         **Q.**   Even though you went to USCIS to press this

13     complaint, right?

14         **A.**   I went their twice, correct.

15         **Q.**   And you invited them into your home?

16         **A.**   They asked if they could come in, and I said yes.

17         **Q.**   They asked if they could come in, and you said yes?

18         **A.**   Yes.

19         **Q.**   And you brought them to your kitchen table, correct?

20         **A.**   Correct.

21         **Q.**   They didn't tell you where to sit, right?

22         **A.**   No.

23         **Q.**   It's your home, right?

24         **A.**   Yes.

25         **Q.**   And when people come to your house, you direct them

*18-20421; USA v. CRAIG DAVID EVANS*

1   where you want them to sit, right?

2        **A.**   No, they just grabbed a couple of chairs, and I

3   grabbed a chair.   I mean, the specifics of that is

4   irrelevant.

5        **Q.**   They grabbed some chairs, you grabbed a chair, and

6   you all start talking, right?

7        **A.**   Right.

8        **Q.**   All right.   And they asked you -- or Jeremy asked

9   you to start at the beginning, and tell them about your

10  relationship with V-1, right?

11       **A.**   Uh-huh.

12       **Q.**   Is that yes?

13       **A.**   Yes.

14       **Q.**   And they listened to you, right?

15       **A.**   Yes.

16       **Q.**   Kind of a long story?

17       **A.**   Yes.

18       **Q.**   Little bit convoluted, and you gave them some

19  details, right?

20       **A.**   Yes.

21       **Q.**   Did it take some time to tell them the story?

22       **A.**   Yes.

23       **Q.**   Did they seem interested in listening to what they

24  had to say?

25       **A.**   Seemed to.

*18-20421; USA v. CRAIG DAVID EVANS*

1      **Q.**  Did they ask you questions or did you -- who did

2      more of the talking, you or them?

3      **A.**  I probably did more of the talking.

4      **Q.**  So they might have asked a question, and you

5      probably would go on for a while to answer, right?

6      **A.**  Yes.

7      **Q.**  And offered to show them things at points where it

8      fitted into what you were telling them?

9      **A.**  Just the photo album.  That was the only time that I

10     went and got anything.

11     **Q.**  You went and got the photo album from the wedding?

12     **A.**  Yeah, the wedding album.

13     **Q.**  And that was in the bedroom?

14     **A.**  Yes.

15     **Q.**  What about the receipt from the hotel?

16     **A.**  That was in the photo album.  I put everything in

17     the photo album.

18     **Q.**  You told them about the hotel and receipt, correct?

19     **A.**  Yes.

20     **Q.**  And then you told them about wedding, and then you

21     showed them the documents about what you were telling

22     them, correct?

23     **A.**  Correct.  I showed them the wedding photos and all

24     the other photos.

25     **Q.**  So that sounds pretty similar to what we heard from

*18-20421; USA v. CRAIG DAVID EVANS*

1    Jeremy, but you say that when your son called, they had

2    told you not to talk to him?

3        A.   They said that it was more important to talk to them

4    than -- when he came to the door, that was almost in the

5    same couple of minutes or two.

6        Q.   Let me back up.  Your son contacted you first on the

7    phone, is that right?

8        A.   Right.

9        Q.   Before he came to the door, he contacted you on the

10   phone?

11       A.   Yes.

12       Q.   Called or texted?

13       A.   I thought he called.

14       Q.   Okay.  And did you answer the call?

15       A.   I said no.

16       Q.   Who said no?

17       A.   I said no, and I turned it on vibrate.

18       Q.   Did Jeremy or Kyle tell to you say no or was that

19   your decision?

20       A.   That was my decision when he first called.

21       Q.   He first called, and you said I'm not going to take

22   this call, and that was your decision?

23       A.   Yes.

24       Q.   I heard you say something about Jeremy or Kyle

25   telling you that speaking to them was more important.

*18-20421; USA v. CRAIG DAVID EVANS*

1    What are you talking about?  When did that happen?

2    **A.**  After the second call.

3    **Q.**  Okay.  So your son called again?

4    **A.**  Yes.

5    **Q.**  Did you answer that phone call?

6    **A.**  No.  I don't remember how many times he called.

7    **Q.**  He tried to contact you multiple times?

8    **A.**  Yes.

9    **Q.**  And you decided not to take the calls?

10   **A.**  Correct.

11   **Q.**  And at some point Jeremy or Kyle talked about that

12   with you, correct?

13   **A.**  I'm not exactly sure.

14   **Q.**  Jeremy testified that he said talk to your son.  Go

15   ahead.  I heard you say something different.  I'm trying

16   to understand what --

17   **A.**  I don't recall him saying go ahead and talk to your

18   son.

19   **Q.**  Did he affirmatively say not to talk to your son?

20   **A.**  I don't recall that either.

21   **Q.**  You don't remember that either?

22   **A.**  Correct.

23   **Q.**  Okay.  At some point your son is now at the house?

24   **A.**  Correct.

25   **Q.**  And he's there -- does he need to get things for

*18-20421; USA v. CRAIG DAVID EVANS*

—

1    school?  Does he need a ride?

2      **A.**  He was suppose to get a ride from me.  He was

3    wondering if I was going to give him a ride, and I asked

4    him to ask his grandfather who was still sitting in the

5    car if he could just get a ride from his grandfather to

6    school.

7      **Q.**  And is it at that point that either Jeremy or Kyle

8    said something to you about talking to them might be more

9    important?

10      **A.**  Yeah, I think it was around that time.

11      **Q.**  And what did they say?

12      **A.**  They just said that this matter was, you know, more

13    important.  I don't know if anyone said anything about

14    more importance or less importance.

15      **Q.**  So it's your testimony that they didn't say, hey,

16    we'll leave.  You should talk to your son.  We'll come

17    back?

18      **A.**  They never said they would leave and come back.

19      **Q.**  You never asked them to stay?

20      **A.**  I don't remember asking them to stay either, but I

21    know they didn't ask -- they didn't offer up to leave to

22    take my son somewhere or nothing like that.  They never

23    offered that up.

24      **Q.**  So you don't remember being adamant that they stay

25    in your home and continued to talk to them?

                    *18-20421; USA v. CRAIG DAVID EVANS*

1     **A.**  I wasn't adamant, no.

2     **Q.**  Okay.  So during this first portion of the

3     interview, I think Ms. Robinson was talking about the

4     first portion and the second portion.  So the first

5     portion being before you get to the electronic consent

6     form.  So during that first portion, you smoked cigarettes

7     sometimes, right?

8     **A.**  They asked me not to.  So I stepped outside.  They

9     didn't want me to.

10    **Q.**  You stepped outside to smoke cigarettes?

11    **A.**  Right.

12    **Q.**  But there were times you smoked cigarettes at the

13    table?

14    **A.**  Not the first half.

15    **Q.**  Did you stand at the door and talked to Jeremy and

16    Kyle while smoking cigarettes?

17    **A.**  At the door wall.  It's a big sliding glass door.

18    So I may have.

19    **Q.**  You may have?

20    **A.**  Yes.

21    **Q.**  Okay.  And then at the point that the agents started

22    talking about your electronic devices, that's when things

23    changed for you a little bit, correct?

24    **A.**  Yes.

25    **Q.**  You got nervous?

                    *18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  Uh-huh.  Yes.

2      **Q.**  Anxious?

3      **A.**  Yes.

4      **Q.**  And at least one of the reasons you were nervous is

5      because you knew there was child pornography on the

6      computers, correct?

7      **A.**  Yes.

8      **Q.**  But you were conflicted.  You still wanted to seem

9      like you were cooperating with the agents, right?

10     **A.**  Yes.

11     **Q.**  Because you didn't want to get in trouble, right?

12     **A.**  Yes.

13     **Q.**  And you're thinking if they find child pornography,

14     you might get in trouble, right?

15     **A.**  Yes.

16     **Q.**  And you probably know that you would get in trouble?

17     **A.**  Yes.

18     **Q.**  And you want them to focus on the immigration fraud.

19     This is your goal to take action that you wanted for your

20     wife, right?

21     **A.**  Yes.

22     **Q.**  And you felt they might be more likely to do that if

23     you were cooperative, is that fair?

24     **A.**  They told me that I should cooperate with them.

25     **Q.**  But as a person you thought, if you can seem like

*18-20421; USA v. CRAIG DAVID EVANS*

1    you're -- if you can be like the part of the interview

2    when things were friendly, then maybe you get in trouble?

3    Maybe they an still focus on your wife, is that right?

4        **A.**  Yes.

5        **Q.**  Okay.  So you stare at the form, and you don't know

6    what to do, is that fair?

7        **A.**  I knew I didn't want to sign it.

8        **Q.**  You knew you didn't want to sign it, but you wanted

9    to seem cooperative.  Are you going back and forth

10   deciding what you should do?

11       **A.**  Yes, going back and forth.

12       **Q.**  You know if you don't sign it, they will think you

13   have something on your computers that you don't want them

14   to see, right?

15       **A.**  Yes.

16       **Q.**  If you do sign it, then they find the stuff that you

17   don't want them to see, right?

18       **A.**  Yes.

19       **Q.**  So you go back and forth and you ultimately sign it,

20   right?

21       **A.**  I signed it when they were giving me the warrant.

22       **Q.**  So it is your testimony that while you are looking

23   at Government Exhibit B, the consent form, that they then

24   show you the search warrant, is that correct?

25       **A.**  Correct.

*18-20421; USA v. CRAIG DAVID EVANS*

1      **Q.**   And I think Ms. Robinson showed you the search
2   warrant, but what they give you is just the two pages,
3   correct?  It doesn't have a whole affidavit.  It's not the
4   30-40 page document?
5      **A.**   I thought it was a couple of pages.
6      **Q.**   Just the search warrant like cover sheet, right?
7      **A.**   Right.
8      **Q.**   And then there as this conversation is turning, they
9   present you with the Miranda Warnings?
10     **A.**   Yes.
11     **Q.**   Government Exhibit C?
12     **A.**   Yes.
13     **Q.**   And on Government Exhibit C we see the initial C.E.
14   seven times, right?
15     **A.**   Yes.
16     **Q.**   Next to each paragraph in the first half?
17     **A.**   Yes.
18     **Q.**   And you wrote that?
19     **A.**   Yes.
20     **Q.**   And Jeremy and Kyle were still the ones that talked
21   to you about this?
22     **A.**   Yes.
23     **Q.**   Still at the kitchen table?
24     **A.**   Uh-huh.
25     **Q.**   Yes?

*18-20421; USA v. CRAIG DAVID EVANS*

```
1       A.  Yes.

2       Q.  And they put this in front of you?

3       A.  Yes.

4       Q.  And Jeremy read it to you, correct?

5       A.  Yes, the lines.  He had me initial it by them.

6       Q.  So as he read it to you, you initialed it?

7       A.  Yes.

8       Q.  So he explained to you that it was his duty it to

9  advise you of your rights, correct?

10      A.  Yes.

11      Q.  Then he said you have the right to remain silent,

12  correct?

13      A.  Yes.

14      Q.  And you initialed it, right?

15      A.  Yes.

16      Q.  And anything that you say can be used against you in

17  a court of law or other proceeding, and you initialed it,

18  correct?

19      A.  Yes.

20      Q.  And he read this out loud.  He just didn't expect

21  you to read it, correct?

22      A.  I believe so, yes.

23      Q.  You had your reading glasses in the kitchen, but you

24  didn't have them on?

25      A.  Correct.
```

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  And then he read to you, you have the right to

2    consult an attorney before making any statement or

3    answering questions, and you initialed it?

4    **A.**  Yes.

5    **Q.**  Same for you have the right to have an attorney

6    present with you during questioning, and you initialed it?

7    **A.**  Yes.

8    **Q.**  And that if you couldn't afford an attorney, one

9    would be appointed for you, and you initialed it?

10    **A.**  Yes.

11    **Q.**  And that if you decide to answer questions, that you

12    could stop the questioning at any time, correct?

13    **A.**  Yes.

14    **Q.**  And you understood these words.  You heard things

15    like that perhaps on TV before?

16    **A.**  Yes.

17    **Q.**  You knew what he was saying?

18    **A.**  Yes.

19    **Q.**  You might have been conflicted about whether or not

20    to sign, but you knew what he was saying, right?

21    **A.**  Yes.

22    **Q.**  Okay.  And then the second half says I have read or

23    someone has read to me this statement, and I understand

24    what my rights are.  At this time I am willing to answer

25    questions about without a lawyer present, and you wrote

*18-20421; USA v. CRAIG DAVID EVANS*

1    your name, signed your name and dated it, right?

2      **A.**  Reluctantly, yes.

3      **Q.**  Reluctantly.  And sitting here today, you might

4    wished you hadn't?

5      **A.**  Yeah.

6      **Q.**  Yeah.  But at the time you signed it and you dated

7    it, and you didn't tell Jeremy or Kyle that you didn't

8    want to do it, did you?

9      **A.**  They knew that I was reluctant to do it.

10     **Q.**  You didn't state to them, I want to have an

11   attorney, did you?

12     **A.**  No, I did not.

13     **Q.**  You didn't say to them, I want to exercise my right

14   to remain silent?

15     **A.**  No.

16     **Q.**  And you didn't say, I want you to stop questioning

17   me, did you?

18     **A.**  No.

19     **Q.**  Okay.  You're saying that they were suppose to read

20   your mind and know that you were reluctant and conflicted

21   about this?

22     **A.**  No, they can't read my mind.

23     **Q.**  Okay.  Then after you signed this form, they asked

24   you more about child pornography -- or they asked you

25   about child pornography at some point?

*18-20421; USA v. CRAIG DAVID EVANS*

1    **A.**  No.  By the time this form came out, they already

2    said they found some on the computers whoever they brought

3    in.

4    **Q.**  So someone had already found child pornography by

5    the time you signed this form?

6    **A.**  Yes.

7    **Q.**  After you signed this form, they continued or asked

8    you questions about child pornography?

9    **A.**  Yes.

10   **Q.**  And you made some statements about that, right?  You

11   continued to talk with them after you signed this form,

12   correct?

13   **A.**  Yes.

14   **Q.**  At some point you were arrested and taken to this

15   courthouse, is that right?

16   **A.**  Yes.

17   **Q.**  And prior to coming down here when you were still at

18   your home, you needed to empty your colostomy bag?

19   **A.**  Change it.

20   **Q.**  Was it before -- do you remember was this right

21   before you left to come downtown that you changed the bag

22   or when was it?

23   **A.**  Pretty much right before we left.

24   **Q.**  Right before you left?

25   **A.**  Yes, approximately that time.

*18-20421; USA v. CRAIG DAVID EVANS*

1    **Q.**  At that time there's a search team in your house, is

2    that right?

3    **A.**  Yes.

4    **Q.**  So the first part of the interview you got Kyle and

5    Jeremy and you, and your son comes for a minute, right?

6    **A.**  Yes.

7    **Q.**  The second part of the interview after you went --

8    around the time you're signing this form, there's people

9    searching your house, is that right?

10   **A.**  Yes.

11   **Q.**  And you even ask Jeremy about the "C" on door to the

12   bathroom, is that right?

13   **A.**  Yes.

14   **Q.**  And he tells you that means the room has been

15   cleared?

16   **A.**  Yes.

17   **Q.**  Because at this time there is a lot more people in

18   the house, right?

19   **A.**  Right.

20   **Q.**  This was right before you left to come downtown.  It

21   was certainly after you had signed this form, correct?

22   **A.**  Yes.

23   **Q.**  And it may have been after you were under arrest?

24   **A.**  I guess so.

25   **Q.**  And when you testified on direct, you knew that

1      Jeremy and Kyle had a firearm, is that right?

2          **A.**   Yes.

3          **Q.**   Because they showed them to you?

4          **A.**   They were wearing them.

5          **Q.**   They were wearing them?

6          **A.**   Yes.

7          **Q.**   But they didn't lift their shirts up to show you?

8          **A.**   No.

9          **Q.**   Is that right?

10         **A.**   Correct.

11         **Q.**   Did you just sort of observe it as they were walking

12     around the house?

13         **A.**   Just when they were at the door and came in, I could

14     see it.

15         **Q.**   They never brandished the firearms, right?

16         **A.**   No.

17         **Q.**   They never even talked about them, right?

18         **A.**   Only when I had scissors that he didn't want me to

19     shoot him -- shoot me.

20         **Q.**   When in the bathroom changing your colostomy bag,

21     there was mention of it, but other than that, Jeremy and

22     Kyle never talked about their firearms, right?

23         **A.**   Right.

24         **Q.**   And they didn't talk about the handcuffs during that

25     portion of the interview either?

*18-20421; USA v. CRAIG DAVID EVANS*

1      **A.**  No.

2      **Q.**  Or point them out to you or anything like that?

3      **A.**  No.

4                    **MS. WOODWARD:**  If I could just have a minute,

5      your Honor.  No further questions.

6                    **THE COURT:**  Thank you.

7

8                         **REDIRECT EXAMINATION**

9

10     BY MS. ROBINSON:

11

12     **Q.**  Mr. Evans, is it fair to say that part of the reason

13     you were surprised of the officers being at your house is

14     that you've never been awaken out of your sleep before by

15     agents at your door?

16     **A.**  Yes, that's true.

17     **Q.**  The prosecutor asked you questions about how

18     enthusiastic you were when they showed up, and your

19     testimony was that you were still out of it, you were

20     still feeling drunk, and still feeling anxious when they

21     came to your house, right?

22     **A.**  Yes.

23     **Q.**  They talked a little bit with you about your

24     decision to decline your son's call when he was trying to

25     get through to you.  Why did you decide not to take his

                    *18-20421; USA v. CRAIG DAVID EVANS*

133

1    call?

2       **A.**   Because they were asking questions.

3       **Q.**   Why did you decide not to take him to school that

4    day?

5       **A.**   Because they were there.   That's why I didn't take

6    him to school.   I probably wouldn't have anyway.   I would

7    have declined because I had been drinking, and his

8    grandfather could drive.   So his grandfather drove him.

9       **Q.**   Did you feel like you had the freedom to stop the

10   interview, take your son's phone call, and take him to

11   school that day?

12      **A.**   No, I didn't.

13      **Q.**   On the times that you were moving around the house

14   to get the photos album and the receipts and so forth,

15   were you ever out of the officers' line of sight?

16      **A.**   For a brief second when I grabbed the photo album

17   because they were watching me go down the hallway, and

18   other time I got up, they said that I was making him

19   nervous.

20      **Q.**   You were making him nervous?

21      **A.**   By moving around, yes.

22      **Q.**   Do you remember which agent said that?

23      **A.**   No.

24      **Q.**   It was your testimony that you never asked the

25   officers to get you a lawyer, but did you have some

*18-20421; USA v. CRAIG DAVID EVANS*

1    conversations with them about a lawyer?

2         A.   Just probably about when they were reading me these

3    rights.

4         Q.   Do you remember what that conversation was?

5         A.   Just Miranda Rights what you see on TV or whatever.

6         Q.   Do you remember at any point in this conversation

7    asking the officer if you should get a lawyer?

8         A.   I asked if I should get a lawyer, and they said as

9    long as I cooperate with them, I didn't need one.

10        Q.   Why did you feel it was necessary to ask them if you

11   needed a lawyer?

12        A.   At that time I didn't really know that I was going

13   to be investigated, that they were going to search my

14   computers.  That was just prior to their forensic guy

15   coming in and finding anything on the computer.

16        Q.   Was there anything about the tone of the

17   conversation that made you begin to think that you would

18   need a lawyer?

19        A.   When they handed me this consent form that's when

20   the whole thing changed.  When my demeanor changed, so did

21   theirs at the same time.

22        Q.   And the last question that I have for you, the

23   prosecutor said -- and you agreed -- that there is no way

24   that you could you read -- the officers could read your

25   mind or get inside your head and figure out what was going

*18-20421; USA v. CRAIG DAVID EVANS*

1    on with you, and you would agree with that, right?

2        A.   Yes.

3        Q.   Did that change the fact that you were feeling

4    extremely anxious while this conversation was happening?

5        A.   It wouldn't change the fact.

6        Q.   Did it change the fact that you were having suicidal

7    thoughts at that time?

8        A.   No, it wouldn't change that.

9        Q.   Did it change the fact that you were still feeling

10   the affects of the alcohol during this entire -- during

11   the entirety of the interview?

12       A.   No, it wouldn't change that.

13            MS. ROBINSON:   May I have one moment, your

14   Honor?

15          No further questions.   Thank you.

16            THE COURT:   Okay.   Thank you.

17

18              (Witness excused.)

19

20            THE COURT:   How do you wish to proceed with

21   the argument?   Do you wish to do it orally or do it in

22   writing?

23            MS. WOODWARD:   We can do it orally.   It is up

24   to the Court.

25            MS. FITZHARRIS:   I'm prepared to orally

*18-20421; USA v. CRAIG DAVID EVANS*

1    argue, unless the Court would like a supplemental

2    briefing.

3                THE COURT:  I'm happy to do it orally if you

4    think it will be a relatively short argument.

5                MS. FITZHARRIS:  Hopefully so, your Honor.

6    Before we begin, is it possible to take a five minute

7    break to run to the restroom?

8                THE COURT:  Well, how about I just give you a

9    week to file a supplemental argument?

10               MS. WOODWARD:  Sure.  I think if we were

11   going to file a supplemental, we probably would have to

12   have the transcript.  Perhaps we would need more than a

13   week to get that.

14               THE COURT:  Right.  Okay.  Let's do it that

15   way, and Ron says he can get that done in a couple of

16   weeks.  So when it gets filed, we will set the date for

17   oral argument.

18               MS. WOODWARD:  Okay.  So we would get the

19   transcript and then have oral argument, or get the

20   transcript and file supplemental --

21               THE COURT:  Transcripts, and then I could go

22   either way.

23               MS. WOODWARD:  We'll talk and see what we

24   think.

25               THE COURT:  Sounds good.  Thank you.  You

*18-20421; USA v. CRAIG DAVID EVANS*

```
1    both did a fine job.
2             MS. WOODWARD:  For the other motion, I would
3    be content to just submit it on the briefs, but there is
4    another motion out there.  Perhaps if we had argument --
5             THE COURT:  The second motion addresses the
6    search warrant.
7             MS. WOODWARD:  And just for everyone here for
8    the sake of efficiency, I didn't make it clear in my
9    brief, but I would say to the Court, that we are relying
10   on the search warrant, not on the defendant's consent to
11   search the devices.  So whether the consent form was
12   validly executed, you can take that question out, and just
13   do the four corners of the search warrant, and then the
14   custodial interrogation question that we were here for
15   today.
16            THE COURT:  Okay.
17            MS. FITZHARRIS:  If you want to do oral
18   argument on that motion right now --
19            THE COURT:  Well, I don't see any reason
20   that -- you don't necessarily have supplemental argument
21   as it relates to that if you're relying on the search
22   warrant.
23            MS. WOODWARD:  Correct.
24            THE COURT:  And so that shouldn't increase
25   your burden at all, right?
```

*18-20421; USA v. CRAIG DAVID EVANS*

1    **MS. FITZHARRIS:**  Your Honor, the only reason

2    that I think the warrant has some play in this, is if the

3    government -- and Ms. Woodward has clarified the record

4    very clearly now that they are not relying on the consent

5    form -- but one basis is that if the search warrant is

6    invalid, and the -- it was used to obtain consent, then

7    the consent would also be invalid as part of the argument,

8    and so if government is relying entirely on the warrant as

9    the basis for the search, then there's no need.

10    **THE COURT:**  Well, she has good faith argument

11    as to the warrant as well, right?

12    **MS. WOODWARD:**  Yes, your Honor.

13    **MS. FITZHARRIS:**  Yes, but again, whether

14    there's good faith reliance, if there's not good faith

15    reliance on the warrant, then again, consent is an issue.

16    So --

17    **THE COURT:**  Okay.  Why don't we get the

18    transcript, and then you can confer, and talk with the

19    Court about whether oral argument is the better way or

20    supplemental.

21    **MS. FITZHARRIS:**  Okay.

22    **MS. WOODWARD:**  Okay.

23    **THE COURT:**  All right.  Thank you, again.

24

25    (Proceedings concluded.)

*18-20421; USA v. CRAIG DAVID EVANS*

1                           -   -   -

2                  C E R T I F I C A T I O N

3            I, Ronald A. DiBartolomeo, official court

4     reporter for the United States District Court, Eastern

5     District of Michigan, Southern Division, appointed

6     pursuant to the provisions of Title 28, United States

7     Code, Section 753, do hereby certify that the foregoing is

8     a correct transcript of the proceedings in the

9     above-entitled cause on the date hereinbefore set forth.

10           I do further certify that the foregoing

11    transcript has been prepared by me or under my direction.

12

13    s/Ronald A. DiBartolomeo                December 6, 2018
      Ronald A. DiBartolomeo, CSR                  Date
14    Official Court Reporter

15                          -   -   -

16

17

18

19

20

21

22

23

24

25

                    *18-20421; USA v. CRAIG DAVID EVANS*