UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                               Case No. 18-20421

v.

                               HON. GEORGE CARAM STEEH

CRAIG DAVID EVANS,

      Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTIONS TO SUPPRESS (DOCS. 20 and 21)

Before the court are two motions filed by Defendant, seeking to

suppress his statements and evidence obtained pursuant to a search

warrant.  The court held an evidentiary hearing on November 27, 2018.

The parties filed supplemental briefs on January 18, 2019.  For the reasons

explained below, Defendants' motions are denied.

## BACKGROUND FACTS

I.    Grounds for Search Warrant

Defendant Craig David Evans has been charged with one count of

receipt of child pornography and one count of possession of child

pornography.  Defendant came to the attention of law enforcement when

he was charged with domestic violence against his "fiancé" (known as V1)

in January 2018. *See* Search Warrant Affidavit at ¶¶ 7-8.  Subsequently, in May 2018, Defendant contacted the United States Citizen and Immigration Services ("USCIS") and spoke with Immigration Officer Adam Bailey. Defendant told Bailey that he wanted to have V1 deported because she did not want to live with him anymore. *Id.* at ¶ 9.  Defendant stated that he had been arrested for domestic violence against V1, but that he did not do anything wrong.  He told Bailey that he was not a "predator" and that V1 decided to dress up with Hello Kitty products on her own. *Id.* at ¶ 10. Bailey tried to get more information, but it seemed difficult for Defendant to "keep a straight train of thought." *Id.*  Defendant stated that "he had plenty of pictures and videos to provide that V1 was willing and that he was not a predator." *Id.*  Defendant told Bailey that V1 was eighteen years old at the time they married so "nobody can say anything." *Id.*

On May 16, 2018, Defendant visited USCIS a second time.  He "had a hearing in his domestic violence case, and was upset that the victim was there, and believed that USCIS should have deported the victim from the country, and she shouldn't have been there." Hearing TR at 17-18 (Doc. 34).

On May 30, 2018, agents spoke to V1. *See* Search Warrant Affidavit at ¶ 12.  She told them that she met Defendant in 2017 in the Philippines.

V1's mother created an online profile for her, when she was seventeen years old, without V1's knowledge. Defendant communicated with V1's mother online, who was pretending to be V1. V1's mother arranged a meeting between V1 and Defendant, who traveled to the Philippines when V1 was seventeen. V1's mother told V1 that she was to marry Defendant. V1 did not want to be married, but her mother told her that she did not have a choice. *Id.*

Dressed in a traditional wedding outfit by her mother, V1 first met Defendant at an airport in the Philippines. *Id.* at ¶ 13. As soon as they met, Defendant forcefully kissed V1 on the lips against her will. *Id.* They later went to a hotel, where Defendant forcefully kissed V1 again and touched her breasts. He set up a video camera and recorded/took pictures of V1 naked.

Defendant left the next day, but returned to the Philippines shortly after V1 turned eighteen. According to V1, her mother and Defendant planned to get V1 drunk. Her mother told V1 that she would give V1 and Defendant two hours alone, and that V1 would not be able to leave until she had sex with Defendant. V1 said that she did not want to, but Defendant said it was "okay because they were married." *Id.* at ¶ 15. V1 stated that Defendant had her "jerk" his privates and she complied because

she felt she did not have a choice. *Id.*

V1 came to the United States to live with Defendant on February 25, 2017. They lived in Sterling Heights, Michigan, with Defendant's adult daughter and twelve-year-old son. According to V1, Defendant began drinking and became abusive when his adult daughter moved out in June or July 2017. V1 said that Defendant "began watching videos of young girls, about five to eight years old, dancing, wearing bikinis, and sometimes naked" on a laptop. *Id.* at ¶ 17. V1 saw him "multiple times masturbating to the videos." *Id.* V1 saw Defendant watching a video of a naked girls, about seven years old, which he claimed to have found on YouTube. When V1 asked if she would be able to find the video on YouTube, Defendant said she could not. V1 said that V1's mother had sent a video to Defendant of V1's younger sister (a minor) dancing in nothing but a long shirt. V1 said that Defendant wanted to have V1 and his twelve-year-old son have sex so he could record it. *Id.* at ¶ 17.

V1 stated that Defendant would constantly try to record and photograph her naked. Defendant took pictures of V1 naked while she was in the Philippines, although she is unsure of whether the pictures showed her lower private area. Defendant threatened to post the pictures/videos online if V1 did not comply with his demands when she was in the United

States. *Id.* at ¶¶ 18-19.

U.S. Border Patrol Agent Robert Galbreath submitted an application for a search warrant for Defendant's residence, which included the above information in the supporting affidavit. On June 7, 2018, Magistrate Judge Anthony P. Patti signed the search warrant, which authorized a search of Defendant's home for evidence of receipt and possession of child pornography, sex tourism (including production of child pornography), forced labor, and stalking.

II.   <u>Interview of Defendant</u>

Agents Galbreath and Jeremy Forys went to Defendant's home in Sterling Heights on June 11, 2018, at approximately 7:20 a.m. They did not initially tell Defendant that they had a search warrant, but instead told him that they were there to ask him additional questions about his request to have V1 deported. *See* TR at 19. According to Agent Forys, Defendant was "very excited" to see them and invited them into his home. *Id.* at 21. Defendant "seemed like finally someone is here to listen to me." *Id.*

Defendant testified that he spent the night before the agents' visit playing video games and drinking bourbon. TR at 74-76. He drank a pint of Jim Beam and fell asleep between nine and ten p.m. *Id.* He woke up later and finished most of a second pint around one or two a.m. *Id.* Defendant

considers himself to be an alcoholic.  *Id.*  After the second pint, Defendant

estimated that on a scale of one to ten, he was "about a seven" in terms of

his level of intoxication.  *Id.* at 79.  When the agents arrived, Defendant

stated that he would "imagine" that he was still drunk, "[d]efinitely over the

limit of like a breathalyzer."  *Id.*  Agent Forys testified that Defendant did not

seem drunk, his speech was not slurred, and he did not smell of alcohol,

although he did note that it was difficult to keep Defendant on a "straight

train of thought."  *Id.* at 22, 42-43, 66-67.

Defendant offered the agents a seat at his kitchen table.  Agent Forys

asked Defendant to tell him about his relationship and marriage to V1. TR

at 23-24.  Defendant said that he met V1 online and went to the Philippines

in 2016 to marry her.  After retrieving a scrapbook from a back room,

Defendant showed the agents photographs from his wedding. *Id.* at 26.

During the interview, Defendant often went outside to smoke cigarettes,

while the agents waited at the kitchen table. *Id.* at 28.

At some point during the interview, Defendant's twelve-year-old son

attempted to contact him by phone, but Defendant declined his calls.  Forys

suggested that Defendant answer the phone, but Defendant "repeatedly

said this is way more important than my son." *Id.* at 27.  Forys testified that

the agents suggested that they could come back at a different time, but

Defendant wanted them to stay. *Id.* at 28.

Although Defendant testified that he did not answer his son's calls because the agents "were telling me that I needed to talk to them right now," he later acknowledged that it was his decision to decline the calls. *Id.* at 85, 119-20.  Defendant does not recall the agents telling him to talk to his son, nor does he recall the agents telling him not to talk to his son. *Id.* at 120.  He testified that he did not tell the agents that the interview was more important than his son, who "is my top priority in this entire world." *Id.* at 85-86.

At approximately 8 a.m., Defendant's son came to the door because he needed a ride to school. TR at 85-86.  Defendant told his son that the "police showed up to talk to me, and he said okay." *Id.* at 87.  His son's grandfather had driven him to Defendant's house, so Defendant asked if his grandfather could drive him the rest of the way to school. *Id.* at 86-87.  Defendant testified that he did not feel free to end the interview and take his son to school, because the agents' "demeanor towards me was we're here now.  That was going to take priority over anything else." *Id.* at 87.

At approximately 9:30 a.m., the agents asked Defendant for consent to search the electronic devices in his home.  The agents suggested that "maybe there were some communications on his phone that would back up

his story with the victim's mother and her arranging this marriage, alluding to that it was a fraudulent marriage." TR at 29.

Agent Forys testified that Defendant's demeanor "completely" changed. *Id.* at 30. Defendant began acting nervously and started chain smoking cigarettes at the kitchen table. *Id.* Defendant told the agents that his devices contained pornography depicting bondage, but they reassured him that if the pornography did not depict minors, then it was "not an issue." *Id.* at 32. Forys explained the consent form to Defendant and, after some hesitation, Defendant signed it. *Id.* at 31-32.

Forys testified that they subsequently presented Defendant with the search warrant. Defendant testified that he was given the search warrant before he signed the consent form, and that he signed it because the agents told him that "it wouldn't matter if I signed it or not because they have a warrant. So I might as well just sign it and cooperate." *Id.* at 91.

After the agents presented Defendant with the search warrant, they read him his *Miranda* rights. *Id.* at 33. Forys testified that they read the *Miranda* rights to him, "asked him if he understood each one, and then he initialed each line." *Id.* at 34. Defendant's testimony is consistent; he stated that Forys read him his rights and he initialed the form. *Id.* at 126-27. Defendant signed the *Miranda* waiver of rights form at approximately 9:50

a.m. *Id.* at 34-35.  Defendant testified that he was "reluctant" to sign the form, but he "felt pressured to do so," because "they already had me do the other form for Exhibit B [electronic consent], and then the warrant itself." *Id.* at 101.  Defendant acknowledged, however, that he understood the *Miranda* rights Forys read to him. *Id.* at 127-28.

After Defendant signed the *Miranda* waiver, the agents asked him if he had child pornography on his computers, and he admitted that he did. Defendant estimated that he had "hundreds of thousands" of files of child pornography.  Defendant told agents that he kept his "main stash" of child pornography in a safe in his son's bedroom.  He provided the agents with the combination and they found external and internal hard drives in the safe.  Although an analysis of Defendant's devices is not yet complete, over 26,000 files of child pornography have been recovered.

## LAW AND ANALYSIS

Defendant has moved to suppress the evidence obtained in the search, alleging that the warrant was not supported by probable cause. Defendant also seeks to suppress the statements he made to the agents before and after the *Miranda* warnings.[1]

---

[1] Defendant also sought to suppress evidence obtained in reliance on the electronic search consent form; however, the government disclaims any reliance on the form and relies upon the search warrant instead.

I.    Probable Cause Supporting the Search Warrant

The issuance of a search warrant requires probable cause.  U.S. Const. Amend. IV.  Probable cause exists when there is "'a fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (citation omitted).  Probable cause "is not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018)).

"Judges are not permitted to engage in 'an excessively technical dissection' of the record when determining probable cause." *Id.* (quoting *Wesby*, 138 S.Ct. at 588).  When reviewing the sufficiency of an affidavit, the court views the facts together, since "the whole is often greater than the sum of its parts," and may rely on "common-sense conclusions about human behavior." *Id.* (quoting *Wesby*, 138 S.Ct. at 587-88).  Probable cause "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Id.*

In reviewing a warrant, the court "does not write on a blank slate" and should pay the issuing judicial officer "great deference." *Tagg*, 886 F.3d at

586. "The reviewing court is not permitted to attempt a de novo review of probable cause; the issuing judge's decision should be left undisturbed if there was a 'substantial basis' for the probable-cause finding." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). An "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Id.* (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc)).

Defendant argues that the search warrant was not supported by probable cause, because it does not provide reason to believe that child pornography would be found on Defendant's electronic devices. Defendant contends that although the affidavit establishes he viewed videos of children naked, nudity is not necessarily pornographic and "child erotica" is not illegal. Viewing the totality of the circumstances, however, there was probable cause to believe that child pornography could be found on Defendant's electronic devices. Defendant began viewing the videos on his laptop only after his adult daughter moved out, when he began drinking and became abusive, and masturbated while viewing them. Defendant told V1 that she would not be able to find these videos on YouTube. Defendant also asked V1 to have sex with his twelve-year-old son so that he could record it, suggesting that he may have wanted to recreate child

pornography that he had viewed.

*United States v. Edwards*, 813 F.3d 953 (10th Cir. 2015), upon which Defendant relies, is distinguishable. In *Edwards*, the Tenth Circuit found probable cause to be lacking when the images described in the affidavit did not satisfy the definition of child pornography, but which the government admitted were child erotica. These images were viewed by an agent "trained to investigate and identify child pornography." *Id.* at 963. In contrast, the images here were viewed by V1, a layperson who is unlikely to know the difference between child erotica and child pornography and could have been describing either or both. *See id.*; *United States v. Soderstrand*, 412 F.3d 1146, 1153 (10th Cir. 2005) (layperson's description of image found on CDs in a safe depicting "several nude Asian children about 10-12 years old" as child pornography sufficient to support probable cause). Nonetheless, V1's description of the images, coupled with the other facts in the affidavit, suggest a "fair probability" that child pornography could be found on Defendant's electronic devices. A showing that child pornography could actually be found on Defendant's devices is not required. *See Tagg*, 886 F.3d at 587 ("It is elementary that an applicant for a search warrant need not allege facts establishing that a crime occurred.").

Even if the warrant was not supported by probable cause, the

evidence obtained need not be suppressed when it was "'seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897 (1984)). As the Supreme Court has emphasized: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). Exclusion of evidence obtained in violation of the Fourth Amendment "has always been our last resort, not our first impulse." *Id.* at 140 (citation omitted).

Here, the agents did not engage in sufficiently culpable conduct so as to require exclusion of the evidence obtained. The agents obtained a search warrant, which did not contain false information, was not "bare bones," and was not so facially deficient as to render the agents' reliance upon it unreasonable. *See Hython*, 443 F.3d at 484 (outlining situations in which the good faith exception does not apply). Therefore, even if the search warrant was not sufficiently supported by probable cause, the court

would apply the good faith exception to the exclusionary rule.

## II.    Motion to Suppress Statements

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 468-70 (1966), police officers must inform a custodial suspect that he has a right to remain silent and to have counsel present. *Miranda* safeguards apply if the suspect is (1) subject to interrogation; (2) while in custody. *United States v. Crowder*, 62 F.3d 782, 785-86 (6th Cir. 1995). "[F]or *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). To determine whether a suspect is in custody, courts focus on the objective circumstances surrounding the interrogation, to assess "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). "Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *Id.*

When a suspect is questioned at home, "these circumstances often

do not rise to the kind of custodial situation that necessitates *Miranda* warnings." *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). However, "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell – turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." *Panak*, 552 F.3d at 466.

A. <u>"In Custody" Requirement</u>

Defendant contends that the agents created an environment that was the functional equivalent of a custodial interrogation. Relying upon *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), Defendant argues that the length of questioning (two and a half hours) created a custodial interrogation. In determining whether an interrogation at home is custodial, the Ninth Circuit "considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *Id.* at 1083. The Sixth Circuit has not adopted this test. *United States v. Saylor*, 705 Fed. Appx. 369, 373 (6th Cir. 2017) ("The Ninth Circuit's opinion [in *Craighead*] carries limited force here because it relies on a four-factor test to distinguish

custodial from non-custodial interrogations that, although cited, . . . has not been imported into the law of our circuit."). Nonetheless, the facts do not support the conclusion that Defendant's home became a "police-dominated" atmosphere.

To the contrary, the evidence presented at the hearing demonstrates that the agents' questioning of Defendant was non-custodial. Agent Forys testified that he and Galbreath knocked on Defendant's door. Defendant answered and, although he was "surprised" to see the officers, he agreed to speak with them and invited them in. Forys testified that Defendant was "very excited" to see them. According to Defendant, the officers were in plain clothes. Although he could see that they were armed, they did not display or brandish their weapons. TR at 130-31. The officers asked Defendant to put his dog outside, which he did "to be courteous." TR at 82. They began by asking Defendant open-ended questions about his relationship with V-1 and how they met. *Id.* at 69, 83. At times during the interview, Defendant went outside to smoke cigarettes. Defendant also retrieved a photo album from his bedroom to show the officers. Defendant acknowledged that it took some time to tell his story and that he "probably did more of the talking." TR at 117-18.

At one point during the interview, Defendant's minor son called him.

Forys testified that he encouraged Defendant to answer to phone and offered to leave and come back another time. Defendant declined to answer his son's call, which he acknowledged was his decision. He did not recall Forys telling him either to answer or not answer the call. Later, his son came to the door. Defendant asked his son if he grandfather could drive him to school. Although Defendant testified that he did not feel free to terminate the interview so he could drive his son to school, he did not identify any actions on the agents' part (other than their general "demeanor towards me") that would cause a reasonable person to feel that his freedom of movement was restricted.

The court credits Agent Forys's testimony that Defendant was happy to see the officers and that he voluntarily spoke with them at the outset of the interview. The objective circumstances surrounding the interview, as described both by Forys and Defendant, indicate that the interview was non-custodial. Defendant was interviewed in his own home, by plainclothes officers, and his freedom of movement was not restrained. He was questioned in a friendly, non-accusatory manner. Although the interview was somewhat lengthy, this was due to Defendant's desire to speak to the agents about his claim of immigration fraud and to tell them his story, not the result of pressure applied by the agents. The court finds

that Defendant was not in custody prior to receiving notice of his *Miranda* rights and that a *Miranda* warning was not required during the first stage of the interview.

B. <u>Waiver of *Miranda* Rights</u>

Agent Forys and Defendant testified that the tone of the conversation changed after the officers presented Defendant with a consent form to search his electronic devices. Defendant became nervous and reluctant to sign the form. TR 84, 122-23. Defendant testified that he ultimately signed the form after the officers also presented him with the search warrant because he wanted to appear cooperative. TR 124.

The officers then presented Defendant with a form waiving his *Miranda* rights. Forys read each of the rights to Defendant, including that he had the right to remain silent and the right to an attorney. TR 126-27. Although Defendant was reluctant and conflicted about whether to sign the form, he testified that he understood the rights Forys read to him. *Id.* Defendant also acknowledged that he did not express his reluctance to the agents. TR 128. Defendant did not identify any coercive behavior on the part of the agents. Based upon the testimony of both Forys and Defendant, the court finds that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

Defendant argues that his *Miranda* waiver was ineffective because it was tainted by the pre-*Miranda* questioning. *See Missouri v. Seibert*, 542 U.S. 600, 614 (2004). In *Seibert*, the Supreme Court found that *Miranda* warnings given mid-interrogation, after the defendant had provided an unwarned confession, were ineffective and any statements repeated after the warnings were inadmissible. The *Seibert* case addressed a police policy of conducting a two-stage interrogation: asking questions, receiving a confession, *then* seeking a waiver of *Miranda* rights and eliciting a repeat confession. The Supreme Court found this approach made the *Miranda* warnings ineffective: "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Siebert,* 542 U.S. at 613. The Court was concerned that this type of deliberate, two-step interrogation strategy was used to circumvent *Miranda.*

Statements given after a midstream *Miranda* warning may be admissible if "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *United*

States v. Ray, 803 F.3d 244, 272-73 (6th Cir. 2015) (quoting Seibert, 542 U.S. at 616 (plurality opinion)).  As identified in Seibert, the factors relevant to this inquiry are "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id.

There is no evidence that the agents used a two-step interrogation strategy in an attempt to circumvent Miranda here.  Cf. Siebert, 542 U.S. at 616 ("The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid.").  The agents did not extract a confession from Defendant, give him Miranda warnings, then seek a repeat confession.  During the first stage of the interview, the agents asked open-ended questions about Defendant's relationship with V1 and his claim of immigration fraud. TR at 23, 28-29.  Defendant's statements were voluntary and uncoerced.  After Defendant signed the Miranda waiver, the interview "turned to the possibility of child pornography in the home." Id. at

37, 61.  There is no evidence that Defendant's subsequent statements were involuntary or that the agents behaved in a threatening or coercive manner.

Moreover, the agents did not engage in a *custodial* interrogation prior to issuing the *Miranda* warning.  Defendant was not in custody during the first stage of the interview and a *Miranda* warning was not required. Because the pre-*Miranda* questioning was non-custodial, the *Seibert* midstream *Miranda* warning test does not apply. *See United States v. Ray*, 690 Fed. Appx. 366, 371-72 (6th Cir. 2017) (*Siebert* test applied when defendant was subject to custodial interrogation at his home prior to *Miranda* warnings); *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (when first statement does not violate *Miranda*, *Siebert* test does not apply to post-*Miranda* statement); *United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006) (same).  For these reasons, the court finds that the *Miranda* warnings to Defendant were not ineffective under *Siebert.  See also Oregon v. Elstad*, 470 U.S. 298, 318 (1985) ("[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.").

Defendant also argues that his *Miranda* waiver was involuntary

because he was intoxicated. Agent Forys did not perceive Defendant to be intoxicated. Moreover, Defendant's own testimony demonstrates that his alleged intoxication did not affect his ability to understand his rights and voluntarily waive them. Despite his intoxication, Defendant was able to remember and recount his conversation with the agents in some detail. Once the conversation focused on his electronic devices, he had the capacity to realize that the officers "were not there to help me . . . . [T]hey were investigating me and not following up on the [marriage fraud] complaint." TR 97. He acknowledged that he understood Forys when he read him the *Miranda* rights. TR 126-27. Defendant did not testify that his intoxication impaired his ability to understand his rights or to voluntarily waive them. The court finds that under the circumstances, to the extent Defendant remained intoxicated from his previous night of drinking, his level of intoxication did not impact his ability to understand and voluntarily waive his *Miranda* rights. *See United States v. Montgomery,* 621 F.3d 568, 572 (6th Cir. 2010) ("Drug-induced impairment . . . is a matter of degree, making it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play.").

## ORDER

For these reasons, IT IS HEREBY ORDERED that Defendant's

motion to suppress evidence (Doc. 20) and motion to suppress statements (Doc. 21) are DENIED.

Dated: February 6, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE